1   **SAGASER, JONES & HELSLEY**
    2445 Capitol Street, 2nd Floor
2   Post Office Box 1632
    Fresno, California 93717-1632
3   Telephone: (559) 233-4800
    Facsimile: (559) 233-9330
4   E-Mail: ptoole@sjhattorneys.com

5   Howard A. Sagaser #072492
    Patrick D. Toole #190118
6
    Attorneys for:      Plaintiffs U.S.A. Express Cab Company, a California corporation, Alpha
7                       Transportation, Inc. dba Alpha Cab Company, a California organization,
                        Dial Dialing, Inc. dba California Cab, a California organization, City Cab
8                       Company, a California organization, Milpitas Cab, LLC, a California
                        organization, National Cab, LLC, a California corporation, and Net Cab
9                       Company, a California organization

10

11                      **UNITED STATES DISTRICT COURT**

12               **NORTHERN DISTRICT OF CALIFORNIA-SAN JOSE DIVISION**

13   U.S.A. EXPRESS CAB, LLC, a California            Case No. C07-06171 RMW
     organization; ALPHA TRANSPORTATION,
14   INC. dba ALPHA CAB COMPANY, a
     California organization; DIAL DIALING, INC.
15   dba CALIFORNIA CAB, a California
     organization; CITY CAB COMPANY, a
16   California organization; MILPITAS CAB, LLC,
     a California organization; NATIONAL CAB,
17   LLC, a California organization; and NET CAB
     COMPANY, a California organization,
18
             Plaintiffs,
19
     vs.
20
     CITY OF SAN JOSE; SAN JOSE CITY            Complaint Filed: December 5, 2007
21   COUNCIL; and DOES 1 through 10,            Trial Date:      Not Assigned
     inclusive,
22
             Defendants.
23

24           **MEMORANDUM OF POINTS AND AUTHORITIES IN**
           **SUPPORT OF EX PARTE AND PRELIMINARY INJUNCTION**
25
                          **Date:           TBA**
26                        **Time:           TBA**
                          **Dept:           6**
27
                          **Judge:          Honorable Ronald M. Whyte**
28

     {6823/002/00217645.DOC}

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  BRIEF ARGUMENT............................................................................2

III. MEET AND CONFER .........................................................................4

IV.  FACTUAL BACKGROUND................................................................5

   A.   Taxicab Service in San Jose Pre-2005 ........................................5

   B.   Taxicab Service in San Jose 2005 – Present................................6

   C.   Proposed Reallocation of Permits Effective January 1, 2008 .....7

V.   LAW AND ARGUMENT REGARDING
     TEMPORARY RESTRAINING ORDER..........................................10

   A.   An Aggrieved Party May Seek, Ex Parte,
        the Issuance of Temporary Restraining Order and
        Show Cause Regarding Preliminary Injunction..........................10

   B.   Plaintiff Cab Companies Meet the Requirements
        For Issuance of a Temporary Restraining Order.........................10

   C.   Ex Parte Relief Requested .........................................................12

   D.   Plaintiff Cab Companies
        Have Posted the Required Bond .................................................12

VI.  LAW AND ARGUMENT REGARDING PRELIMINARY INJUNCTION .......12

   A.   Standard for Preliminary Injunction ..........................................12

   B.   Plaintiffs Are Likely to Succeed on the
        Merits of Their Equal Protection Claim......................................13

        1.   The City May Not Discriminate on the Basis of Race..................13

        2.   The Plaintiff Cab Companies Have
             Suffered Invidious Discrimination.................................14

        3.   The Permit Reallocation Fails Strict Scrutiny ................18

             a.   The City Has a Compelling Interest...................................18

             b.   The City's Permit Reallocation Process
                  Is Not Narrowly Tailored......................................18

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF EX PARTE AND PRELIMINARY INJUNCTION

C07-06171 RMW

1

## TABLE OF CONTENTS

2

### (Continued)

3    C.    The City Permit Reallocation is Not "Race Neutral ..................................20

4    D.    Plaintiffs Are Likely to Succeed on the
        Merits of Their Due Process Claim ...........................................................21

5

6        1.    The City's Actions Are Arbitrary and Irrational...........................21

7        2.    Independent Constitutional Violation ............................................22

8    E.    The Equities Strongly Support an Injunction.............................................22

9    VII.    CONCLUSION.............................................................................................24

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF EX PARTE AND PRELIMINARY INJUNCTION                    C07-06171 RMW

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Abarand Contractors v. Pena,*

4
515 U.S. 200, 229 (1995)................................................................................18, 20

5

*Anderson v. United States,*

6
612 F.2d 1112, 1115 (9th Cir. 1979) ........................................................................23

7

*Associated General Contractors v. Coalition for Economic Equity,*

8
950 F.2d 1401, 1412 (9th Cir 1991) ........................................................................22

9

*Bronco Wine Co. v. United States,*

10
997 F.Supp. 1309, 1313 (E.D.C. 1996) ................................................................11, 12

11

*Cleburne v. Cleburne Living Center, Inc.,*

12
473 U.S. 432, 439 (1985)........................................................................................13

13

*Coalition for Economic Equity v. Wilson,*

14
122 F.3d 692, 701 (9th Cir. 1997) ................................................................1, 13, 14, 18

15

*Community House, Inc v. City of Boise,*

16
490 F.3d 1041, 4048 (9th Cir. 2007) ........................................................................12

17

*Coral Construct. Co. v. King County,*

18
941 F.2d 910, 916 (1991)................................................................................15, 17, 20

19

*Deblasio v. Zoning Bd. Of Adjustment,*

20
53 F.3d 592, 597 (3rd Cir. 1995) ........................................................................21

21

*Doherty v. City of Chicago,*

22
75 F.3d 318, 325 (1996)................................................................................21, 22

23

*Doran v. Salem Inn, Inc.,*

24
422 U.S. 922, 932 (1975)........................................................................2, 11, 13, 23

25

*Hunter v. Regents of the University of California,*

26
190 F.3d 1061, 1076 (9th Cir. 1999) ........................................................................1, 18

27

*Illinois Migrant Council v. Pilliod,*

28
398 F. Supp. 882, 904 (N.D. Ill 1975) ........................................................................23

## **TABLE OF AUTHORITIES**

### **(Continued)**

*In re Petersen,*
51 Cal.2d 177 (1958) ...................................................................................18

*Martin v. International Olympic Committee,*
740 F.2d 670, 674-75 (9th Circuit 1984) ..........................................................11

*Monterey Mech. Co. v. Wilson,*
125 F.3d 702, 715 (9th Cir 1997) ....................................................................22

*Planned Parenthood v. Citizens for Com. Action,*
558 F.2d 861, 867 (8th Cir. 1977) ................................................2, 11, 13, 23

*Railway Labor Executives' Ass'n v. Gibbons,*
448 U.S. 1301, 1305 (1980)..........................................................................23

*Rudebusch v. Hughes,*
313 F.3d 506, 515 (9th Cir. 2002) ...........................................................15, 17

*Serrano v. Francis,*
345 F.3d 1071, 1081 (9th Cir. 2003) ..............................................................13

*Union Pacific Railroad Co. v. Village of South Barrington,*
958 F.Supp. 1285, 1296  (N.D. Ill. 1995) ........................................................21

*United States v. Paradise,*
480 U.S. 149, 171 ........................................................................................20

*Warsoldier v. Woodford,*
418 F.3d 989, 994 (9th Cir. 2005) ..................................................................12

*Washington v. Davis,*
426 U.S. 229, 239 ...................................................................................13, 14

*Washington Capitols Basketball Club, Inc. v. Barry,*
304 F.Supp.1193, 1197 (N.D. Cal. 1969) ........................................................23

*Willowbrook v. Olech,*
528 U.S. 562, 564 (2000)..........................................................................1, 21

1

2

## **TABLE OF AUTHORITIES**

### **(Continued)**

3

*Wygant v. Jackson Bd. Of Ed.*,
476 U.S. 267, 277-278 (1986) ....................................................................................18

4

5

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)..............................................................................................13, 14

6

7

### **MISCELLANEOUS**

8

Federal Rules of Civil Procedure, Rule 65 ........................................................................4

9

Local Rule 7-2................................................................................................................10

10

Local Rule 65-1..............................................................................................................10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.

## **INTRODUCTION**

Plaintiffs U.S.A. Express Cab, LLC, a California organization; Alpha Transportation, Inc. dba Alpha Cab Company, a California organization, Dial Dialing, Inc. dba California Cab, a California organization, City Cab Company, a California organization, Milpitas Cab, LLC, a California organization, National Cab, LLC, a California organization, and Net Cab Company, a California organization (collectively "Plaintiffs" or "Cab Companies") seek a preliminary injunction preventing the City of San Jose ("City") and the City Council ("Council") (collectively "Defendants") and related officers, employees, or representatives from reallocating its taxicab Airport service permits ("Permit Reallocation") on January 1, 2008.[1]

Cab Companies seek either an expedited hearing on the preliminary injunction, or preferably, the issuance of a temporary restraining order effective January 1, 2008, with a preliminary injunction hearing on January 5, 2008.[2]   Plaintiff Cab Companies seek this emergency relief to maintain the status quo until a full evidentiary hearing can be heard on the preliminary injunction.   At most, Plaintiff Cab Companies request the Court enjoin the City and its agents from reallocating taxicab permits for only four (4) days (January 1 through January 5).   In maintaining the status quo, there is no detriment or prejudice to the City.   In fact, the City has already delayed the Permit Reallocation from September 2007 to January 2008.   Another four (4) days is of no effect.

---

[1]   As further explained below, the Permit Reallocation will redistribute current Airport permits to taxi companies based on a percentage of "off Airport" trips calculated by the City. In order to receive the permits, each company must meet a certain criteria such as maintaining a fleet of fifteen (15) vehicles.   If they qualify, the taxi company will receive a minimum of four (4) Airport permits.

[2]   Plaintiff Cab Companies are not opposed to a hearing date later than January 5th if the City will consent to an extension of the temporary restraining order for longer than ten (10) days.  Plaintiff Cab Companies are available for hearing on any Friday in January 2008.   Prior to filing this Ex Parte Application and as further discussed below, counsel for Plaintiffs and the City were unable to confirm an agreed hearing date or an extension of the temporary restraining order beyond ten (10) days should the Court issue such an Order.

Conversely, Plaintiff Cab Companies will suffer great and irreparable harm if the Permit Reallocation occurs on January 1, 2008.  The Permit Reallocation will cause Alpha Cab, National Cab and Net Cab to lose all their permits.  California Cab, City Cab, Milpitas Can and U.S.A. Express Cab will lose over fifty percent (50%) of their permits.  In turn, the Permit Reallocation is causing Plaintiff Cab Companies to lose their drivers.  In fact, several drivers have terminated their employment with Plaintiff Cab Companies to work for other cab companies who will receive a greater number of permits under the proposed Permit Reallocation.  Due to the actual and future loss of its drivers, California Cab, City Cab, Milpitas Cab and U.S.A. Express Cab will lose all of their Airport permits.  As a result, all Plaintiff Cab Companies will cease to operate.  Plaintiff Cab Companies therefore request emergency relief from this Court to enjoin the City from the planned Permit Reallocation.

## II.

## BRIEF ARGUMENT

If allowed to go into effect, the Permit Reallocation will discriminate against Plaintiffs on the basis of race. This is a form invidious discrimination prohibited by the Equal Protection clause of the United States and California Constitutions.  Currently, Plaintiffs collectively have over sixty percent (60%) of the Airport permits.  The one non-minority Company has twenty-five percent (25%) of the permits.  Under the proposed Permit Reallocation, three (3) minority owned businesses will lose all their permits and four (4) minority owned businesses will lose over fifty percent (50%) of their current permit allocation.  Simultaneously, the one (1) non-minority owned business will receive at least 55 of 105 of the Airport service permits.  This reallocation results in a seventy-five percent (75%) swing in permits to the non-minority company.

Even more egregious, none of the minority Cab Companies are slated to receive additional permits beyond the minimum allocation.  In fact, Plaintiff Cab Companies were not even considered for additional permits for unexplained reasons.  In contrast, the one non-minority cab company is receiving forty-seven (47) additional permits or nearly half (1/2) the total allocation.  With only four (4) permits each, the Plaintiff Cab Companies cannot comply

1  with the City requirement to maintain fifteen (15) cabs. When this happens, Plaintiff Cab

2  Companies will lose 100% of their current permits, which will then be given to the remaining

3  non-minority businesses. This invidious discrimination on the basis of race is not narrowly

4  tailored to meet any compelling government interest, and consequently, cannot stand.

5  *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 701 (9th Cir. 1997); *Hunter v. Regents*

6  *of the University of California*, 190 F.3d 1061, 1076 (9th Cir. 1999) (Dissenting Opinion of J.

7  Beezer)

8          Not only does the Permit Reallocation discriminate against minorities on the

9  basis of race, it has been carried out in an arbitrary manner in violation of Plaintiff's Due

10 Process rights. First, the City arbitrarily requires Plaintiffs to maintain a fleet of fifteen (15)

11 taxicabs to be allocated *any* Airport permits. This requirement is arbitrary since the City only

12 requires a business to operate five (5) taxicabs to be considered a taxicab company. There is

13 no rational basis to require fifteen (15) cabs to obtain four (4) permits.[3] This ratio of nearly

14 four to one (4 to 1) is an insufficient number of permits with which to support such a large fleet

15 of taxicabs.

16          Second, the manner of counting "off-Airport" trips that is the basis of the

17 reallocation is totally arbitrary and capricious. There was, and is, no guideline to determine

18 what constitutes an "off Airport" trip. Even so, the City arbitrarily reduced the number of

19 reported "off-Airport" trips by some minority owned cab companies by fifty percent (50%).

20 However, non-minority owned taxicab companies only had their unverified "off-Airport" trips

21 reduced by the "estimated" number of unverified trips. Thus, the final Permit Reallocation

22 allocates permits on some unknown and unspecified calculation. This is unconstitutional.

23 *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

24          Third, the final allocation proposed by the City on December 10, 2007, does not

25 allocate permits to <u>all</u> companies who reported "off Airport" trips. For unknown and

26 ///

27

28 [3]    This is especially true when considering the City allocated each registered cab company
   seven (7) permits in 2005 without regard to fleet size.

{6823/002/00217645.DOC}                                    3

1  unexplained reasons, the City did not count <u>any</u> of the Plaintiff minority Cab Companies trips.

2  In fact, the City totally <u>excluded</u> Plaintiff Cab Companies from the process.

3          Finally, the equities weigh strongly in favor of an injunction.  An injunction is

4  proper where the plaintiff will suffer a deprivation of constitutionally protected rights. *Planned*

5  *Parenthood v. Citizens for Com. Action*, 558 F.2d 861, 867 (1977).  In particular, an injunction

6  is proper where a substantial loss of business is threatened. *Doran v. Salem Inn, Inc.*, 422 U.S.

7  922, 932 (1975).  Here, the Permit Reallocation will infringe on Plaintiffs' Equal Protection

8  and Due Process Rights.   Additionally, it is unquestioned that depriving Plaintiff Cab

9  Companies of their Airport Permits will destroy their business.   Demand in San Jose will

10  support only a two to one ratio of total cabs to Airport permits. (Bhatia Dec., ¶ 19; Lasher Dec.,

11  ¶ 19; Pooni Dec. ¶ 19; Woldegebrial Dec. ¶ 13.) Because the Taxicab companies will have

12  insufficient Airport permits to support such a large fleet of taxicabs and drivers, the Plaintiffs

13  will quickly lose drivers to competitors who are receiving a greater allocation of permits.

14  (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19; Woldegebrial Dec., ¶ 13.) (Active

15  Driver Decl., ¶ 10; Gebrehiwot Tesfandries Decl., ¶ 6.)  Soon, Plaintiffs will fall below the

16  fifteen (15) cab and fifteen (15) driver requirements, thereby losing <u>all</u> of their Airport permits.

17  The result and intended discriminatory effect of this regulation is to drive minority companies

18  out of business.  Either ground is sufficient to issue an injunction.  (*Id.*)  By comparison, the

19  City will suffer no detriment or prejudice if an injunction should issue.  In fact, the City has

20  already delayed the Permit Reallocation from September 1, 2007 to January 1, 2008; a mere

21  four (4) additional days is of no moment.  Accordingly, a temporary and preliminary injunction

22  must issue.

23                                               **III.**

24                                    **MEET AND CONFER**

25          Plaintiff Cab Companies served the Complaint on December 10, 2007.

26  (Declaration of Lisa Silva ["Silva Decl."], ¶ 2.)  On the same date, Plaintiff Cab Companies

27  contacted the City's Attorney's Office to determine which attorney would handle the action.

28  (Silva Decl., ¶ 3.)  Plaintiff Cab Companies' counsel was informed by the City Attorney's

1 │ Office that the person designating assignments was out of the office on that day and would

2 │ return the next day, December 11, 2007. (Silva Decl., ¶ 4.)

3 │         On the morning of December 11, 2007, Plaintiff Cab Companies' counsel

4 │ contacted with Mr. George Rios, Assistant City Attorney, at approximately 10:15 a.m.

5 │ Plaintiff Cab Companies' counsel left a detailed message regarding the filing of the action and

6 │ the Plaintiff Cab Companies' intent to seek a temporary restraining order or preliminary

7 │ injunction as soon as possible. (Silva Decl., ¶ 5.) There was no response from Mr. Rios.

8 │ Plaintiff Cab Companies' counsel again initiated contact at approximately 3:00 p.m. on the

9 │ afternoon of December 11, 2007, regarding the filing of an ex parte application. (Silva Decl., ¶

10 │ 6.) Mr. Rios informed Plaintiff Cab Companies' counsel that no assignment had been made,

11 │ but that the matter would be referred to counsel within 24 hours. (Declaration of Patrick D.

12 │ Toole ["Toole Decl."], ¶ 2.)

13 │         On December 13, 2007, Plaintiff Cab Companies' counsel again contacted Mr.

14 │ Rios of the City Attorney's Office at approximately 1:20 p.m. (Toole Decl., ¶ 3.) At this time,

15 │ Mr. Rios' assistant informed Plaintiff Cab Companies' counsel that Ms. Daisy Nishigaya was

16 │ assigned the action on behalf of the City.

17 │         Plaintiff Cab Companies contacted Ms. Nishigaya to discuss the scheduling of a

18 │ temporary restraining order and the preliminary injunction hearing on Friday, December 14,

19 │ 2007. (Toole Decl., ¶ 5.) As to the filing of this motion, counsel were unable to confirm a date

20 │ or procedure for the ex parte or agreement upon an expedited date for hearing the preliminary

21 │ injunction. (Toole Decl., ¶ 6.) Given the short time available, Plaintiff Cab Companies elected

22 │ to file the ex parte as soon as possible and agreed to electronic service on the City. (Toole

23 │ Decl., ¶ 7.)

24 │ **IV.**

25 │ **FACTUAL BACKGROUND**

26 │ A.    **Taxicab Service in San Jose Pre-2005**

27 │         City Ordinance 6.64.140 requires a company own and operate a minimum of

28 │ five (5) taxicabs to operate a taxicab company in the City. (Complaint ¶ 20.) Prior to 2005,

{6823/002/00217645.DOC}         5

1    few taxicabs companies operated more than this minimum number. (Bhatia Dec., ¶¶ 6-7;

2    Lasher Dec., ¶¶ 6-7; Pooni Dec., ¶¶ 6-7; Woldegebrial Dec., ¶ 6.) In fact, the only taxi service

3    with more than ten (10) cabs at this time were United Cab and Yellow Cab ("Yellow"). There

4    was little demand for taxicab services in San Jose, excepting the Airport. Thus, without

5    Airport service, companies could not grow beyond the five (5) or seven (7) car fleet. (Id.)

6    From 1994 to 2004, the City had granted exclusive concessions to Yellow and

7    United Cab to provide taxicab services at the Mineta San Jose International Airport

8    ("Airport"). (Complaint ¶ 22.) Under this exclusive agreement, other taxi services, including

9    Plaintiffs, were not allowed to pick up customers at the Airport. The companies were only

10   allowed to service other areas of the City. As a result, there was little competition and overall

11   service was poor. In 2004, a report commissioned by the City found that complaints about taxi

12   service at the Airport and in the community rose to historic levels. (Complaint¶ 23.)

13   **B.    Taxicab Service in San Jose 2005 - Present**

14   In an effort to improve overall service, the City decided to open the Airport to

15   all taxicab companies in 2005. (Complaint ¶ 24.) The City issued 300 Airport service permits:

16   195 permits directly to individual taxicab drivers and 105 to taxicab companies. (Complaint ¶

17   26, 27.) Each registered taxicab company received a minimum of seven permits regardless of

18   fleet size. (Complaint ¶ 27.) To improve service to the San Jose community, permitted

19   taxicabs were prohibited from operating at the Airport on consecutive days. On the days the

20   taxicab was prohibited from working at the Airport, the taxicab was required to complete four

21   (4) "off-Airport" trips. (Id.)

22   The Airport permits were valid for a two-year period, 2005 to September 2007.

23   (Complaint ¶ 34.) During this time, taxicab companies were required to report all "off-

24   Airport" trips completed by permitted taxicabs to the City. (Id.) Plaintiffs were told that "off-

25   Airport" trips were those originating at a location other than the Airport. (Id.) However, the

26   City never clearly defined what constituted an "off-Airport" trip. (Complaint ¶ 34; Bhatia

27   Dec., ¶ 13; Lasher Dec., ¶ 13; Pooni Dec., ¶ 13; Woldegebrial Dec., ¶ 9.) Further, the City was

28   unclear if only permitted cabs or all company cabs were to be considered when counting "off

Airport" trips. (*Id.*) The total number of "off-Airport" trips completed July 1, 2006 to June 30, 2007 became the basis for permit reallocations that will take effect in 2008. (Complaint 34; Bhatia Dec., ¶ 13; Lasher Dec., ¶ 13; 7; Pooni Dec., ¶ 13, 7; Woldegebrial Dec., ¶ 9.)

During the time period between 2005 and 2007, Plaintiff Cab Companies were able to increase the size of their fleet, number of employee's hired, and total number of trips completed.  (Bhatia Dec., ¶¶ 6, 7; Lasher Dec., ¶¶ 6, 7; Pooni Dec., ¶¶ 6, 7;  Woldegebrial Dec., ¶ 6.)  At the same time, taxicab service at the Airport and in the City improved.

**C.    Proposed Reallocation of Permits Effective January 1, 2008**

In the September 2007, the City issued its findings of reported "off Airport" trips.  The City found the following:

| | |
|---|---|
| Alpha | 29,164 |
| American | 0 |
| California | 22,111 |
| City Cab | 16,074 |
| Executive | 14,081 |
| Golden Star | 41,690 |
| Milpitas | 15,994 |
| National | 0 |
| Net | 11,645 |
| Rainbow | 67,241 |
| SV Checker | **111,779** |
| United | 57,285 |
| USA Express | 16, 959 |
| Yellow | **337,684** |

(Complaint ¶ 38.)

The City was unable to verify the "off-Airport" trip totals for three companies, Plaintiff National, Plaintiff Net Cab, and non-party Yellow. (Complaint, ¶¶ 39 and 40.) For Net Cab, the City arbitrarily reduced the number of off-Airport trips by fifty percent (50%) to 11, 645. (Lasher Dec., ¶ 20) For National, the City did not count any of approximately 6,700 "off-Airport" trips submitted. (Woldegebrial Dec., ¶7.) In contrast, the City reduced the number of reported Yellow "off-Airport" trips by an estimated amount of trips the City could not verify. The City has offered no explanation for the difference in treatment.

Based on these arbitrary numbers, the City proposed to reallocate permits to the remaining taxi companies in October 2007.  (Complaint, ¶ 44.) This reallocation was strictly

based on a percentage of verified "off-Airport" trips. (Complaint, ¶ 44.) For example, a qualified company with twenty percent (20%) of the total "off-Airport" trips was to receive twenty percent (20%) of the Airport Permits in 2008. Due to opposition from multiple taxi companies, including Plaintiffs, the City tabled the allocation to November 20, 2007. After public comment, the City decided to adopt the Permit Allocation with the proviso that all qualified companies would receive a minimum of four (4) Airport Permits. (Complaint, ¶ 46.) Additional permits would be allocated by calculating "off-Airport" trips. (Complaint, ¶¶ 46-47.) The City presented its revised findings in a December 12, 2007, letter as follows:

| Company | San Jose Trips | % of San Jose Trips* | Minimum Allocation | Companies Earning Over 4 Permits Percentage of 462, 398 trips | Additional Permits earned | Total Permits Allocated |
|---|---|---|---|---|---|---|
| California | 19167 | .037% | 4 | | 0 | 4 |
| City | 7998 | .015% | 4 | | 0 | 4 |
| Executive | 11209 | .021% | 4 | | 0 | 4 |
| Golden Star | 36938 | .071% | 4 | .079% | 5 | 9 |
| Milpitas | 7894 | .015% | 4 | | 0 | 4 |
| Rainbow | 58269 | .111% | 4 | 126% | 8 | 12 |
| SV Checker | 74014 | .141% | 4 | 160% | 10 | 14 |
| United | 32154 | .061% | 4 | .069% | 5 | 9 |
| USA Express | 14922 | .028% | 4 | | 0 | 4 |
| Yellow | 261023 | .499% | 4 | .564% | 37 | 41 |
| | 523588 | | 40 | | 65 | 105 |

* % of San Jose trips for companies earning more than 4 permit minimum based on companies percentage of 462,398 trips. Total San Jose trips for Golden Star Cab reduced by 50% due to the lack of sufficient verifiable data by this company.

Note: The following companies were not eligible to participate in the reallocation due to not having met all of the, minimum requirements for eligibility; All Star Cab, Alpha Cab, American Cab, National Cab and Net Cab.

(Lasher Dec ¶ 25.)

///

///

To obtain the permits for 2008, the City imposed several <u>new</u> obligations on all Airport permitees. To qualify for a 2008 allocation, each taxicab must own or operate fifteen (15) taxicabs, complete twenty five percent (25%) of Airport trips with alternative fuel vehicles, track trips using GPS devices and computer-operated dispatch, complete customer service training. (Complaint ¶45.) If a Taxicab company does not meet all of these requirements, the company will receive <u>zero</u> (0) Airport service permits in 2008. (Complaint ¶ 46.)

It is not economically feasible for the taxicab companies to maintain a fleet of fifteen (15) taxicabs with only four (4) Airport permits. Currently, demand in the City will support two (2) taxicabs for every one (1) Airport permit. Under the proposed reallocation, at best, the City is demanding that one Airport permit support four (4) taxicabs. Unfortunately, the demand in San Jose will not support such an obligation. (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19; Woldegebrial Dec., ¶ 13.) Furthermore, the fifteen (15) cab fleet requirement was imposed on the Cab Companies without meaningful notice, or input from the effected Cab Companies. (Bhatia Dec., ¶ 20; Lasher Dec., ¶ 20; Pooni Dec., ¶ 20; Woldegebrial Dec., ¶ 14.)

Many taxicab drivers are hired on the condition that they are allotted an Airport permit by their employer. (Bhatia Dec., ¶¶ 6-7 Lasher Dec., ¶¶ 6-7; Pooni Dec., ¶¶ 6-7; Woldegebrial Dec., ¶ 5.) These drivers have notified their employers that if the permit reallocation goes into effect they will be forced to quit because they will not be able to make a living working only in the City. (Bhatia Dec., ¶¶ 21-22; Lasher Dec., ¶¶ 21-22; Pooni Dec., ¶ 21-22; Woldegebrial Dec., ¶15-16; Active Driver Declarations[4], ¶ 10; Gebrehiwot Tesafandries Decl., ¶ 8.)

---

[4] With this filing, Plaintiffs have gathered 38 declarations from current drivers. They are: Amanpreet Singh Bath; Dagnechew Anbesso Bekele; Tesfahun Demissie Beshah; Daniel Melesse Damma; Hassan Mohammed Egal; Tesfai Embaye; Adem Arale Kahin; Said Farah Koreye; Deeq Abdi Mursal; Trong Hoang Phan; Kamaljit Singh; Swran Singh; John Ronald Stark; Abebayehu Tedesse Wossen; David Alan Yukutat; Bajinder Singh Bains; John Ballone; Anthony Murray Barron; Gurmail Singh Bath; Herminia Bryars; Harpal Singh Chahal; Engida Tedesse Degefu; Negussu Awlachew Gebra; Nashih Bariagabir Gilazgi; Ali Abdiaziz Hasan;

1    In fact, multiple taxicab drivers have already quit and begun working for taxicab

2  companies that will receive a large allocation under the proposed reallocation. (Bhatia Dec., ¶¶

3  21-22; Lasher Dec., ¶¶ 21-22; Pooni Dec., ¶¶ 21-22; Woldegebrial Dec., ¶¶ 15-16; Gebrehiwot

4  Tesfandries Decl., ¶8.)   Because of the injuries suffered, Plaintiffs request that an injunction

5  issue immediately preventing the reallocation of Airport service permits.

6                                   **V.**

7  **LAW AND ARGUMENT REGARDING TEMPORARY RESTRAINING ORDER**

8  **A.    An Aggrieved Party May Seek, Ex Parte, the Issuance of Temporary
         Restraining Order and Show Cause Regarding Preliminary Injunction**

9

10    Local Rule 65-1 allows parties to request, Ex Parte, temporary restraining orders

11  as long as they are accompanied by a copy of the complaint, a separate memorandum appoints

12  to authorities in support of the ex parte motion, proposed order, and other documents in support

13  of the motion which the party wishes the court to consider.  (Id.)

14    Plaintiff Cab Companies have complied with these requirements.  Attached to

15  this filing is a copy of this Complaint (Silva Decl., ¶ 8), two (2) proposed orders, thirty-nine

16  (39) separate declarations of drivers, four (4) declarations of the Cab Company owners, and

17  two (2) declarations from counsel or staff.  In addition, counsel for Plaintiff Cab Companies

18  has met and conferred with the City Council in an effort to resolve the matter without the need

19  for ex parte relief.  (Toole Decl., ¶¶ 2-7.)  Due to the limited timeframe, the parties were unable

20  to reach an agreement and Plaintiff Cab Companies are required to proceed immediately to

21  avoid further irreparable injury.

22  **B.    Plaintiff Cab Companies Meet the Requirements
         For Issuance of a Temporary Restraining Order**

23

24    The reallocation of Airport permits is effective January 1, 2008.  Given the

25  Court's requirement of thirty-five (35) days notice (Local Rule 7-2), Plaintiff Cab Companies

26  _____

27  Harjinder Singh; Kulwant Singh; Shamsher Singh; Mozelo Tesfamariam; Mohamed Elmi;
    Mussie Haile; Ali Muse; Alex Olhsanya Oguhlade; Amarvir Singh; Varinder Singh; Sewa

28  Sahota; Vali Aprebisedleh; Haile Gebremeskel; Belew Yifro.  Collectively, these are referred
    to as the "Active Driver Declarations."
    {6823/002/00217645.DOC}                         10

1    cannot have a regularly noticed motion heard prior to January 1, 2008. As such, Plaintiff Cab

2    Companies must seek emergency relief from this Court.

3            A court has authority to grant a temporary restraining order in the exercise of its

4    equitable powers. *Federal Rules of Civil Procedure, Rule 65.* The purpose of a temporary

5    restraining order is to preserve the status quo pending a full hearing on a preliminary

6    injunction. *Bronco Wine Co. v. United States*, 997 F.Supp. 1309, 1313 (E.D.C. 1996). In

7    seeking emergency relief, the party must meet the standard for preliminary injunctive relief.

8    (*Id.*)  Alternatively, if a moving party can demonstrate irreparable injury or if "serious

9    questions" are raised and the balance of hardships tip sharply in a moving party's favor, an

10   injunction should issue. *Martin v. International Olympic Committee*, 740 F.2d 670, 674-75

11   (9th Circuit 1984).

12           Plaintiff Cab Companies claim that both standards are met in this case. As

13   argued below, Cab Companies will suffer irreparable injury if the relief is not granted.

14   Plaintiff Cab Companies have the likelihood of success on the merits, and the City will not be

15   harmed at all by the injunction.[5]

16           Alternatively, moving parties will suffer irreparable injury and the balance of

17   hardship tips sharply in the Plaintiff Cab Companies' favor. As evidenced by the

18   accompanying declarations from forty-four (44) drivers and owners, the City's Permit

19   Reallocation will destroy Plaintiff Cab Companies if put into effect. (Bhatia Dec. ¶ 19; Lasher

20   Dec. ¶ 19; Pooni Dec. ¶ 19; Woldegebrial Dec. ¶ 13..)  As this Court is well aware, an

21   injunction is proper where there is a substantial loss of business is threatened or where the

22   plaintiff will suffer a deprivation of constitutionally protected rights. *Planned Parenthood v.*

23   *Citizens for Com. Action*, 558 F.2d 861, 867 (1977); *Doran v. Salem Inn, Inc.*, 422 U.S. 922,

24   932 (1975). Both rights are affected here.

25   ///

26

27   [5]    As the majority of this Memorandum of Points & Authorities discusses these issues,

28   Plaintiff Cab Companies will not restate them here, but simply incorporate by reference the
     Law and Argument regarding Preliminary Injunction, *infra.*

     {6823/002/00217645.DOC}                              11

1    Moreover, there is no hardship to the City to enjoin the Permit Reallocation.

2    The City will not go out of business, lose its customers, or otherwise be affected by an

3    emergency or preliminary injunction. Indeed, the City has already delayed its implementation

4    of the Permit Reallocation from September 1, 2007 to January 1, 2008 without incident.

5    Issuing a temporary restraining order for even ten (10) days appears to have little or no impact

6    on the City. As such, the irreparable injury coupled with the balance of hardship weighs in

7    favor of issuing an injunction. (*Bronco Wine Co., supra.*)

8    **C.      Ex Parte Relief Requested**

9          Plaintiff Cab Companies seek to enjoin the City from enforcing its taxicab

10   permit reallocation effective January 1, 2008. Plaintiff Cab Companies want to shorten time to

11   hear the preliminary injunction motion prior to January 1, 2008 **or** have the Court issue a

12   temporary restraining order effective January 1, 2008 and schedule a preliminary injunction

13   hearing for January 5, 2008. Of course, the Plaintiff Cab Companies have no objection to

14   having a later hearing date assuming the City will stipulate to an extension of a temporary

15   restraining order beyond ten days. If so, every Friday in January is open for Plaintiffs.

16   **D.      Plaintiff Cab Companies Have Posted the Required Bond**

17         Although the action seeks to maintain the status quo, Plaintiff Cab Companies

18   have already secured and lodged with the Court an undertaking in the amount of $10,000 so

19   that temporary restraining order or preliminary injunction may issue. (Silva Decl., ¶ 7.)

20                                      **VI.**

21   **LAW AND ARGUMENT REGARDING PRELIMINARY INJUNCTION**

22   **A.      Standard for Preliminary Injunction**

23         A plaintiff is entitled to a preliminary injunction upon a showing of "either (1) a

24   likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence

25   of serious questions going to the merits and the balance of hardships tipping in the moving

26   party's favor." *Community House, Inc v. City of Boise*, 490 F.3d 1041, 4048 (9th Cir. 2007).

27   "These two alternatives represent extremes of a single continuum, rather than two separate

28   tests." *Id.* (citing *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). An injunction is

{6823/002/00217645.DOC}                          12

proper where the plaintiff will suffer a deprivation of constitutionally protected right. *Planned Parenthood v. Citizens for Com. Action*, 558 F.2d 861, 867 (1977). In addition, an injunction is proper where as here a substantial lose of business is threatened. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).

Plaintiffs have asserted two causes of action upon which they are likely to succeed. Plaintiffs have been discriminated against on the basis of race in violation of the Equal Protection Clause. Additionally, the City's actions are arbitrary and unreasonable in violation of Due Process. Either ground is sufficient to warrant injunctive relief. (*Id.*)

**B.** **Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim**

    **1.** **The City May Not Discriminate on the Basis of Race**

The Supreme Court has held that "[t]he central purpose of the *Equal Protection Clause of the Fourteenth Amendment* is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (emphasis in original). "The ultimate goal of the *Equal Protection Clause* is to do away with all governmentally imposed discrimination based on race." *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 701 (9th Cir 1997) (internal quotation marks omitted). "Therefore, whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Coalition for Economic Equity v. Wilson*, *supra*, 122 F.3d at 701 (internal quotation mark omitted).

The Ninth Circuit Court of Appeals has held that "[a]ny governmental action that classifies persons by race is presumptively unconstitutional and subject to the most exacting judicial scrutiny. *Coalition for Economic Equality v. Wilson*, *supra*, 122 F.3d at 702. Essentially, the Equal Protection Clause is a directive "that all persons similarly situated should be treated alike." *Serrano v. Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (quoting *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).

"A statute, otherwise neutral on its face, must not be applied so invidiously to discriminate on the basis of race." *Washington v. Davis*, *supra,* 426 U.S. at 241 (citing *Yick Wo*

1  *v. Hopkins*, 118 U.S. 356 (1886)).  The test for determining whether a legislative scheme is

2  constitutionally valid, the racial classification, "regardless of its purported motivation, must be

3  narrowly tailored to serve a compelling governmental interest, an extraordinary justification."

4  *Coalition for Economic Equality v. Wilson*, *supra*, 122 F.3d at 702. Where the legislative

5  scheme is facially neutral, "invidious discriminatory purpose may often be inferred from the

6  totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on

7  one race than others."

8      2.    **The Plaintiff Cab Companies Have Suffered Invidious Discrimination**

9          The first step in determining whether a law violates the Equal Protection Clause

10  is to identify the classification that it draws.  *Coalition for Economic Equity v. Wilson*, *supra*,

11  122 F.3d at 702. "A statute, otherwise neutral on its face, must not be applied so invidiously to

12  discriminate on the basis of race." *Washington v. Davis*, *supra,* 426 U.S. at 241 (citing *Yick Wo*

13  *v. Hopkins*, 118 U.S. 356 (1886)).

14          In the present case, Plaintiffs are all members of racial minorities, either Punjabi

15  or Ethiopian.  (Bhatia Dec. ¶ 3; Lasher Dec. ¶ 3; Pooni Dec. ¶ 3;  Woldegebrial Dec. ¶ 3.)

16  Because the Taxicab companies will have insufficient Airport permits to support such a large

17  fleet of taxicabs and drivers, the Plaintiffs will quickly lose drivers to competitors who are

18  receiving a greater allocation of permits. (Bhatia Dec. ¶ 19; Lasher Dec. ¶ 19; Pooni Dec. ¶ 19;

19  Woldegebrial Dec. ¶ 13; Active Driver Decl., ¶ 10; Gebrehiwot Tesfandries Decl., ¶ 6.)  Soon,

20  Plaintiffs will fall below the fifteen cab and fifteen driver requirements, thereby losing all of

21  their Airport permits.  The result and intended effect of this regulation is to drive minority

22  companies Admittedly, the regulation at issue does not blatantly discriminate on the basis of

23  race on its face.  However, the Permit Reallocation does discriminate against minorities as

24  applied in violation of the Equal Protection Clause. *Washington v. Davis*, *supra*, 426 U.S. at

25  241.

26          The invidious discrimination is manifested in multiple ways. First, the Plaintiff

27  Cab Companies can establish statistical discrimination in the reduction of Airport permits.

28  Statistical comparisons are an " 'invaluable tool' in evaluating the extent of discrimination

1   warranting a response. […] '[W]here gross statistical disparities can be shown, they **alone** may

2   in a proper case constitute prima facie proof of a pattern or practice of discrimination.'"

3   *Rudebusch v. Hughes*, 313 F.3d 506, 515 (9th Cir. 2002) (quoting *Coral Construct. Co. v. King*

4   *County*, 941 F.2d 910, 916 (1991) (Emphasis Added.).)  This is such a case.

5           Plaintiff Cab Companies currently hold approximately sixty percent (60%) of

6   the total Airport service permits. (Complaint, ¶ 31.)  Under the proposed reallocation, Plaintiffs

7   will have their number reduced to fifteen percent (15%) of the Airport permits allocated to

8   businesses. (Lasher Dec. ¶ 25.)  In contrast, the non-minority taxicab companies, who currently

9   hold approximately twenty-five percent (25%) of the permits, will receive at least fifty five

10  percent (55%) of the permits under the permit reallocation. (Lasher Dec. ¶ 25.)  That means

11  seventy-five percent (75%) of the Airport permits are changing hands.

12          More importantly, this discrepancy will only widen with time.  As established

13  by the owner and driver declarations submitted in support of this Motion, Airport permits are a

14  condition of employment.  (Bhatia Dec., ¶ 7; Lasher Dec., ¶ 7; Pooni Dec., ¶ 7; Woldegebrial

15  Dec., ¶ 5.)  If there are no Airport permits, or if the numbers are reduced, then the drivers will

16  move on.  (Bhatia Dec., ¶¶ 19; Lasher Dec., ¶¶ 19; Pooni Dec., ¶¶ 19; Woldegebrial Dec., ¶

17  13.Without fifteen cabs and drivers, Plaintiff Cab Companies are not eligible for any Airport

18  permits.  (Bhatia Dec., ¶¶ 19; Lasher Dec., ¶¶ 19; Pooni Dec., ¶¶ 19; Woldegebrial Dec., ¶ 13..)

19  In fact, three Plaintiffs (Alpha Cab, National Cab and Net Cab) were excluded from the Airport

20  Permit Reallocation because they could not meet the fifteen (15) cab requirement.  (Lasher Dec

21  ¶ 25.)  The remaining Plaintiffs (California Cab, City Cab, Milpitas Cab and U.S.A. Express)

22  will lose their permits when the drivers quit and those companies no longer have fifteen cabs.

23  As a result, the minority Cab Companies will lose 100% of their permits that will be

24  reallocated to the non-minority companies (Checker and Yellow).  This drastic reduction in the

25  number of permits the Cab Companies receive is discriminatory in light of the traditional

26  allocation.

27  ///

28  ///

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF EX PARTE AND PRELIMINARY INJUNCTION                    C07-06171 RMW

1    Second, Plaintiffs have been discriminated against in the manner the

2   reallocation has been conducted. The City requires that each taxicab that is permitted to service

3   the Airport alternate days working at the Airport with days working in San Jose. Therefore, if

4   an Airport permitted taxicab operated one day at the Airport, the next the day the taxicab was

5   required to operate servicing the community in San Jose.

6    Initially, the City required that each taxicab permitted to complete four "off-

7   Airport" trips during the days the taxicab was servicing the community. (Bhatia Dec., ¶¶ 13,

8   14; Lasher Dec., ¶¶ 13, 14; Pooni Dec., ¶¶ 13, 14; Woldegebrial Dec., ¶ 9.)The number of "off-

9   Airport" completed in San Jose was required to be submitted to the City. (Bhatia Dec., ¶ 13;

10  Lasher Dec., ¶ 13; Pooni Dec., ¶ 13; Woldegebrial Dec., ¶ 9.)  Plaintiff Cab Companies

11  submitted this data in accordance with the regulation. (Bhatia Dec., ¶¶ 14, 15, 16; Lasher Dec.,

12  ¶¶ 14, 15, 16; Pooni Dec., ¶¶ 14, 15,16; Woldegebrial Dec., ¶ 9.)  Plaintiffs later learned that

13  other taxicab companies were submitting information based on all trips completed, regardless

14  of where the trip originated from, and disregarding whether or not the taxicab was permitted to

15  service the Airport. When Plaintiff taxicab companies attempted to submit similar data, the

16  City refused to consider this information. (Bhatia Dec., ¶ 16; Lasher Dec., ¶ 16; Pooni Dec., ¶

17  16  Woldegebrial Dec., ¶¶ 10, 11.)

18    Third, the City has discriminated against Plaintiffs by arbitrarily reducing the

19  number of trips reported.  For example, Plaintiff Net Cab had its number of reported trips

20  reduced by fifty percent. (Lasher Dec., 11.) In the case of National Cab none of the submitted

21  data was counted for reallocation. (Woldegebrial Dec., 9.) The City has not explained this

22  refusal to count this data.  (Complaint ¶ 39.)

23    In dealing with non-minorities, the City's actions were patently less callous.

24  The City could not verify all of the trips completed by Yellow. Instead of reducing the trips

25  reported by this company by fifty percent, as had been done with minority companies, the City

26  reduced the number of "off-Airport" trips by the number of trips actually not verified.

27  (Complaint ¶ 40.)   The City acted similarly in reducing Checker's reported trips.   This

28  difference in treatment between minority companies and non-minority companies is

1   discriminatory and shows that the City treats minority taxicab companies as less favored

2   persons. *Rudebusch v. Hughes*, 313 F.3d 506, 515 (9th Cir. 2002) (quoting *Coral Construct.*

3   *Co. v. King County*, 941 F.2d 910, 916 (1991)).

4          Fourth, the permit conditions, which require that the taxicab companies

5   maintain a fleet of fifteen (15) taxicabs and fifteen (15) drivers to receive four (4) permits, is

6   discriminatory as applied to Plaintiffs. Currently, Taxicab Companies operate approximately

7   two taxicabs for every one Airport permit. Some of Plaintiff Cab Companies will be allocated

8   only four taxicab permits. (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19.) The City's

9   requirements result in a four to one (4 to 1) ratio. This is a patently insufficient number of

10  permits upon which to support fifteen taxicabs. The City is requiring a four to one ratio, when

11  demand in San Jose will support only a two to one ratio. (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19;

12  Pooni Dec., ¶ 19; Woldegebrial Dec., ¶ 13.) Because the Taxicab companies will have

13  insufficient Airport permits to support such a large fleet of taxicabs and drivers, the Plaintiffs

14  will quickly lose drivers to competitors who are receiving a greater allocation of permits.

15  (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19; Woldegebrial Dec., ¶ 13.) (Active

16  Driver Decl., ¶ 10; Gebrehiwot Tesfandries Decl., ¶ 8.) Soon, Plaintiffs will fall below the

17  fifteen cab and fifteen driver requirements, thereby losing all of their Airport permits. The

18  result and intended effect of this regulation is to drive minority companies out of business. This

19  type of discrimination is impermissible and must be stopped.

20          Fifth, the latest proposed Airport Permit Reallocation blatantly excludes all

21  Plaintiff minority Cab Companies without justification. (Lasher Decl., ¶ 25.) On November

22  20, 2007, the City modified its initial Permit Reallocation scheme to provide a minimum of

23  four (4) permits to each company assuming they otherwise qualify. (Complaint, ¶ 46.) On

24  December 10, 2007, the City produced a chart detailing the final allocation of Airport permits

25  for 2008. (Lasher Decl., ¶ 25.) It appears the City provided each qualified company a

26  minimum of four (4) permits. (Id.) However, the City chart goes on to award additional

27  permits based on alleged percentage of "off Airport" trips. (Id.) For unexplained and

28  unknown reasons, each of the Plaintiff Cab Companies were excluded from this additional

{6823/002/00217645.DOC}                    17

1  allocation. (Id.) This additional allocation resulted in an award of forty-seven (47) (almost

2  half of the total permits available) to Yellow and Checker, the non-minority companies. (Id.)

3  This is impermissible, and incomprehensible.

4       **3.**     **The Permit Reallocation Fails Strict Scrutiny**

5       The Supreme Court and the Ninth Circuit have held that "[t]o be constitutional,

6  a racial classification must be narrowly tailored to serve a compelling governmental interest, an

7  extraordinary justification." *Coalition for Economic Equity v. Wilson, supra,* 122F.3d at 702;

8  *Wygant v. Jackson Bd. Of Ed.,* 476 U.S. 267, 277-278 (1986) (plurality opinion).

9       **a.**     **The City Has A Compelling Interest**

10       The California Supreme Court has determined that cities may constitutionally

11  regulate the operations of Taxicabs that operate on its public streets and highways. See, *In re*

12  *Petersen,* 51 Cal.2d 177 (1958). Thus, Plaintiff's do not challenge the City's interest in

13  regulating taxicab companies.

14       **b.**     **The City's Permit Reallocation Process Is Not Narrowly Tailored**

15       Where, as here, there is a disparate racial impact, the City must demonstrate that

16  its reallocation plan is narrowly tailored to the asserted interest. "'Under strict scrutiny the

17  means chosen to accomplish the State's asserted purpose must be specifically and narrowly

18  framed to accomplish that purpose.'" *Hunter v. Regents of the University of California,* 190

19  F.3d 1061, 1076 (9th Circ 1999) (Dissenting Opinion of J. Beezer) (quoting *Wygant v. Jackson*

20  *Bd. Of Educ.,* 476 U.S. 267, 280 (1986)). "This narrow tailoring requirement demands the 'the

21  most exact connection between justification and classification." *Id. Abarand Contractors v.*

22  *Pena,* 515 U.S. 200, 229 (1995). The purpose of this searching justification is to "ensure that

23  there is little or no possibility that the motive for the classification was illegitimate racial

24  prejudice or stereotype. *Id.* (quoting *Croson,* 488 U.S. 469, 496). Strict scrutiny "requires a

25  direct rather than approximate fit of means to ends." (*Id.* at 1076.)

26       In the present case, there is an absence of a direct fit between the means and the

27  ends. Improvement of Airport service, improved service in the community, orderly operation

28  of the taxicabs in San Jose, are no doubt an important government interests. The City,

1    however, has not carried out the permit reallocation in manner that is a "direct fit." Not a

2    single one of the City's asserted goals is achieved by taking away or reducing the Airport

3    permits to seven minority Cab Companies and giving them to one non-minority. The permit

4    reallocation will limit access to the Airport because fewer companies will receive airport

5    permits. Furthermore, a former concessionaire receives fifty-five (55) of the 105 Airport

6    Permits. Allowing one company to hold a virtual monopoly on the Airport Permits is exactly

7    the situation the City was determined to move away from in opening the Airport to all taxicabs

8    in 2005. The City's reallocation has effectively reverted to the Pre-2005 model, a model the

9    City found to be ineffective.

10          The Airport Permit reallocation will not improve taxicab service inside the City.

11    Taxicab companies not receiving Airport permits will be forced to close either because they

12    cannot remain open financially or drivers will not remain employed by companies which do

13    not hold Airport permits.  (Active Drivers Decl., ¶ 10; Gebrehiwot Tesfandries Decl., ¶ 7.)

14    Therefore, taxicab customers in San Jose will lack meaningful choice. These customers will be

15    forced to utilize taxicab services that were previously found to under serve the Airport.

16    Customers wishing to utilize taxicab services in the City area will continue to be underserved.

17    Taxicab companies are able to support non-Airport serving cabs with Airport serving cabs, in a

18    ration of about two to one. (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19;

19    Woldegebrial Dec., ¶ 13.) Plaintiff's Alpha, National, and Net Cab are being asked either

20    eliminate a large portion of their taxicab fleet to remain profitable, or maintain fifteen taxicabs,

21    an excessively large fleet, in the hopes of qualifying for 2009 permits. Plaintiff's U.S.A.

22    Express, California, and City Cab are being asked to maintain four taxicabs for every one

23    Airport permit, a ratio that demand in the City cannot maintain. These companies will then be

24    forced to scale back operations, dropping below the fifteen required taxicabs, and lose all

25    permits. In either situation service to the community itself suffers.

26          It is not possible to earn a living without having access to an Airport permit.

27    (Active Drivers Decl., ¶ 10; Gebrehiwot Tesfandries Decl., ¶ 7.)  Drivers will be forced to seek

28    employment with companies that receive a large share of Airport permits on whatever terms

1    these companies demand, however unconscionable. Furthermore, because the Airport permits

2    are consolidated in so few companies the drivers lack ability to control any of the working

3    conditions. There is clearly not a "direct fit" between the Airport reallocation and the City's

4    professed goals and is therefore not narrowly tailored.

5    **C.**    **The City Permit Reallocation is Not "Race Neutral"**

6    In determining whether a racial classification is narrowly tailored, the court

7    looks to a number of factors, including "whether there was any consideration of the use of

8    race-neutral means" *Adarand*, 515 U.S. at 237-238, and the efficacy of alternatives" *United*

9    *States v. Paradise*, 480 U.S. 149, 171. The City's permit reallocation scheme fails all these

10    requirements.

11    "Among the various narrow tailoring requirements, there is no doubt that

12    consideration of race- neutral alternatives is among the most important." *Coral Construction*,

13    941 F.3d at 922. The City has utterly failed this standard. The City has neglected to undertake a

14    "serious, good faith consideration" of race-neutral alternatives. *Id.* at 923. Rather, the City has

15    undertook a course of conduct that patently discriminates against minorities at virtually every

16    opportunity.  The City should have allowed Plaintiff Cab Companies to report "off-Airport

17    trips" on the same basis as non-minority companies were allowed to report. Furthermore,

18    Plaintiff's unverified "off-Airport" trips should have been reduced by the actual number of

19    unverified trips, as in the case of Yellow, rather than by indiscriminately reducing the reported

20    trips by fifty percent. (Complaint ¶ 40.) It is clear from this course of action that the City

21    performed these acts to ensure that non-minority companies received a greater proportion than

22    minority taxicab companies. The City has failed to undertake any consideration of race-neutral

23    alternatives as required by *Coral Construction*. Therefore, the permit reallocation fails

24    narrowly tailoring and should be enjoined.

25    Furthermore, race neutral alternatives may be more effective in carrying out the

26    City goals.  The goal of the Service Plan is to Open up Airport service to all Cab Companies,

27    improve service to the Airport and Community, and create equity between drivers and

28    companies.  (Complaint, ¶ 25.)  The City's discriminatory actions fail each one of these

asserted goals. The City could have utilized the permit reallocation in a nondiscriminatory manner by excluding or including unverified trips on the same basis for all companies, minority or non-minority. Additionally, the City could have utilized any of the other alternative permit allocation schemes identified in the City's 2004 Service Model. These alternatives possibly include: maintaining the pre-2005 system or implementing a "medallion system." Thus, a race neutral plan is more effective in providing superior service to the Airport and help to equalize the relationship between drivers and companies.

**D.    Plaintiffs are Likely to Succeed on the Merits of Their Due Process Claim**

"Substantive due process is an area of law 'famous for its controversy, and not known for its simplicity." *Union Pacific Railroad Co. v. Village of South Barrington*, 958 F.Supp. 1285, 1296 (N.D. Ill. 1995) (quoting *Deblasio v. Zoning Bd. Of Adjustment*, 53 F.3d 592, 597 (3rd Cir. 1995). Substantive due process "addresses whether the alleged unlawful conduct itself was so 'arbitrary and irrational' that it violated plaintiff's constitutional rights." *Union Pacific Railroad Co. v. Village of South Barrington*, 958 F.Supp. 1285, 1296 (N.D. Ill. 1995) (quoting *Doherty v. City of Chicago*, 75 F.3d 318, 325 (1996)). To claim a substantive due process violation, a plaintiff must allege that (1) it was subject to "arbitrary and irrational" conduct by the state; and (2) either state law remedies are inadequate or an independent constitutional violation exists. *Union Pacific Railroad Co. v. Village of South Barrington*, 985 F.Supp. 1285, 1296 (N.D. Ill. 1995). In the present case, the City's actions are arbitrary and irrational – an independent constitutional violation.

**1.    The City's Actions Are Arbitrary and Irrational**

The Supreme Court has made clear that people have a right not to be singled out by the government for arbitrary and irrational treatment. *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The City's actions are arbitrary and irrational such that the Plaintiffs constitutional rights have been infringed upon.

The City has acted in a number of arbitrary ways: (1) Requiring a taxicab company to own and operate fifteen (15) taxicabs in order to qualify for taxicab Airport permits while the City Ordinances only require a taxicab company to own and operate five (5)

taxicabs to be considered a taxicab company for licensing purposes; (2) Only allocating a minimum of four (4) Airport permits to each taxicab company despite the fifteen (15)-cab requirement; (3) Failing to provide clear or consistent information to the taxicab companies regarding what ""off-Airport"" trip information was required; (4) Failing to provide oversight of what information should be reported to the City regarding ""off-Airport"" trips; (5) Reducing, by fifty percent (50%), the number of reported trips of Net; (6) Arbitrarily reducing Yellow's reported trip numbers by Eighty Thousand (80,000) trips; (7) By failing to actually reallocate permits based on the number of "off Airport" trips; (8) By arbitrarily excluding Plaintiff Cab Companies from consideration of additional permits without notice or justification; and (9) By creating a system where at least fifty-two percent (52%) of the Airport permits are allocated to a single non-minority concessionaire. These actions have been commenced without any evidence in the record and without giving Plaintiffs any opportunity to comment or be heard on these issues.

### 2.    Independent Constitutional Violation

A plaintiff desiring to bring a substantive due process claim is required to show either the adequacy of state law remedies or an independent constitutional violation. *Doherty v. City of Chicago*. As described in great detail above, the Plaintiff's have made out a prima facie case demonstrating a violation of Equal Protection as guaranteed by the Fourteenth Amendment. *Doherty v. City of Chicago*, 75 F.3d 318, 326 (1996).

### E.    The Equities Strongly Support an Injunction

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs will suffer irreparable harm if the permit reallocation goes into effect. The Ninth Circuit has unequivocally held that an alleged constitutional infringement will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir 1997) (quoting *Associated General Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir 1991).

///

No adequate remedy at law exists for Plaintiff's claims. An irreparable injury is defined as one that "cannot be compensated by the award of money damages; it is injury which is certain and great." *Washington Capitols Basketball Club, Inc. v. Barry*, 304 F.Supp.1193, 1197 (N.D. Cal. 1969) Generally, a preliminary injunction will not issue if there is an adequate remedy at law. *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979). Monetary damages, however, are not an adequate remedy at law when a "pattern of unconstitutional deprivation of rights is established. *Illinois Migrant Council v. Pilliod*, 398 F. Supp. 882, 904 (N.D. Ill 1975). Moreover, even where the alleged damage is monetary, when the damage is unconstitutional and unrecoverable, irreparable injury can be found. *Railway Labor Executives' Ass'n v. Gibbons*, 448 U.S. 1301, 1305 (1980). Consequently, the courts have generally held that interference with constitutional rights "supports a finding of irreparable injury." *Planned Parenthood v. Citizens for Com. Action*, 558 F.2d 861, 867 (8th Cir. 1977). Because Plaintiff's have suffered a violation of their constitutional rights irreparable injury will result unless this Court enjoins the City from implementing the Permit reallocation.

Furthermore, the Supreme Court has held that a "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief constitutes "irreparable injury." *Doran v. Salem Inn, Inc.* 422 U.S. 922, 932 (1975).  In the present case, Plaintiffs Cab Companies will experience a substantial loss of business if the proposed Airport permit reallocation is carried out.  Plaintiffs contend, and the City must agree, that Airport service is the lifeblood of taxicab companies in San Jose. Without the ability to fully serve the Airport, taxicab companies will experience a substantial loss of business. (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19; Woldegebrial Dec., ¶¶ 13, 15, 16.)  Moreover, Plaintiffs may completely lose the ability to service the Airport. (Bhatia Dec., ¶ 19; Lasher Dec., ¶ 19; Pooni Dec., ¶ 19;  Woldegebrial Dec., ¶13.) Under city regulations, to maintain any Airport permits, each taxicab company must maintain a fleet of fifteen taxicabs and fifteen drivers. If the company falls below that requirement, the company will lose all of its permits and be unable to service the Airport. Plaintiff taxicab companies are already experiencing a lose of drivers because of the proposed reallocation. (Bhatia Dec., ¶¶ 21, 27; Lasher Dec., ¶¶ 21, 27; Pooni

1  Dec., ¶¶ 21,27;  Woldegebrial Dec., ¶ 15.) (Active Drivers Decl., ¶ 10; Gebrehiwot Tesfandries

2  Decl., ¶ 6.)  Furthermore, a significant number of taxicab drivers have threatened to leave their

3  current employers if the company loses any Airport permits. (Bhatia Dec., ¶22; Lasher Dec., ¶

4  22; Pooni Dec., ¶ 22; Woldegebrial Dec., ¶ 16; Gebrehiwot Tesfandries Decl., ¶ 6.)  Plaintiff

5  taxicab companies face a substantial and real threat of being forced into closure because they

6  cannot maintain the fifteen taxicab and driver requirement. (Bhatia Dec., ¶ 19; Lasher Dec., ¶

7  19; Pooni Dec., ¶ 19; Woldegebrial Dec., ¶ 13.) This is a significant threat that will result in the

8  substantial loss of business. Plaintiffs will suffer an irreparable injury that this Court can

9  prevent by issuing a preliminary injunction at this time.

10           Finally, the balance of equities (including the public interest) weighs heavily in

11 favor of an injunction. Not only will Plaintiff's suffer irreparable harm to their protected

12 interest, the public will likewise suffer. For example, the Service Plan is supposed to create

13 greater equity for local taxicab drivers by giving them greater options to align themselves with

14 whichever taxicab company they choose.  Under the proposed reallocation, taxicab drivers will

15 suffer because they will be forced to drive for companies they otherwise would not.  These

16 drivers are currently unable to assert their rights on their own. Finally, the taxicab passengers

17 will suffer.  The plan places a shocking majority of Airport permits in the hands of a taxicab

18 company that was previously found to undeserve the Airport. Issuing an injunction will not

19 harm the City. The City has already delayed the permit reallocation for several months without

20 adverse consequences.  Therefore, the City will not suffer any harm by issuing the requested

21 preliminary injunction.

22                                          **VII.**

23                                    **CONCLUSION**

24           Plaintiff Cab Companies seek emergency relief to protect their constitutional

25 rights.  If allowed to go into effect on January 1, 2008, the City's Permit Reallocation program

26 will destroy the Plaintiffs' businesses.  The City's Permit Reallocation program disparately

27 impacts seven (7) minority businesses in violation of the Equal Protection Clause of the United

28 States Constitution.  In simple numeric terms, Plaintiff Cab Companies will lose virtually all of

1   their permits resulting in the gain of one (1) non-minority business of over fifty-five percent

2   (55%). Alternatively, the arbitrary and capricious actions of the City constitute a violation of

3   the Plaintiff Cab Companies' Due Process Rights guaranteed by the United States Constitution.

4          In addition to this irreparable injury, the balancing of hardships and the public

5   interest favors issuance of a temporary and preliminary injunction. There is no prejudice or

6   detriment to the City to maintain the status quo pending a full evidentiary hearing. Conversely,

7   the loss of business by not one (1), but seven (7) separate cab companies, is tremendous.

8   Accordingly, an emergency and preliminary injunction should issue from this Court preventing

9   the City from reallocating the Airport permits effective January 1, 2008, or any other date.

10

11  DATED: December /8, 2007                    SAGASER, JONES & HELSLEY

12

13                                              By_____
                                                  Patrick D. Toole, Attorneys for Plaintiffs
14                                                U.S.A. Express Cab Company, Alpha
                                                  Transportation, Inc. dba Alpha Cab
15                                                Company, Dial Dialing, Inc. dba California
                                                  Cab, City Cab Company, Milpitas Cab,
16                                                LLC, National Cab, LLC, and Net Cab
                                                  Company
17

18

19

20

21

22

23

24

25

26

27

28