1  RICHARD DOYLE, City Attorney (#88625)
   GEORGE RIOS, Assistant City Attorney (#77908)
2  DAISY M. NISHIGAYA, Deputy City Attorney (#186614)
   RICHARD D. NORTH, Deputy City Attorney (#225617)
3  Office of the City Attorney
   200 East Santa Clara Street
4  San José, California  95113-1905
   Telephone Number: (408) 535-1900
5  Facsimile Number:  (408) 998-3131
   E-Mail Address:  cao.main@sanjoseca.gov
6
7  Attorneys for Defendant CITY OF SAN JOSE

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                         SAN JOSE DIVISION
11

12
13  U.S.A. EXPRESS CAB, LLC, ALPHA          Case Number:  C07-06171 HRL
    TRANSPORTATION, INC. dba ALPHA
14  CAB COMPANY, DIAL DIALING, INC.         **DEFENDANTS' OPPOSITION TO**
    dba CALIFORNIA CAB, CITY CAB            **PLAINTIFFS' APPLICATION FOR**
15  COMPANY, MILPITAS CAB, LLC,             **TEMPORARY RESTRAINING ORDER**
    NATIONAL CAB, LLC and NET CAB           **AND PRELIMINARY INUNCTION**
16  COMPANY,
17                     Plaintiffs,          Date:    TBD
                                            Time:    TBD
18         v.                               Judge:   Hon. Ronald M. Whyte
19
20  CITY OF SAN JOSE; SAN JOSE CITY
    COUNCIL, and DOES 1-10, inclusive,
21
                      Defendants.
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND STATEMENT OF ISSUES....................................................1

II.    STATEMENT OF FACTS ...........................................................................................2

III.   ARGUMENT................................................................................................................7

      A.   PLAINTIFFS ALPHA TRANSPORTATION (ALPHA CAB), DIAL
            DIALING (CALIFORNIA CAB) AND NET CAB LACK THE
            LEGAL CAPACITY TO SUE. ..........................................................................8

      B.   PLAINTIFFS HAVE NOT MET THE REQUIREMENTS FOR
            ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR
            PRELIMINARY INJUNCTION. ..........................................................................8

            1.   The Regulation Of Taxicab Permits Falls Squarely Within The
                 City's Police Power. ....................................................................9

            2.   Plaintiffs Are Not Likely To Succeed On The Merits Of Their
                 Equal Protection Claim. ............................................................10

                 a.   The Reallocation Was Not Based On Racial Classifications.   11

                 b.   Plaintiffs Have Not Established A Discriminatory Purpose.   12

            3.   Plaintiffs Are Not Likely To Succeed On The Merits Of Their
                 Due Process Claim. ..................................................................17

            4.   Plaintiffs Have Not Shown The Possibility Of Irreparable Injury.........22

IV.    CONCLUSION ..........................................................................................................24

## TABLE OF AUTHORITIES

**Page**

### CASES

*Arlington Heights v. Metro. Hous. Dev. Corp.*
429 U.S. 252 (1977) .................................................................. 13

*Coalition for Economic Equity v. Wilson*
122 F.3d 692 (9th Cir. 1997) ........................................... 11, 12

*Collins v. Harker Heights*
503 U.S. 115 (1992) .................................................................. 17

*Coral Constr. Co. v. King County*
941 F.2d 910 (1991) .................................................................. 14

*Cotta v. City and County of San Francisco*
No. A116583, 2007 WL 4395647 (Cal. App. 1st Dist. Dec. 18, 2007) ............... 9, 10

*County of Sacramento v. Lewis*
523 U.S. 833 (1998) ............................................................. 17, 18

*Daniels v. Williams*
474 U.S. 327 (1986) ............................................................. 17, 18

*Doran v. Salem Inn, Inc.*
422 U.S. 922 (1975) .................................................................. 22

*Eastman v. Yellow Cab Co.*
173 F.2d 874 (7th Cir. 1949) .................................................. 10

*Hervey v. Estes*
65 F.3d 784 (9th Cir. 1995) ...................................................... 2

*Hunter v. Regents of the University of California*
190 F.3d 1061 (9th Cir. 1999) ................................................. 11

*In re Cal. Lumber Corp.*
24 F.R.D. 190 (S.D. Cal. 1959) ................................................. 9

*In re Petersen*
51 Cal.2d 177 (1958) .................................................................. 9

*Int'l Brotherhood of Teamsters v. United States*
431 U.S. 324 (1977) .................................................................. 14

*Konecranes, Inc. v. Sinclair*
340 F.Supp.2d 1126 (D. Or. 2004) ........................................... 9

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
634 F.2d 1197 (9th Cir. 1980) ............................................. 9, 22

# TABLE OF AUTHORITIES

**Page**

*Lulac v. Texas*
793 F.2d 636 (5th Cir. 1986) ............................................. 12, 13

*Luxor Cab Co. v. Cahill*
21 Cal.App.3d 551 (1971) .................................................. 10

*Martin v. Int'l Olympic Comm.*
740 F.2d 670 (9th Cir. 1984) ............................................. 12, 13

*O'Connor v. Superior Court*
90 Cal.App.3d 107 (1979) .................................................. 9

*Palm Valley Homeowners Ass'n, Inc. v. Design MTC*
85 Cal.App.4th 553 (2000) ................................................. 8

*People v. Galena*
24 Cal.App.2d Supp. 770 (1937) .......................................... 10

*Personnel Adm'r v. Feeney*
442 U.S. 256, 273 (1979) .................................................. 13

*Reed v. Norman*
48 Cal. 2d 338 (1957) ...................................................... 8

*Republic of the Philippines v. Marcos*
862 F.2d 1355 (9th Cir. 1988) ............................................. 9

*Rudebusch v. Hughes*
313 F.3d 506 (2002) ........................................................ 14

*Sampson v. Murray*, 415 U.S. 61 (1974) .................................. 22

*Tanner v. Estate of Best*
40 Cal.App.2d 442 (1940) .................................................. 2

*Union Pac. R.R. Co. v. Vill. Of S. Barrington*
985 F. Supp 1285 (N.D. Ill. 1995) ........................................ 18

*United States v. Salerno*
481 U.S. 739 (1987) ........................................................ 17

*Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*
259 F.2d 921 (C.A.D.C. 1958) ............................................. 22

*Washington v. Davis*
126 U.S. 229 (1976) .............................................. 11, 12, 13, 16

*Wolff v. McDonnell*
418 U.S. 539 (1974) ........................................................ 17

iii

## TABLE OF AUTHORITIES

**Page**

### STATUTES

Cal. Corp. Code § 2205 ............................................................................ 8

Cal. Rev. & Tax Code § 19719 ................................................................. 8

Cal. Rev. & Tax Code § 23301 ................................................................. 8

Cal. Veh. Code § 21100 ............................................................................ 9

FRCP 17(b) .......................................................................................... 2, 8

FRCP 19(a) ............................................................................................... 6

FRCP 65 .................................................................................................... 9

### OTHER AUTHORITIES

San Jose City Charter (amended 2004) ..................................................... 2

WITKIN, Cal. Pro. (4th Ed. 1997) § 59 ....................................................... 2

Wright, Miller & Kane, FED. PRAC. & PROC. § 2951 (1995) ....................... 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  
2  

### I.     <u>INTRODUCTION AND STATEMENT OF ISSUES</u>

In their Complaint for Declaratory and Injunctive Relief ("Complaint") and Memorandum of Points and Authorities in Support of Ex Parte and Preliminary Injunction ("MPA"),[1] Plaintiffs characterize the pending reallocation of permits to taxicab companies desiring to provide on-demand pickup service at the Mineta San Jose International Airport ("Airport") as a virulently racist and arbitrary act purposefully intended to drive San Jose's minority-owned cab companies out of business. But the absence of any compelling evidence for these dramatic claims forces Plaintiffs to rely entirely on conclusory, inflammatory and unsupported allegations. As Defendants demonstrate herein, the reallocation was based on non-racial criteria specifically and solely designed to enhance and improve taxicab service both at the Airport and within the larger City of San Jose ("City"). Plaintiffs *do not* and *cannot* allege any facts demonstrating a discriminatory purpose behind the reallocation *because no discriminatory purpose exists*. For these and other reasons, Plaintiffs' equal protection and due process claims are destined to fail and Plaintiffs' application for a temporary restraining order and preliminary injunction should be denied accordingly.

The issues presented for the Court's consideration are: (1) Is the City's regulation of taxicabs a valid exercise of the City's police power precluding equal protection and due process claims related thereto; (2) Are Plaintiffs unlikely to succeed on the merits of their equal protection claim for failure to identify use by the City of racial classifications and for failure to establish discriminatory purpose; (3) Are Plaintiffs unlikely to succeed on the merits of their due process claim for failure to demonstrate that the reallocation was grossly arbitrary and unrelated to the City's interest in ensuring quality taxicab service to the Airport and the City; and (4) Have Plaintiffs failed to establish the possibility of irreparable harm resulting from the reallocation.

---

[1] The "facts" in the MPA are not supported by admissible evidence. The declarations contain inadmissible evidence and the MPA relies heavily on unsupported allegations presented only in the unverified complaint.

1

## II.    STATEMENT OF FACTS

On May 18, 2004, the City Council of the City of San Jose[2] approved the Taxicab

Service Model ("Model") (attached to the Declaration of Robert Lockhart ("Lockhart

Declaration") as <u>Exhibit A</u>),[3] providing for the allocation of Company Taxicab Airport Access

Permits to qualified taxicab companies ("Company Permits") desiring to provide on-demand

pickup service[4] at the Mineta San Jose International Airport.  (Supplemental Memorandum

to the Mayor and City Council of San Jose, dated October 12, 2007, at pg. 6 ("October 12,

2007 Memo") (Lockhart Declaration, <u>Exhibit B</u>).)  The Model was implemented in September

2005 and remains in use at the present time.  (*Id*.)  Prior to implementation of the Model,

"only two [taxicab] companies were authorized to serve Airport on-demand taxicab trips."

(Supplemental Memorandum to Transportation and Environment Committee, dated

September 21, 2007, at pg. 2 ("September 21, 2007 Memo") (Lockhart Declaration, <u>Exhibit

C</u>).)  The Model provided for a total of 300 permits, with 105 Company Permits available for

qualified taxicab companies and 195 permits available for individual drivers ("Driver

Permits") who could affiliate with any taxicab company that retains an On-demand Ground

Transportation Concession Agreement with the City of San Jose.  (Memorandum to the

Airport Commission, dated September 25, 2007, at pg. 1 ("September 25, 2007 Memo")

---

[2] Although Plaintiffs have named the City Council as defendants, the City Council is not a legal entity and cannot be sued.  The City Council is a legislative body empowered by the City Charter for the City of San Jose.  *See* City Charter (amended 2004) at Sec. 400 *et seq*.; <u>Witkin</u>, Cal. Pro. (4th Ed. 1997) § 59 (a party to an action can only be subject to the jurisdiction of the court if it is a legal entity); *Tanner v. Estate of Best*, 40 Cal.App.2d 442, 445 (1940) (same); *see also* Fed. R. Civ. P. 17(b) ("capacity to sue or be sued shall be determined by the law of the state in which the district court is held"); *Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995) (intergovernmental association not a separate legal entity and therefore not subject to suit).

[3] The Model was developed by an outside consultant; Brooklyn, New York-based Schaller Consulting.  (Model, Lockhart Declaration, <u>Exhibit A</u>.)

[4] "On-demand" pickup is where taxicabs wait at a designated stand at the Airport to service arriving passengers.  On-demand is distinguished from reservation service, where customers have pre-arranged with a company to be picked up from or dropped off at the Airport.  Airport access permits are not required for taxicab companies to provide reservation service at the Airport.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                    C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION          454543

1  (Lockhart Declaration, Exhibit D).)  When the Model was implemented in September 2005,

2  the 105 Company Permits were distributed among fourteen taxicab companies with a

3  minimum of seven Company Permits each.  (September 21, 2007 Memo, Lockhart

4  Declaration, Exhibit C at pg. 3; MPA at 6:17-18.)

5      The Model further provided for an "initial two-year operating period", at the end of

6  which an "evaluation and update" would take place.  (September 21, 2007 Memo, Lockhart

7  Declaration, Exhibit C at pg. 1.)  The two-year period was intended to allow companies "to

8  build and develop their off-Airport business … and to match fleet and driver requirements to

9  better serve the entire City."  (September 25, 2007 Memo, Lockhart Declaration, Exhibit D at

10 pg. 1.)  In order to qualify for access to the 105 Company Permits at the end of the two-year

11 period, taxicab companies would have to demonstrate that they had met a number of

12 requirements, including "conducting a minimum of 25% of their Airport trips with alternative

13 fuel vehicles to reduce environmental impact" and "operating a minimum fleet of 15 vehicles

14 and 15 drivers to ensure a fleet size and driver workforce that can meet the municipal code

15 requirement to provide dispatch services 24/7, and to be able to adequately meet Airport

16 service requirements and the needs of a large, geographically dispersed City."[5]  (September

17 21, 2007 Memo, Lockhart Declaration, Exhibit C at pg. 5.)  Companies that met these

18 requirements would then qualify for "a reallocation of [Company] Permits … to be based on

19 each company's share of the off-Airport trips as reported by the companies over the prior

20 year" ("Reallocation").[6]  (September 25, 2007 Memo, Lockhart Declaration, Exhibit D at pg.

21

22  [5] Plaintiffs claim that "the City imposed several new obligations … [t]o qualify for a
2008 allocation [including] … track[ing] trips using GPS devices and computer-operated

23  dispatch".  (MPA at 9:1-4 (emphasis in original).)  This is incorrect.  The requirement for
taxicab companies to track trips using a GPS device and computer-operated dispatch is a

24  requirement in order to qualify for the Company Permit allocation in 2009.  (Chuck Reed and
Sam Liccardo Memorandum to City Council, dated November 2, 2007, at pg. 1 (attached to

25  the McAnally Declaration as Exhibit B).)

26  [6] "Off-Airport" trips being those trips originating in Santa Clara County from locations
other than the Airport.  See, e.g., relevant portion of the On-demand Ground Transportation

27  Concession Agreement with the City of San Jose ("Final Company Contract"), dated
January 4, 2006, at pg. 9, sec. 7(b) (Lockhart Declaration, Exhibit E) (companies required to

28  provide monthly reports "setting forth, by permit number, the number of passenger pickups
(footnote continued on next page)

3

1; October 12, 2007 Memo, Lockhart Declaration, <u>Exhibit B</u> at pg. 6 (referring to "the

Methodology for Adjusting Airport Taxicab Permits approved by City Council on November

16, 2004" ("Methodology")).)  The City placed great importance on the number of off-Airport

trips in order to "create an incentive [for taxicab companies] to better serve Downtown and

neighborhoods, which were shown to have service levels short of customer expectations."[7]

(September 21, 2007 Memo, Lockhart Declaration, <u>Exhibit C</u> at pg. 5.)

      Plans for the Reallocation of Company Permits based on the number of reported off-

Airport trips were presented on September 28, 2007.  (October 12, 2007 Memo, Lockhart

Declaration, <u>Exhibit B</u> at pg. 6.)  At that time, "[m]any small taxicab companies voiced their

objection to the [M]ethodology stating [that] it favored larger established taxicab

companies."  (*Id*.)  However, as noted by "the largest taxicab company in the City[,] … the

process being implemented followed the previously approved method that all companies

were made aware of throughout the two-year process."  (*Id*.)  In fact, the Methodology and

details for reporting off-Airport trips had been "described to taxicab companies at the

September 23, 2005 [Taxicab Advisory Team] meeting, and at meetings held with

companies on September 28 and 30, 2005."[8]  (*Id*. at pg. 5; Supplemental Memorandum to

the Mayor and City Council of San Jose, dated November 16, 2007, at pg. 3 ("November

16, 2007 Memo") (Lockhart Declaration, <u>Exhibit F</u>).)  A follow up letter reiterating the details

---

made by Contractor's Airport permitted drivers at locations in Santa Clara County, other than the Airport during the previous month").

    [7] As stated in the Model: "This recommendation is a key part of providing incentives for cab companies to build their dispatch business since the number of airport permits issued to each company would be dependant on each company's volume of non-airport business.  Companies that increase their dispatch operations can thus increase their share of airport permits.  Companies with little non-airport business would receive a proportionately smaller number of airport permits in subsequent reallocations of permits." (Model, Lockhart Declaration, <u>Exhibit A</u> at pg. 38.)

    [8] Handouts at the September 28th and 30th, 2005 meetings "included [a] sample excel spreadsheet indicating the data fields that needed to be filled out for all permitted drivers (Airport and non-Airport permittees) [including], dispatch and flag drop trips, [and] origination and destination codes (a sample sheet of codes was handed out)."  (November 16, 2007 Memo, Lockhart Declaration, <u>Exhibit F</u> at pg. 3.)

4

1  of how off-Airport trips should be reported was sent to the companies on October 4, 2005.[9]

2  (Pamela McAnally Letter dated October 4, 2005 ("October 4, 2005 Letter") (Declaration of

3  Pamela McAnally ("McAnally Declaration"), Exhibit A).)  As such, there were significant

4  reservations about changing the Methodology after the fact, as desired by some of the

5  smaller companies.  Specifically: (1) "the method was previously established and well

6  communicated"; (2) "the smaller companies had a two year period to develop business, but

7  many appear to have not focused on developing and marketing their business in a way

8  needed to gain market share in the City"; and (3) "if the method is changed or a delay [in

9  implementing the Reallocation] is approved, [no] incentive or requirement would exist for

10  smaller companies to take the necessary steps to build their dispatch and neighborhood

11  business."  (October 12, 2007 Memo, Lockhart Declaration, Exhibit B at pg. 6.)

12      The plans for Reallocation of the Company Permits were approved by the City

13  Council in open session on November 20, 2007.  (City Council Agenda Synopsis (November

14  20, 2007) at pg. 19, section 6.3 (Lockhart Declaration, Exhibit G); Lockhart Email and Letter

15  to Taxicab Company Owners, dated December 12, 2007, at pg. 2 ("December 12, 2007

16  Letter") (Lockhart Declaration, Exhibit H).)  The City Council further decided that, of all of the

17  off-Airport trips reported by companies, only trips originating in San Jose ("SJ") would be

18  counted as off-Airport trips for purposes of the Reallocation.[10]  (Id.)  This determination had

19  the effect of reducing the combined total of off-Airport trips for all reporting companies and

20  specifically reduced the volume of trips reported by SV Checker and Yellow Cab by a total

21  of approximately 114,000.  (Lockhart Declaration at 7:24-8:2.)  An extensive audit was

23      [9] Stating that companies were to provide for each off-Airport trip: (1) the name of the
24  company; (2) the date of the trip; (3) the Permit number; (4) whether there was airport
    access; (5) whether it was a dispatch or flag drop; (6) the time of the trip; (7) the place (by
25  code) of origination; and (8) the place (by code) of destination.  (October 4, 2005 Letter,
    McAnally Declaration, Exhibit A.)
26      [10] The reason for this decision by the City Council was that the inclusion of trip data
27  from outside of San Jose in the Reallocation Methodology would not target the goal of
    serving the City of San Jose as closely as it could if only trips originating in San Jose were
28  counted.  (McAnally Declaration at 4:6-11.)

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                    C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION          454543

performed by the Department of Transportation, City of San Jose, in order to verify each

company's percentage of documented trips originating in the City of San Jose but not

obtained through the Airport on-demand dispatch system.  (McAnally Declaration at 3:1-12.)

Random samples of data received for the past year from each company were reviewed and

any company with questionable data was asked to submit to the City copies of driver and

outreach trip logs, if applicable, for a specific time period so that a comparison could be

made to the original reported data.  (*Id*.)  On review of Net Cab's submitted off-Airport trip

record and subsequent verbal conversation with the company owner, it was determined that

at least 50% of Net Cab's entries could not be verified and the total number of trips used for

purposes of the Reallocation was reduced accordingly.[11]  (*Id*.; Lockhart Declaration at 8:8-

14; September 21, 2007 Memo, Lockhart Declaration, <u>Exhibit C</u> at pg. 5 ("[W]here [off-

Airport] trip data could not be adequately verified through reasonable documentation and

explanation, trip activity was not counted.").)

      Plaintiffs filed their complaint on December 5, 2007.  One week later, on December

12, 2007, the taxicab companies were provided with the final Company Permit Reallocation,

which provided for a minimum allocation of four Company Permits to qualified companies.

(December 12, 2007 Letter, Lockhart Declaration, <u>Exhibit H</u> at pg. 2.)  Company Permits

were awarded as follows (asterisk indicates Plaintiff companies):[12]

---

[11] Like Net Cab, Golden Star had serious problems with the verifiability of many entries in their off-Airport trip reporting, including too many trips by a driver in very short time periods and several trips from different places at the same time.  For both of these companies, the verifiable data was estimated at about 50% of the total and a reduction was made accordingly as an alternative to voiding all of the data and disqualifying the companies from receiving Company Permits.  Net Cab and Golden Star were the only two reporting companies who could not verify a substantial portion of their data.  (McAnally Declaration at 3:13-19; Lockhart Declaration at 8:8-14.)

[12] Six of the ten taxicab companies slated to receive Company Permits under the Reallocation are not parties to this action and are arguably indispensable.  *See* Fed. R. Civ. P. 19(a) ("shall be joined as a party in the action if … the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may [ ] as a practical matter impair or impede the person's ability to protect that interest").  These six companies have taken actions over the past two years in the interest of receiving Company Permits under the Reallocation and any delay of or

(footnote continued on next page)

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                    C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION          454543

| Company | # of SJ Trips | % of SJ Trips | Permits Allocated |
|---|---|---|---|
| California * | 19,167 | .037% | 4 |
| City * | 7,998 | .015% | 4 |
| Executive | 11,209 | .021% | 4 |
| Golden Star | 36,938 | .071% | 9 |
| Milpitas * | 7,894 | .015% | 4 |
| Rainbow | 58,269 | .111% | 12 |
| SV Checker | 74,014 | .141% | 14 |
| United | 32,154 | .061% | 9 |
| USA Express * | 14,992 | .028% | 4 |
| Yellow | 261,023 | .499% | 41 |

(*Id.* at pg. 3.)  Yellow and SV Checker are owned by a non-minority, Golden Star is a cooperative of primarily Indian, Ethiopian and Somali drivers, United is owned by a woman and Executive and Rainbow are owned by a Russian immigrant.  (McAnally Declaration at 4:4-5; Lockhart Declaration at 9:10-14.)  Plaintiffs Alpha, National and Net Cab were not awarded Company Permits for failure to meet the minimum requirements for eligibility.[13]  (*Id.*)  The scheduled effective date for the Reallocation is January 1, 2008.[14]  (December 12, 2007 Letter, Lockhart Declaration, Exhibit H at pg. 1.)

### III.    ARGUMENT

revisions to the Reallocation may negatively affect this interest.  (Lockhart Declaration at 9:5-9.)

[13] Neither Alpha, National nor Net Cab met the minimum requirement of fifteen vehicles and National also did not meet the minimum requirement for trips by alternative fueled vehicles.  (Lockhart Declaration at 9:15-18.)

[14] Plaintiffs cite a "delay" in the effective date of the Reallocation "from September 2007 to January 2008."  (MPA at 1:18-20.)  The "delay" to January 1, 2008 was to allow time to address the issues brought forward by the industry, including the Plaintiffs, at the October 1, 2007 Transportation and Environment Committee and Airport Commission meetings and in subsequent communications prior to the November 20, 2007 City Council meeting when the Council set the effective date to January 1, 2008.  (Lockhart Declaration at 9:21-28.)

7

**A.   PLAINTIFFS ALPHA TRANSPORTATION (ALPHA CAB), DIAL DIALING (CALIFORNIA CAB) AND NET CAB LACK THE LEGAL CAPACITY TO SUE.**

Plaintiffs Alpha Transportation, Inc. dba Alpha Cab Company and Dial Dialing, Inc. dba California Cab have had their incorporation status suspended and are not authorized to do business in the State of California.[15]   (Reports of the California Secretary of State (attached to the Declaration of Alex Davis ("Davis Declaration") and Defendants' Request for Judicial Notice as Exhibit A and Exhibit B).)   The suspension of these companies was initiated by the California Franchise Tax Board.  (Davis Declaration at 2:14-16.)  The San Jose Police Permits Unit has also informed the City that Plaintiff Net Cab was out of business as of December 18, 2007.  (Davis Declaration at 2:17-18.)  As such, these Plaintiffs lack the legal capacity to sue.  *See* Cal. Rev. & Tax Code, § 23301; *Reed v. Norman*, 48 Cal. 2d 338, 342-43 (1957) ("[A] corporation may not prosecute or defend an action, nor appeal from an adverse judgment in an action while its corporate rights are suspended for failure to pay taxes."); *Palm Valley Homeowners Ass'n, Inc. v. Design MTC*, 85 Cal.App.4th 553, 560 (2000) (a corporation suspended under Cal. Corp. Code, § 2205 for failure to file its biennial statement lacks capacity to sue or defend itself); *see also* Fed. R. Civ. P. 17(b) ("the capacity of a corporation to sue or be sued shall be determined by the law under which it was organized … [and] in all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held").  Moreover, any person who purports to exercise the rights and powers of a suspended corporation pursuant to Section 23301 is guilty of a misdemeanor.  Cal. Rev. & Tax Code, § 19719.

**B.   PLAINTIFFS HAVE NOT MET THE REQUIREMENTS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.**

"A TRO is intended to preserve the status quo until the court can rule upon the application for preliminary injunction."  *Konecranes, Inc. v. Sinclair*, 340 F.Supp.2d 1126,

---

[15] Plaintiffs have not established that these or any of the other Plaintiff companies are licensed and in good standing with the State of California and the City of San Jose and eligible to receive Company Permits.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION

1128 (D. Or. 2004) (citing Wright, Miller & Kane, FED. PRAC. & PROC. § 2951 (1995)).  "The moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Id*. at 1129.  "Serious questions are substantial, difficult and doubtful, as to make them fair ground for litigation … [and] *must involve a fair chance of success on the merits*."  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (emphasis added) (internal quotations omitted).  "These are not separate tests, but the outer reaches 'of a single continuum.'"  *Konecranes*, 340 F.Supp.2d at 1129 (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980)).  "The drastic remedy of injunctive relief should issue only in extraordinary circumstances where the court is satisfied that a right is about to be destroyed or irreparably injured by an illegal act."  *In re Cal. Lumber Corp.*, 24 F.R.D. 190, 192 (S.D. Cal. 1959) (noting that "[Federal Rule of Civil Procedure] 65 was adopted to guard against abuse of the remedy").

### 1.    The Regulation Of Taxicab Permits Falls Squarely Within The City's Police Power.

Plaintiffs concede that the City has an "important" interest in "[i]mprovement of Airport service, improved service in the community, [and] orderly operation of the taxicabs in San Jose".  (MPA at 18:27-28.)  In fact, "[t]he regulation of the taxicab industry is a traditional subject of the police power of cities and counties."  *Cotta v. City and County of San Francisco*, No. A116583, 2007 WL 4395647, at *6 (Cal. App. 1st Dist. Dec. 18, 2007) (citing Cal. Veh. Code § 21100).  "Local authorities act pursuant to their police power in regulating virtually all aspects of the taxicab business, including … where cabs may travel[ ] and where cabs may pick up passengers."  *Id*. (citing *O'Connor v. Superior Court*, 90 Cal.App.3d 107, 113-114 (1979) (license or permit to operate a taxicab is granted by local government entity pursuant to police power); *In re Petersen*, 51 Cal.2d 177, 182-83 (1958) (affirming City's power to designate certain stands for the exclusive use of certain taxi companies in picking up passengers); *People v. Galena*, 24 Cal.App.2d Supp. 770, 775 (1937) (affirming power of

9

city supervisors to regulate taxicab stands to promote the convenience, safety, and welfare of the traveling public, and to adopt measures that will best ensure adequate service and will be of the most practical benefit)).  "In addition, California courts have consistently held that taxicab drivers do not obtain any vested right in the grant of permission to operate taxicabs on the public roadways.  Rather, that permission may be altered at the discretion of the issuing authority."  *Id*. (citing *Luxor Cab Co. v. Cahill*, 21 Cal.App.3d 551, 558 (1971) (where plaintiffs unsuccessfully argued that the city's issuance of additional cab medallions "infringed on the vested rights of present certificate holders")).  As stated in *Luxor*:

> The use of streets by taxicabs is a privilege that may be granted or withheld *without violating either due process or equal protection*.  This privilege may be granted exclusively or nonexclusively to render public services.  In any event, the granting or withholding of a privilege based on certificates of public convenience and necessity presents no judicial controversy touching on the impairment of vested rights.

21 Cal.App.3d at 558 (emphasis added).

The Reallocation of Company Permits falls squarely within the City's police power. *Cotta*, 2007 WL 4395647, at *6.  The Plaintiff cab companies are pursuing this action because they are receiving fewer Company Permits under the Reallocation than they would prefer.  But mere dissatisfaction does not equate to the impairment of a vested right. Company Permits may be granted in any number or withheld entirely subject to the City's determination of public convenience and without violating either due process or equal protection.  *Luxor*, 21 Cal.App.3d at 558; *see also Eastman v. Yellow Cab Co.*, 173 F.2d 874 (7th Cir. 1949) (control and regulation of taxicabs used by the public is a valid exercise of the police powers of a city).

> **2.     Plaintiffs Are Not Likely To Succeed On The Merits Of Their Equal Protection Claim.**

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  Different equal protection analyses apply when a regulation employs overt racial classifications as opposed to when the regulation is, on its face, race-

10

neutral and the claim is based on disparate impact.  *See id.* at 242 ("Standing alone, [disproportionate impact] does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.") (internal citation omitted).  Here, Plaintiffs fail to acknowledge or incorporate this distinction, resulting in arguments that are confused and contradictory.[16] What *is* clear, however, is that Plaintiffs' claims are not likely to succeed on the merits no matter which analysis is applied, because: (1) Plaintiffs have not shown that the Reallocation made use of racial classifications; and (2) Plaintiffs have not shown that the Reallocation was motivated by a discriminatory purpose.

        a.    The Reallocation Was Not Based On Racial Classifications.

       Plaintiffs argue at length (MPA at 18:4-21:7) that this Court should apply a "strict scrutiny" analysis to the City's Methodology and resultant Reallocation.  Strict scrutiny is implicated "when a law classifies individuals by race or gender" because such "governmental action … is presumptively unconstitutional and subject to the most exacting judicial scrutiny."  *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997).  "To be constitutional, a racial classification, regardless of its purported motivation, must be narrowly tailored to serve a compelling government interest, an extraordinary

---

   [16] For example, while claiming on one hand that the City employed "racial classification[s]" in making the Reallocation, Plaintiffs also "admit[ ] [that] the regulation at issue does not [on its face] discriminate on the basis of race".  (MPA at 14:22-23; 20:6-10.) In another example, Plaintiffs conflate equal protection case law pertaining to racial classifications with case law pertaining to statutes neutral on their face.  (MPA at 14:9-13 (citing language from *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997) and *Washington v. Davis* as if they were parts of the same legal standard).)  Plaintiffs also cite to the dissent in *Hunter v. Regents of the University of California*, 190 F.3d 1061 (9th Cir. 1999), in support of their assertion that "[w]here, as here, there is a disparate racial impact, the City must demonstrate that its reallocation plan is narrowly tailored to the asserted interest."  (MPA at 18:15-20 (arguing for the application of "strict scrutiny" in the instant case.)  Nothing in *Hunter* supports this proposition.  *Hunter* concerned an explicitly race-based school admissions policy and contained no discussion of disparate impact.  *See* 190 F.3d at 1063 ("To meet the strict scrutiny test, the Regents must demonstrate that [the] *consideration of race/ethnicity* is narrowly tailored to serve a compelling governmental interest.") (emphasis added).

1  justification." *Id*. Thus, "[t]he first step in determining whether a law violates the Equal

2  Protection Clause is to identify the classification that it draws." *Id*.

3      But Plaintiffs do not identify *any* racial classifications used in the Methodology or the

4  Reallocation as would trigger strict scrutiny. The reason for this is simple: the City *did not*

5  *employ* any race-based information in determining the number of Company Permits to be

6  distributed in the Reallocation. The City's determination as to the number of Company

7  Permits to be allocated per company was based on requirements and calculations having

8  absolutely nothing to do with race including, in controversial part, the maintenance[17] of

9  fifteen vehicles and drivers and the number of off-Airport trips reported by the companies for

10  the prior year. In the absence of racial classifications, strict scrutiny does not apply and

11  Plaintiffs' arguments as to whether the Reallocation has been narrowly tailored to serve a

12  compelling state interest are inapplicable.

13          b.    Plaintiffs Have Not Established A Discriminatory Purpose.

14      "The Constitution forbids only purposeful discrimination." *Lulac v. Texas*, 793 F.2d

15  636, 646 (5th Cir. 1986) (citing *Washington*, 426 U.S. at 238-48). Where a regulation is

16  racially neutral, "in the sense that it is not overtly or covertly [race-based]", the court must

17  determine "whether the adverse affects under the [regulation] reflect invidious [race-based]

18  discrimination." *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 678 (9th Cir. 1984).

19  "[Supreme Court] cases have not embraced the proposition that a law or other official act,

20  without regard to whether it reflects a racially discriminatory purpose, is unconstitutional

21  solely because it has a racially disproportionate impact." *Washington*, 426 U.S. at 239.

22  "The invidious quality of a law claimed to be racially discriminatory must ultimately be traced

23  to a racially discriminatory purpose … [which may] be inferred from the totality of the

24  relevant facts." *Id*. at 240, 242.

25
26              Nevertheless, we have not held that a law, neutral on its face
                and serving ends otherwise within the power of government to
27              pursue, is invalid under the Equal Protection Clause simply

28      [17] Not "own", as Plaintiffs claim. (MPA at 21:27.)

                                    12

1

2

because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

3  *Id*. at 242. "The fourteenth amendment is violated only if a state decisionmaker selects or

4  continues in a particular course of action at least in part because of, not merely in spite of,

5  its adverse effects upon an identifiable group." *Lulac*, 793 F.2d at 646 (citing *Personnel*

6  *Adm'r v. Feeney*, 442 U.S. 256, 273 (1979)). "The plaintiff must prove that discriminatory

7  purpose was a 'motivating factor' in the decision." *Id*. at 646-47 (citing *Washington*, 426

8  U.S. at 238-48, among other Supreme Court cases). "In assessing the motivation of the

9  decisionmaker, it is essential to determine the genuineness of the state interests asserted,

10  their nature and strength, and the degree to which they are served by the challenged

11  action." *Id*. at 646. The court may apply factors identified by the Supreme Court, including:

12  (1) "[t]he historical background of the decision … particularly if it reveals a series of official

13  actions taken for invidious purposes"; (2) "[t]he specific sequence of events leading up to

14  the challenged decision"; (3) [d]epartures from the normal procedural sequence …

15  afford[ing] evidence that improper purposes are playing a role"; and (4) [s]ubstantive

16  departures … particularly if the factors usually considered important by the decisionmaker

17  strongly favor a decision contrary to the one reached." *Martin*, 740 F.2d at 678 (citing

18  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)).

19      Plaintiffs' allegations are entirely insufficient to establish that the Reallocation was

20  motivated by a discriminatory purpose.[18] Plaintiffs' inflammatory assertion that the "real and

21  intended effect of this regulation is to drive minority companies out if business" (MPA at

22  17:17-18), is dramatic but entirely unsupported.[19] For example, Plaintiffs' claim that

23

24      [18] For example, Plaintiffs have failed to allege that the non-plaintiff companies other than Yellow and SV Checker that are slated to receive a greater than minimum number of

25  Company Permits under the Reallocation are not owned by minorities. Non-plaintiff Golden Star, which is slated to receive nine Company Permits (up from zero prior to the

26  Reallocation), is in fact a cooperative owned by primarily Indian, Ethiopian and Somali drivers. (McAnally Declaration at 4:4-5; Lockhart Declaration at 9:10-14.)

27      [19] Plaintiffs allege in the Complaint (but do not repeat in the MPA) that a council member commented that the City was not interested in "corporate welfare", which Plaintiffs

28
(footnote continued on next page)

13

1    because their total number of Company Permits is decreasing under the Reallocation and

2    the total number of Yellow and SV Checker's Company Permits is increasing, the "gross

3    statistical disparit[y] … constitute[s] prima facie proof of … discrimination."  (MPA at 154:26-

4    15:4 (quoting *Rudebusch v. Hughes*, 313 F.3d 506, 515 (2002) (citing *Coral Constr. Co. v.*

5    *King County*, 941 F.2d 910, 916 (1991)).)  Plaintiffs' reliance on this overly simplistic

6    "statistical" analysis is misplaced.  As the Supreme Court has stated, the usefulness of

7    statistics "depends on all of the surrounding facts and circumstances."  *Int'l Brotherhood of*

8    *Teamsters v. United States*, 431 U.S. 324, 340 (1977).  "Statistical evidence often does not

9    fully account for [ ] complex factors and motivations … many of which may be entirely race-

10   neutral."  *Coral*, 941 F.2d at 919.  None of the alleged facts and circumstances surrounding

11   the Reallocation demonstrate an underlying discriminatory purpose.

12        Plaintiffs point to the off-Airport trip reporting process in support of their disparate

13   impact claim.  Plaintiffs first allege that, with regard to off-Airport trip reporting, the City's

14   initial instructions were that only trips from off-Airport days and those completed in San Jose

15   were to be reported, and that when Plaintiffs later learned that other companies were

16   reporting all trips completed, Plaintiffs tried to submit similar information and were rejected.

17   (MPA at 16:6-17.)  In fact, in mandatory meetings in September 2005 and an October 2005

18   letter, the City provided companies with clear instructions for off-Airport trip reporting,

19   including exactly what categories of information were to be provided.  (October 4, 2005

20   Letter, McAnally Declaration <u>Exhibit A</u> (stating that companies were to provide for each off-

21   Airport trip: (1) the name of the company; (2) the date of the trip; (3) the Permit number; (4)

22   whether there was airport access; (5) whether it was a dispatch or flag drop; (6) the time of

23   the trip; (7) the place (by code) of origination; and (8) the place (by code) of destination).)

24

25   allege constitutes evidence of a discriminatory purpose.  (Complaint at ¶¶ 70, 78.)  This

26   alleged inference is capricious and unsupported by the weight of evidence; the evidence
     supports the fact that *all* companies had the opportunity to *qualify* for Company Permits by

27   meeting certain requirements and to *earn* Company Permits above the minimum in an
     amount proportional to that company's verifiable reported off-Airport trips.

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                              C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION                    454543

The type of information to be reported was perfectly clear and made no distinction between on or off-Airport days. Further, the City required that origination and destination codes for *all* off-Airport trips be provided, not just those with San Jose origins or destinations. No changes were made to these requirements in the two years prior to the Reallocation. (Lockhart Declaration at 6:15-16.) Second, the reduction of some companies' reported off-Airport trips for purposes of the Reallocation was not arbitrary. (MPA at 16:18-22.) Net Cab's owner could not verify a very substantial number of the company's reported trips, so the total number was reduced by 50% (as opposed to voiding the submission entirely) in order not to completely disqualify the company from obtaining Company Permits. (McAnally Declaration at 3:1-12.) National Cab's reported data was not considered because the company had not met the minimum number of vehicle or alternative fuel trip requirements.[20] (Lockhart Declaration at 10:1-2.) Third, the allegation that off-Airport trips reported by Yellow and SV Checker were reduced by the "number of trips actually not verified" is simply wrong.[21] (MPA at 16:23-17:3.) Yellow and SV Checker's reported numbers were reduced along with all the other qualifying companies when the City Council opted to only include San Jose-originating trips for purposes of the Reallocation. (McAnally Declaration at 3:20-22.) Finally, there is no evidence whatsoever that any of the Plaintiffs were "excluded" from the award of additional permits beyond the minimum four provided to qualifying companies. (MPA at 17:20-18:3.) All Company Permits granted in addition to the minimum were based on the number of verifiable reported off-Airport trips and on no other grounds. Notably, Plaintiffs U.S.A. Express Cab, California Cab, City Cab and Milpitas Cab reported only

---

[20] Plaintiffs assert in the MPA that "[t]he City has not explained this refusal to count [National's] data" (MPA at 16:20-22.), notwithstanding having admitted in the Complaint that "National … did not have the requisite number of fifteen [ ] cabs to participate in the 2008 reallocation" (Complaint at ¶ 39). The admission in the Complaint also conflicts with the Declaration of Mekonnen Woldegebrial, owner of National, who states that the company had fifteen cabs at the time of the Reallocation. (Woldegebrial Declaration at 2:10-11.)

[21] This assertion in the MPA also contradicts Plaintiffs' allegation in the Complaint that "[t]here is no evidence in the record why" Yellow's reported trip numbers were reduced. (Complaint at ¶ 40.)

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                    C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION          454543

2.8%, 3.7%, 1.5% and 1.5%, respectively, of the total number of reported off-Airport trips but still received four Company Permits each. (December 12, 2007 Letter, Lockhart Declaration, Exhibit H at pg. 2.)  Yellow and SV Checker, although they respectively accounted for 49.9% and 14.1% of the total off-Airport trips, received only 41 and 14 Company Permits, respectively representing only 39% and 13.3% of the total allocation.  Id. The allocations for Yellow and Checker were smaller than their actual percentage of reported off-Airport trips in order to provide at least four Company Permits to all qualifying companies, even if those companies attained less than 4% of the total off-Airport trip volume.  (Lockhart Declaration at 10:3-12.)

Plaintiffs generally rely on *Washington v. Davis* in support of their discriminatory impact claim.  (MPA at 14:11-13, 23-25.)  This reliance is misplaced, as *Washington* hews in support of the Defendants' position in this action.  At issue in *Washington* was a written personnel test given to police department applicants, which was "designed to test verbal ability, vocabulary, reading and comprehension."  426 U.S. at 235.  The plaintiffs claimed an equal protection violation because the test "excluded a disproportionately high number of Negro applicants."  *Id*. at 232-33, 237 (four times as many blacks failed the test than did whites).  The court disagreed with plaintiffs, holding that because the test was "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue", the constitution had not been violated "simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups."  *Id*. at 245.  The instant case is comparable.  The Methodology and resultant Reallocation did not employ racial classifications, used objectively verifiable data and served to fulfill the legitimate government interest of ensuring quality taxicab service to both the Airport and the City of San Jose.  (September 21, 2007 Memo, Lockhart Declaration, Exhibit C at pg. 5.) Discriminatory purpose cannot be inferred from the mere fact that some minority-owned companies did not receive as many Company Permits as other companies owned by non-minorities under the Reallocation.

Even in the unlikely event the Court determines that Plaintiffs have demonstrated a *prima facie* case of disparate impact, Defendants have rebutted the presumption of unconstitutionality.  As detailed throughout this brief, Defendants have clearly established that the Reallocation was based on "permissible racially neutral selection criteria and procedures", *i.e.*, the maintenance of a minimum number of vehicles and the volume of verifiable off-Airport trips. *Washington*, 426 U.S. at 241 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)); *see also Lulac*, 793 F.2d at 646 (an action will not violate the equal protection clause even when the decisionmaker knows that it will have a disparate impact as long as "permissible racially neutral selection criteria and procedures" were employed).  Having failed to present any compelling evidence establishing discriminatory purpose, Plaintiffs' equal protection claim is not likely to succeed.

### 3. Plaintiffs Are Not Likely To Succeed On The Merits Of Their Due Process Claim.

"The touchstone of due process is protection of the individual against arbitrary action of government". *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).  Violations of substantive due process are implicated by "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense". *County of Sacramento*, 523 U.S. at 846 (internal quotation omitted).  "[T]he cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.* at 846-47 (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987) (substantive due process prevents the government from engaging in conduct that "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty") (citation omitted); *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992) (substantive due process is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense")).  "Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of*

17

1  *Sacramento*, 523 U.S. at 849 (citing *Daniels*, 474 U.S. at 331 (the guarantee of due process

2  has historically "been applied to *deliberate* decisions of government officials to deprive a

3  person of life, liberty, or property") (emphasis in original)).[22]

4          Plaintiffs' allegations fail to establish any likelihood of prevailing on the substantive

5  due process claim.  (MPA at 21:26-22:11.)  Plaintiffs allege that Defendants have acted

6  arbitrarily by: (1) requiring that companies maintain a minimum of fifteen vehicles to qualify

7  for Company Permits; (2) allocating a minimum of four Company Permits notwithstanding

8  the fifteen vehicle requirement; (3) not providing "clear or consistent information" regarding

9  off-Airport trip reporting; (4) not providing oversight of off-Airport trip reporting; (5) reducing

10 Net Cab's reported off-Airport trips by 50%; (6) reducing Yellow Cab's reported off-Airport

11 trips by 80,000; (7) failing to reallocate Company Permits based on the number of off-Airport

12 trips; (8) excluding Plaintiffs "from consideration of additional [Company] Permits without

13 notice or justification"; and (9) "creating a system where [ ] 52%" of Company Permits are

14 allocated "to a single non-minority concessionaire."  (*Id.*)  These allegations are addressed

15 in turn.

16         First, the minimum vehicle requirement is based on the premise that fifteen taxicabs

17 are needed in order for companies to provide quality customer service at the Airport *and*

18 ensure dispatching services 24 hours a day and 365 days a year to the City.  (September

19 21, 2007 Memo, Lockhart Declaration, Exhibit C at pg. 5.)  Although the City may only

20 require five vehicles and drivers to qualify as a taxicab company for licensing purposes, the

21 provision of Airport services is not a requirement for licensing and the scope of services

22 non-Airport permitted taxicab companies are expected to provide is not as great.  As stated

23 in the Model:

24

25 ─────────────────────

26    [22] Plaintiffs cite no Ninth Circuit or Supreme Court law setting forth the legal standard
applicable to substantive due process claims.  (MPA at 12:8-20.)  Plaintiffs' reliance on a
non-controlling case from the Northern District of Illinois is misplaced.  (MPA at 12:15-20

27 (citing *Union Pac. R.R. Co. v. Vill. Of S. Barrington*, 958 F. Supp 1285, 1296 (N.D. Ill. 1995)
for a legal standard that has not been adopted in the Ninth Circuit).)

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                          C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION                454543

> The minimum fleet of 15 cabs is recommended because the City's current minimum of five taxicabs is not sufficient for companies to provide a satisfactory level of dispatch service in San Jose. … The requirement should be phased in during the first two years to allow companies time to increase the size of their operations and should be applied only to companies serving the airport.

(Model, Lockhart Declaration, Exhibit A at pg. 38.)  The minimum vehicle requirement was suggested by an independent consultant, serves a legitimate government interest and is therefore not arbitrary.

Second, the minimum award of four Company Permits (out of 105) per qualifying company served to benefit qualifying companies even if they reported less than 4% of the total off-Airport trips.  (Lockhart Declaration at 11:32-4.)  As described in Section III.B.2.b. above, four of the Plaintiffs were each awarded the minimum number of four Company Permits even though their verifiable reported trips amounted to less than 4% of the total.

Third, the specific requirements for off-Airport trip reporting were described to taxicab companies as early as September 23, 2005 at a Taxicab Advisory Team meeting, and at mandatory meetings held with companies on September 28 and 30, 2005.  (October 12, 2007 Memo, Lockhart Declaration, Exhibit B at pg. 5; November 16, 2007 Memo, Lockhart Declaration, Exhibit F at pg. 3.)  Handouts at the September 28th and 30th meetings "included [a] sample excel spreadsheet indicating the data fields that needed to be filled out for all permitted drivers (Airport and non-Airport permittees) [including], dispatch and flag drop trips, [and] origination and destination codes (a sample sheet of codes was handed out)."  (November 16, 2007 Memo, Lockhart Declaration, Exhibit F at pg. 3.)  An October 4, 2005 letter was mailed to all of the San Jose licensed taxicab companies with specific instructions for off-Airport trip reporting.  Specifically, Permit-holding drivers were instructed to record: (1) the name of the company; (2) the date of the trip; (3) the Permit number; (4) whether there was airport access on the trip; (5) whether it was a dispatch or flag drop; (6) the time of the trip; (7) the place (by code) of origination; and (8) the place (by code) of destination.  (October 4, 2005 Letter, McAnally Declaration Exhibit A.)  The off-Airport trip requirements did not change between September 2005 and the Reallocation.

19

(Memorandum to the Building Better Transportation Committee, dated March 29, 2004, at pg. 7 ("March 29, 2004 Memo"), Lockhart Declaration, Exhibit I.)  Plaintiffs' allegation that instructions on off-Airport trip reporting were unclear or inconsistent is unsupported and conclusory.

Fourth, Plaintiffs do not state what "oversight" of the off-Airport trip reporting they believe would have been appropriate.  Plaintiffs, like other taxicab companies, were given specific instructions in September and October 2005 as to exactly off-Airport trip information they would be required to report and were free to raise questions and seek clarification with regard to the reporting requirements at any time during the two years prior to the Reallocation.  Furthermore, an extensive audit was performed by the Department of Transportation, City of San Jose, in order to verify each company's reported off-Airport trips. (McAnally Declaration at 3:1-12.)  City staff reviewed random samples of data received for the past year from each company.  (*Id*.)  Any company with questionable data was asked to submit to the City copies of driver and outreach trip logs, if applicable, for a specific time period so that a comparison could be made to the original reported data.  (*Id*.)  Thus, the City gave companies specific reporting instructions and also verified the accuracy of reported data before calculating the Reallocation.  These actions are testimony to the City's diligence and contrary to Plaintiffs' claim that the Plaintiffs were denied due process.

Fifth, Net Cab's reported off-Airport trips were reduced by 50% due to their reporting of a very large number of unverifiable trips.  (McAnally Declaration at 3:1-12.)  Officials met with Net Cab's owner, who agreed that the data was extensively either incorrect or falsified. (*Id*.)  Department of Transportation and Airport staff then agreed that instead of throwing out the data entirely and denying any Company Permits to Net Cab, a 50% reduction would be made to the reported total.  (*Id*.)  But this decision had no impact on Net Cab's failure to receive Company Permits, which resulted from the company's failure to meet the minimum number of vehicles requirement.  (Lockhart Declaration at 11:5-7.)

Sixth, the total number of Yellow Cab's reported off-Airport trips were reduced for purposes of the Reallocation because of the City Council's November 20, 2007 decision to

1   only include those off-Airport trips that originated in the City of San Jose rather than all of

2   Santa Clara County.  (Lockhart Declaration at 11:8-14.)  All of the qualifying companies

3   were subject to this reduction.  (*Id*.)  And because all companies were required to report

4   origination and destination codes for each and every off-Airport trip, this correction was

5   easily applied to the reporting companies without need to solicit further data.[23]  (*Id*.)

6        Seventh, the Reallocation was based on company fulfillment of minimum

7   qualifications and the number of their reported and verifiable off-Airport trips.  Plaintiffs'

8   allegation denying this fact is unsupported, conclusory and completely false.

9        Eighth, Plaintiffs' allegation that they were excluded "from consideration of additional

10  Company Permits without notice or justification" is baseless.  (MPA at 22:8-10.)  Qualifying

11  companies' entitlement to Company Permits over and above the four permit minimum was

12  solely a function of the number of verifiable reported off-Airport trips reported to the City.

13  Plaintiffs were made aware of this fact as early as September 2005.

14        Finally, when the Methodology was approved by the City Council in 2004, the City

15  had no way of knowing what companies would meet the requirements or how many

16  verifiable off-Airport trips they would report over the course of the next two years.  The

17  Methodology was based on objective criteria designed to serve the City's interest in

18  enhancing taxicab service to both the Airport and the City at large.  The fact that Yellow and

19  SV Checker are owned by a non-minority is irrelevant, as the Methodology only weighs the

20  fact that these companies performed and verifiably reported the largest percentage of off-

21  Airport trips among the qualifying companies.

22        In sum, the historic background and series of events leading up to the Reallocation

23  expose the fallacy of Plaintiffs' due process claim.  Plaintiffs' conclusory allegations fall far

24

25        [23] As described above, the Reallocation was made according to reporting standards
26  for off-Airport trips that had been provided to Plaintiffs two years prior to the Reallocation.
    Plaintiffs were instructed in 2005 to report origination and destination codes for *all* off-Airport
27  trips, whether or not they originated in the City of San Jose.  Therefore, Plaintiffs cannot
    convincingly argue that the Council's decision denied them any credit for off-Airport trips
28  they may have otherwise been able to claim.

21

1  short of demonstrating that the City's conduct was egregious, arbitrary or without rational

2  justification to an extent that would implicate a constitutional violation.  To the contrary, the

3  Reallocation was the result of a transparent process and a Methodology using objective

4  criteria the parameters of which Plaintiffs were well informed.

**4.    Plaintiffs Have Not Shown The Possibility Of Irreparable Injury.**

6  "The basis of injunctive relief in the federal courts is irreparable harm and inadequacy

7  of legal remedies."  *Nat'l Football League*, 634 F.2d at 1202 (citing *Sampson v. Murray*, 415

8  U.S. 61 (1974)).  As the Supreme Court has stated:

> [T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury … "The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended … are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

14  *Sampson*, 415 U.S. at 90 (quoting *Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*,

15  259 F.2d 921, 925 (C.A.D.C. 1958)).  Plaintiffs' claim that they will lose 100% of their

16  business is unsupported by the weight of the evidence.  As detailed below, Plaintiffs have

17  not made a compelling argument that a reduction in the number of Company Permits

18  allocated to the Plaintiffs will drive the Plaintiffs out of business.[24]

19  The Golden Star taxicab company is conspicuously absent from this lawsuit.  Golden

20  Star's absence is conspicuous not only because they are minority-owned but because

21  Golden Star had *zero* Company Permits prior to the Reallocation.  (Lockhart Declaration at

---

23  [24] Plaintiffs incorrectly cite *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) for the proposition that "'substantial loss of business and perhaps even bankruptcy' absent preliminary injunctive relief constitutes 'irreparable injury.'"  (MPA at 23:15-17.)  In fact, *Doran* states: "respondents alleged … that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy.  Certainly the *latter type injury* sufficiently meets the standard for granting interim relief, for otherwise a favorable final judgment might well be useless."  422 U.S. at 932 (emphasis added).  Plaintiffs disingenuously misquote *Doran*, but more importantly, *Doran* reaffirms that mere loss of business does not justify injunctive relief.

22

12:1-4.)  Between 2005 and 2007, Golden Star successfully grew its business and earned nine Company Permits in the Reallocation, more than double the number of Company Permits awarded to any one of the Plaintiff companies.  (December 12, 2007 Letter, Lockhart Declaration Exhibit H at pg. 3.)  Golden Star outperformed the Plaintiffs and earned Company Permits above the minimum notwithstanding the fact that each of the Plaintiffs possessed eight or more Company Permits prior to the Reallocation.  (Pooni Declaration at 2:19-24; Woldegebrial Declaration at 2:9-10; Bhatia Declaration at 2:22-25; Lasher Declaration at 2:22-27 (Milpitas Cab acquired nine and all other Plaintiff companies acquired eight Company Permits).)  This is testimony to Golden Star's industriousness but also demonstrates the fallacy of Plaintiffs' claim that a reduction in the number of Company Permits held by the Plaintiffs will result in their extinction.

        The fallacy is further exposed by the fact that all of the Plaintiffs were in business prior to the implementation of the Model in 2005, when all on-demand services at the Airport were handled by only two companies and none of the Plaintiffs had any such access.  (Lockhart Declaration at 11:19-27.)  Plaintiffs were still able to access the Airport at that time because Company Permits only regulate on-demand pickups; any taxicab company can pick up or drop off at the Airport on a reservation basis.  (*Id*.)  Also, in the fiscal year July 2006 through June 2007, there were 387,362 Airport on-demand taxicab trips and 523,588 non-Airport San Jose-originating trips made by those companies that qualified for Company Permits in the Reallocation.  (*Id*.)  Thus, the Airport on-demand trips accounted for only 42.5% of the total City business.  (*Id*.)  This percentage would be lower if the off-Airport trips for the companies that failed to qualify for the Reallocation were included in the total.  And Company Permits are not a "condition of employment", such that Plaintiff companies holding the minimum number of Company Permits will be unable to attract drivers.  (MPA at 15:13-14.)  There are 195 Driver Permits available for drivers who can affiliate with any company they choose.  Golden Star, for example, had no Company Permits prior to the Reallocation but gained 83 affiliated Driver Permits and was able to successfully grow their business between 2005 and 2007, earning nine Company Permits in the Reallocation.  (Lockhart

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                                    C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION                    454543

Declaration at 11:15-18.)  Finally, the next Reallocation of Company Permits will be based on trips generated between April 1, 2008 and December 31, 2008.  (Lockhart Declaration at 12:4-7)  All companies, including the Plaintiffs, will have the ability to demonstrate that they have met the requirements to qualify and receive Company Permits commensurate with the volume of their off-Airport trips.  (*Id.*)

In sum, Plaintiffs have not compellingly demonstrated that a reduction in the number of Company Permits they are allocated will result in irreparable harm.  It is not inconceivable that Plaintiffs may suffer a temporary loss of income as a result of the Reallocation but, as Golden Star and the weight of the evidence have shown, the prospects for Plaintiffs' future successes or failures are not inextricably linked with possession of a few more or a few less Company Permits.

## IV.    CONCLUSION

For the above reasons, Defendants respectfully request that the Plaintiffs' application for Temporary Restraining Order and Preliminary Injunction be denied.

Respectfully submitted,

Dated:  December 28, 2007                    RICHARD DOYLE, City Attorney


By:  _____/s/_____
          RICHARD D. NORTH
          Deputy City Attorney

Attorneys for CITY OF SAN JOSÉ

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                    C07-06171 HRL
APPLICATION FOR TRO AND PRELIMINARY INJUNCTION          454543