**EXHIBIT D**
**DECLARATION OF ROBERT LOCKHART**



### CITY OF SAN JOSE
CAPITAL OF SILICON VALLEY

# *Memorandum*

**TO:** AIRPORT COMMISSION

**FROM:** Robert Lockhart

**SUBJECT: TAXICAB PERMIT REALLOCATION**

**DATE:** 9-25-07

| Approved | Date |
|----------|------|
|          |      |

## RECOMMENDATION

Approve the reallocation process for taxicab Company Airport Access Permits, effective November 1, 2007.

## BACKGROUND

On September 7, 2005, the new Taxicab Service Model was initiated and 300 Airport Access Permits (Permits) were distributed, 195 directly to individual drivers. 105 Permits were issued to taxicab companies based on market share with a minimum of seven Permits to all companies.

The drivers holding the 195 Permits, 65% of the total permits available, have the flexibility to affiliate with any San Jose taxicab company that retains a contract wit the Airport. Taxicab companies are required to publish Company Plan and Offers to provide drivers with a clear understanding of the business activity and opportunities, rate structures and dispatching and marketing plans. The plan and offer process is designed to facilitate competition among companies for drivers as a way to balance the equity and control within the industry.

The Taxicab Service Model, approved by City Council in 2004, established a reallocation of the Company Permits after the first two years of operation to be based on each company's share of the off-Airport trips as reported by the companies over the prior year. Taxicab companies were provided the two-year development period from September 2005 to September 2007 to build and develop their off-Airport business, install enhanced computer aided dispatch systems, and to meet fleet and driver requirements to better serve the entire City.

The use of off-Airport trips as the rationale for distribution of company Permits is based on the need to create an incentive to better serve the Downtown and other neighborhoods of San Jose and the surrounding area, which were shown to have service levels short of customer expectations. The reallocation will take effect on November 1, 2007 and will recur annually from this point forward. No minimum level of permits per company is established in the reallocation process.

AIRPORT COMMISSION
9-25-07
Subject: **Taxicab Permit Reallocation**
Page 2

## ANALYSIS

14 taxicab companies submitted their monthly off-Airport trips to the Department of
Transportation (DOT) who conducted the first analysis of the data submitted. After clarification
of some of the data for accuracy by DOT and Airport staff, reallocations were set by assigning
the 105 company Permits to companies based on their share of the total trips reported. In cases
where data could not be adequately verified through reasonable documentation and explanation,
trip activity was not counted. Two companies did not meet the minimum requirement of 15
drivers and 15 vehicles in their fleets and were not allocated Permits.

A meeting regarding the reallocation process was scheduled for Friday September 28th to discuss
the process used and the individual company results with all of the company owners.

There has been communication from several of the smaller taxicab companies who have
requested they be able to maintain their current allocation or be issued additional Permits, rather
than reallocating all of the Permits based on the pre-established method. Staff does not support
this request as all of the companies have had a full, equal opportunity to build their business and
off-Airport trip volume over the past two years. The reallocation process was fully discussed
prior to approval by City Council in 2004 and numerous times with companies over the past two
years. Staff has also received communication from one company concerned with what they
perceive to be a delay in the implementation of pre-approved method from September 30, 2007
to November 1, 2007. Staff established the current timeframe based on the need to verify
questionable data prior to the final reallocation.

The City Council's Transportation and Environment Committee (T&E) is scheduled to discuss
taxicab issues at their October 1, 2007 meeting, including a brief discussion of the Permit
reallocation process. The staff memo to T&E is attached to provide a more thorough review of
the current taxicab industry.

The Airport issues the Permit and the Airport Commission thereby is an impartial body that may
review and approve the Staff actions regarding that Permit.  Staff requests Airport Commission
approval of the Company Airport Access Permit reallocations, to be effective November 1, 2007.


Robert Lockhart
Airport Operations Manager



**CITY OF**
# SAN JOSE
CAPITAL OF SILICON VALLEY

*Memorandum*

TO:  TRANSPORTATION AND
ENVIRONMENT COMMITTEE

FROM:  James R. Helmer
William F. Sherry, AAE

SUBJECT:  **TAXICAB SERVICE MODEL
STATUS REPORT
SUPPLEMENTAL MEMORANDUM**

DATE:  09-21-07

Approved _____       Date    9/24/07

## REASON FOR SUPPLEMENTAL

The Taxi Cab Service Model Status Report scheduled for the June 4, 2007 Transportation and
Environment Committee meeting was deferred to the October 1, 2007 meeting. This
supplemental memorandum provides updated information and a response to several questions
raised by a representative of some taxicab drivers.

## RECOMMENDATION

Accept the Taxicab Service Model Status Report and the associated recommendations regarding
Taxi San Jose dispatch operations, taxicab company Airport permit reallocations, leasability,
transferability and Citywide driver and vehicle caps.

## BACKGROUND

On September 7, 2005, the new Taxicab Service Model was initiated and Taxi San José (TSJ)
began providing On-Demand Ground Transportation Dispatch Services at Mineta San José
International Airport (Airport) to all 14 San José taxicab companies and the individual drivers
with Airport-issued permits affiliated with those companies. Various other service model
elements, including customer service training for drivers, were also initiated. In September
2007, the Taxicab Service Model passed its initial two-year operating period prompting an
evaluation and update to the Model.

On June 4, 2007, City staff was prepared to provide the Transportation and Environment (T&E)
Committee, with an update regarding the Taxicab Service Model. At that time, staff intended to
offer a follow-up report to the Committee regarding the Taxicab Service Model and the issues of
Driver Testing, Leasability, Transferability and Driver/Vehicle Caps as discussed as part of the
Taxi Advisory Team (TAT) workplan. In addition, staff was also prepared to address the status of
the On-Demand Dispatch Service at the Airport, including recommendations for on-going
operations of the Taxicab Service Model. However, several concerns were raised by some taxicab

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject: Taxicab Service Model Status Report Supplemental Memorandum
Page 2

drivers through a representative and the Committee chose to defer the report and requested staff to respond to the concerns. This supplemental memorandum responds to that Committee request.

## ANALYSIS

### Taxicab Service Model Goals and Performance

The Taxicab Service Model has been in operation for two years and by all accounts has been effective in moving towards the four stated goals of the service model. The goals were to:

1. Enhance Access to the Airport and Improve Service to the City
2. Improve Service to the Customer
3. Balance the Equity and Control within the Taxicab Industry (between driver and owners)
4. Maintain an Effective and Efficient City Regulatory and Oversight System

### 1. Enhance Access to the Airport and Service to the City

Prior to current service model only two companies were authorized to serve Airport on-demand taxicab trips. Today 14 companies have Airport access and serve on-demand taxicab trips. All Airport permitted drivers are required to spend every other day serving the rest of the City as part of their service obligation to retain alternate day access to the Airport.

Service to the rest of the City, Downtown, neighborhoods, and outreach clients appears to be on the rise. Annual off Airport trip estimates developed during the Taxicab Service Model Study identified an estimate of 530,000 annual trips based upon available dispatch logs and computerized systems, estimated walk up business at hotels and taxicab stands, and other types of trip activity like driver personal calls. The study also identified that personal taxicab calls could be significantly higher than reported. Based upon that information it is reasonable to assume that annual trip activity in 2004 was in the 530,000 to 600,000 range. For the year ending June 2007, the 14 San Jose taxicab companies reported 808,202 non-Airport trips, an approximate 35%+ increase over 2004. Staff's conclusion is that off-Airport trips have increased significantly since 2004 for several reasons. First, Airport drivers are required to alternate their days serving the Airport and the rest of the City, and as a result service to the Downtown, to outreach clients, coverage of dispatch calls, and work with personal clients has been on the rise. Second, companies are required, and have an incentive, to report off Airport trip activity as the data forms the basis of the reallocation of the 105 company Airport access permits.

In the same year, Taxi San Jose dispatched 387,362 taxicab trips and 20,122 door-to-door shuttle trips carrying passengers from the Airport. These two industries have accommodated over 567,460 passengers and assisted them in reaching their chosen destinations in San Jose or other locations around the Bay Area. Additionally, Compressed Natural Gas (CNG) or hybrid vehicles recorded 144,497 taxicab trips or 37.3% of the total taxicab trips from the Airport. The 122 more environmentally friendly vehicles conducted over 42% of the Airport trips in July 2007.

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject:  Taxicab Service Model Status Report Supplemental Memorandum
Page 3

## 2.   Improve Service to the Customer

In August 2007, Airport staff developed and distributed 2,000 surveys to passengers using taxicab services from the Airport.  The survey addressed the following important service areas:

- Driver Courtesy and Professionalism
- Taxicab and Airport Shuttle Responsiveness
- Vehicle Condition
- Trip Timeliness
- Customer Wait Times

This survey of passengers shows that service levels provided by TSJ staff and the drivers from the taxi and shuttle industries have improved.  While the small size of respondents limits the complete reliability of the data, positive responses from the 70 respondents relating to courtesy, professionalism, assistance with luggage and arriving at their destination in a timely manner reinforced the impressions of improved performance by the taxi and shuttle industries' drivers. Most impressive was the almost 96% of customers rating taxicab drivers as courteous and almost 92% rating the vehicles clean.

The surveys reflected a continued opportunity to improve in the areas of customer waits for taxis. Taxi San Jose, the drivers and staff have concentrated on this issue, especially on Sunday evenings, in an effort to reduce the numbers of customers who are waiting for a taxi.  The contracts set a standard of a maximum 5-minute wait for a taxi and all parties are working together to attain that standard for every passenger.  A sample of the survey data indicates that about seven of 10 of customers had no wait at all.

## 3.   Balance Equity and Control within the Taxicab Industry (between Driver and Owners)

The Taxicab Service Model was designed to better balance equity and control within the taxicab industry by orienting the distribution of Airport permits towards drivers.  Roughly two thirds (195) of the permits were issued to drivers and approximately one third (105) were distributed to companies. With 14 companies gaining access to the Airport instead of two under the old model, driver's options as to which company they affiliate with has been greatly enhanced. Furthermore, taxicab companies were required to develop and publish a Plan and Offer that drivers could evaluate and determine which company was most advantageous for them to affiliate.  These important changes reversed a situation where drivers felt trapped because they could only work for the two concession companies if they wanted to serve the Airport.  Since the Taxicab Service Model has been implemented significant driver movement has occurred among companies.  Many drivers have been able to reduce weekly gate fees they pay to companies because the competition among companies for drivers has driven average fees downward.

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject: Taxicab Service Model Status Report Supplemental Memorandum
Page 4

## 4.  Maintain Effective and Efficient City Regulatory and Oversight Model

The current Taxicab Service Model effectively uses both market and regulatory mechanisms to direct, incent, and guide the taxicab industry to provide quality service, serve all customers, and balance the equity and control in the industry.  The current model properly relies on market mechanisms because staff resources are so limited to develop and manage provisions that require heavy regulatory roles, such as driver and vehicle caps.  In 2004, staff estimated that taxicab industry fees fell short of cost recovery by approximately $750,000 on an annual basis.  Adding regulatory requirements, which necessitates more City investment, is not realistic given the unwillingness of the taxicab industry to even meet current cost recovery through its fees.  The challenge lies in the fact that certain factions of drivers continually advocate for more regulation of the industry placing themselves at odds with staff, and forcing the City Council to engage in overly detailed discussions about regulatory matters.  This issue will be further discussed in a later section of the report.

## Taxi San José Dispatch Operations/Agreement Extension

As outlined in greater detail in the May 29, 2007 memorandum to the T&E Committee, staff has taken steps to exercise the first one-year option period for Taxi San Jose (TSJ).  While there have been documented concerns with TSJ related to operating the taxicab and shuttle dispatch system, there is a realization that establishing a new program, related to an industry that has historically had its challenges, will encounter difficulties during the initial implementation and operation phases.  Dan Fenton, Chair of TSJ, has committed to the resolution of these issues and has been instrumental in maintaining the direction of TSJ from the outset.  TSJ has committed to providing the resources necessary to ensure the levels of service required by the Airport's passengers.  TSJ has and will continue to meet with staff to ensure the appropriate measures and controls are in place to provide the necessary improvements.  Staff will return to City Council should any action be required outside of the current agreement.

## Airport Taxicab Driver Permits (195 Permits)

Taxicab drivers holding the 195 alternate-day Airport access permits have been offered one-year extensions as envisioned as part of the Taxicab Service Model.  The drivers holding the 195 permits, 65% of the total pool of 300 Airport access permits, have the flexibility to affiliate with any San Jose taxicab company that retains a contract with the Airport.  Taxicab companies are required to publish Company Plan and Offers to provide drivers with a clear understanding of their business activity and opportunities, rate structures, and dispatching and marketing plans.  The plan and offer process is designed to facilitate competition among companies for drivers as a way to balance the equity and control within the industry.

## Taxicab Company Airport Access Permits (105 Permits)

The initial two tear year contract term for companies to operate at the Airport expires at the end of September 2007.  With delegated authority from City Council, staff has extended the contracts of each company in compliance with the provisions of their contract and the Taxicab Service

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject: Taxicab Service Model Status Report Supplemental Memorandum
Page 5

Model. Companies not in compliance have not been offered one-year extensions to their contract. The requirements include:

- Completion of customer service training by all drivers working under Airport permits.
- Operating a minimum fleet of 15 vehicles and 15 drivers to ensure a fleet size and driver workforce that can meet the municipal code requirement to provide dispatch services 24/7, and to be able to adequately meet Airport service requirements and the needs of a large, geographically dispersed City.
- Operating a computer aided dispatch system to improve on the capability to serve customers, track and not lose customer calls, and provide the City with verifiable data that can not be easily manipulated or fabricated.
- Conducting a minimum of 25% of their Airport trips with alternative fuel vehicles to reduce environmental impact.
- Be current on all fees and charges due to the City.

The 105 company Airport access permits will be reallocated among companies whose contracts have been extended. As established in the City Council approved Taxicab Service Model, the permits will be reallocated based on the number of off-Airport trips reported to the City by their company over the past year. Taxicab companies were provided a two year development period from September 2005 through September 2007 to build and develop their off Airport business, install enhanced computer aided dispatch systems, and meet fleet and driver requirements to better serve the entire City. Staff is conducting a meeting with all licensed taxicab companies on Friday, September 28 to review the established reallocation methodology that has been followed and present the results of the reallocation. Staff has scheduled this item for the October 1, 2007 meeting of the Airport Commission. The permits will be effective for one year from November 1, 2007 at which time they will be reallocated based upon the same methodology.

For purposes of edification of the Committee, DOT and Airport staff reviewed off-Airport trip figures submitted by the companies on a monthly basis over the past year. After clarification of some data for accuracy, the reallocations were set by assigning the 105 permits to companies based on their share of the total trips reported. In an instance where data could not be adequately verified through reasonable documentation and explanation, trip activity was not counted. The use of off Airport trips as the rationale for distributing company permits is based upon the need to create an incentive to better serve Downtown and neighborhoods, which were shown to have service levels short of customer expectations.

There has been communication from several of the smaller taxicab companies who have requested that they be able to maintain their current permit allocation or be issued additional permits, rather than reallocating all of the permits based upon the pre-established method. Staff does not support this request, as all of the companies have had a full, equal opportunity to build their business and off-Airport trip volume over the last two years. The reallocation method was fully discussed prior to approval by City Council and numerous times with companies over the past two years. Staff has also received communication from one company concerned with what they perceive to be a delay in the implementation of pre-apporoved method from September 30,

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject: Taxicab Service Model Status Report Supplemental Memorandum
Page 6

2007 to November 1, 2007. Staff has established the current timeframe based upon the need to verify questionable data. Staff will conduct a September 28th meeting with all companies to present the results, and will present the findings to the Airport Commission on October 1st.

## Leaseability/Transferability/Caps

The TAT established a series of working groups to discuss and consider the feasibility and methodology of further accommodating the lease and potential transfer of Airport access permits, as well as the establishment of a Citywide cap on the number of drivers and vehicles. The working groups held a series of meetings and discussed ideas and possible approaches to the TAT. Simultaneously, and in response to City Council direction set forth during the initial adoption of the Taxicab Service Model, staff developed a potential methodology for the transferability of Airport access permits. The findings of the working groups, along with corresponding staff recommendations are detailed in Attachment A, "Evaluation of Taxicab/Airport Permit Leaseability, Transferability, and Caps," which clearly outlines the background, stakeholder discussion, and recommended actions related to each issue.

It is important to note that this evaluation was brought before the Airport Commission on May 7, 2007 for their consideration and action. The Commission voted to support all of staff's recommendations. As previously noted, staff recommended that the Committee accept the report and the associated recommendations at the June 4, 2007 T&E Committee meeting. However, immediately prior to the meeting staff received a letter from Mr. Rattan Dev S. Dhaliwal, Esq., as a representative of a faction of taxicab drivers, raising concerns with staff's recommendations. The attached letter from Deputy City Manager Ed Shikada provides a response to Mr. Dhaliwal.

## Taxicab Regulation/Governance

The Taxicab Advisory Team (TAT) was originally established in 2001. At its inception the TAT was created to serve as the oversight, dispute resolution and advisory body for the taxicab industry issues. The group was intended to be balanced in its representation of affected stakeholders in order to ensure that all perspectives were being considered. The TAT was established with seventeen members representing the following groups:

- Four Owners and/or their representatives
- Four Drivers and/or their representatives
- Four customer representatives (Downtown Business Assoc., Hotel Industry, Convention/Visitors Bureau, and Disability Advisory Commission)
- Five City Administrators (a representative from the CMO that would serve as Chair, and representatives from DOT, SJPD, Airport, and CAE)

Each appointee was asked to serve for a two-year period to maintain continuity. At the outset the TAT met on a quarterly basis (August, November, February, and May), with specific topics of discussion identified for each meeting. The TAT was then required to provide an annual report to City Council in the fall of each year.

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject: Taxicab Service Model Status Report Supplemental Memorandum
Page 7

Over time the TAT evolved into a less formal body. The meetings were held more frequently, on a monthly rather than quarterly basis, and while each of the stakeholder groups continued to be represented, the group representatives changed without formal appointment. In addition, the TAT decision-making process became more consensus oriented rather than driven by a Roberts Rules of order and a majority of stakeholder votes. It should be noted that through this evolution, the TAT has proved to be an important and successful forum for the consideration and resolution of issues confronting the taxicab industry.

However, this less formal format best served the committee when acting on the less contentious issues. In addition, recent action by driver representatives to refrain from participating in TAT meetings has called the current structure into question and has placed the City Council in the awkward position of being the final arbiter regarding very detailed issues related to the operation of the Taxicab Service Model. Consequently, staff recommends that Council consider the following three options for re-establishing regulatory governance over the Taxicab industry.

First, Council may return to the original formal appointee format for the TAT and appoint individuals to fulfill the respective stakeholder terms. This would re-establish the TAT's formal oversight responsibilities and offer all stakeholders an opportunity for meaningful participation.

Given the ongoing challenges faced by the industry and in an attempt to ensure broad participation by industry stakeholders, a second governance option could be the City Council creating an Independent Taxicab Commission. Such a Commission would take independent and final action on issues relating to the operation of the Taxicab Service Model in the City of San José. The Commission would require the assistance of direct staff support likely, at a minimum, some type of Administrator and Staff Assistant. Taxicab Commission staff would be supported by current staff in the Transportation, Airport and Police Departments in their respective areas.

If the Committee is interested in further exploring a Commission, an example to consider is a seven member body appointed by the Mayor and approved by the City Council, selecting individuals from a broad spectrum of constituencies, and not necessarily stakeholders in the Taxicab Industry. The Administrator and Staff Assistant could be appointed by the City Manager to ensure consistent professional staff support. Finally, a fee assessed to both Taxicab companies and drivers to ensure cost recovery of the Commission would be suggested.

A final alternative would be to consider regulating taxicab service on a countywide basis through the Valley Transportation Authority (VTA). Taxicab service delivery constantly crosses municipal boundaries in the County. Outreach Paratransit services are already coordinated by VTA.

## Upcoming Challenges Related to Airport Taxicab Service and Management

The Airport construction program will impact the location and size of taxi and shuttle staging areas as well as the roadways between them. While pick-up locations will remain close to customers, providing quick access and maintaining timely service will be challenging. It will be

TRANSPORTATION AND ENVIRONMENT COMMITTEE
09-21-07
Subject: Taxicab Service Model Status Report Supplemental Memorandum
Page 8

important for TSJ, the drivers and Staff to work closely together to ensure efficient flow and coordination of movements to get the vehicles to the correct locations in a timely manner.

Funding of the appropriate staffing and the Airport Ground Transportation Program (GT Program) will be discussed this fall as the Airport works towards cost recovery of the programs. Adjustments to trips fees, including the potential for changing monthly fees into per trip fees is being considered. Taxi trips comprise over half of the trips generated within the GT Program. Economics of the industries are being considered and has been one of the major reasons for not increasing fees for the dispatch system or the GT Program since the inception of the new Model.

Consistency and open communications between TSJ and the taxi and shuttle industries, as well as between TSJ and City Staff, will remain an important piece of providing a positive and growing service to our Airport passengers. Accurate reporting and provision of information to the drivers and owners will eliminate many of the issues that have arisen over the first two years of the program. TSJ has committed to this level of service and Staff will work with them to accomplish this high level of performance.

Impartial and fair treatment of both taxi and shuttle industries by all levels of TSJ will assist in resolving the issues between the taxi and door-to-door industries. Both industries are competing for the same group of passengers, those without prior reservations looking for a commercial ground transportation option. By clearly providing the data that supports the impartial distribution of trips and equality of treatment, this issue can be defused. Improvement in future locations of the two industries at the pick-up curbs will assist with this process, but both sides must be able to clearly see that neither party is being favored and that the customer is able to clearly make their own choice in their travel options.

## PUBLIC OUTREACH

Staff has presented to and sought feedback regarding major elements of this report from Taxi San Jose and the Taxicab Advisory Team.

## COORDINATION

This report has been coordinated with the Police Department and City Attorney's Office.

James R. Helmer
Director of Transportation

for    William F. Sherry, AAE
Director of Aviation

Attachment A

# Evaluation of Taxicab/Airport Permit Leaseability, Transferability, and Caps

The purpose of this document is to evaluate three specific taxicab industry items – leaseability, transferability, and driver and vehicle caps. Each of these items has been considered during the development of the new Taxicab Service Model. In approving the current Taxicab Service Model, the City Council referred two of the three items (transferability and driver/vehicle caps) to staff for further review and follow up.

## BACKGROUND AND HISTORY

Through the spring and summer of 2005, staff and the taxicab industry invested significant resources to ensure the effective implementation of the new Taxicab Service Model. The volume and complexity of implementation issues – from competitive procurement of a starter and dispatch service, to developing and executing driver permits and company contracts, to refining data and communication systems – limited the time that staff and the industry have had available to effectively work on other customer service, industry and regulatory issues.

Following a reasonably successful implementation of the new service model in the fall of 2005, taxicab driver training was implemented in the Spring of 2006 as part of the overall effort to improve the quality of the taxicab industry and its customer service. Almost 400 of the 500 drivers received the training. However, other components of the proposed customer service program such as enhanced industry marketing and business development, and the installation of information display pouches in taxicab vehicles, have not been advanced by the taxicab industry. By most accounts though, the new taxicab service model has been highly successful when measured against the stated goals of the service model.

Since the Taxicab Service Model was approved in May of 2004, the Taxicab Advisory Team (TAT) has continued to meet on a monthly basis to work on issues that are important to the City and the taxicab industry. During the semi-annual development of the workplan for the City Council Transportation Committee, staff has reported on the status and progress of the Taxicab Service Model and other regulatory and industry issues. The feedback from the Committee has been positive to date.

In response to the three items that are the focus of this evaluation, it is important to note several actions that have already occurred. The current Taxicab Service Model already provides a system of leaseability for companies and limited leaseability for drivers with Airport permits. Further, in May of 2005 and again in August of 2005, staff at the direction of the City Council, agendized a proposal that would have created a temporary cap on the number of Citywide taxicab driver permits and vehicles. The item was deferred and dropped in August 2005 pending the outcome of the implementation of the new taxicab service model. In September of 2005, with the implementation of the new taxicab service model, permit caps were established at the Airport based upon the consultant's recommendation to ensure that there was a sufficient supply of cabs while minimizing taxicab wait times. The Airport market more naturally lent itself to the regulation of the number of permits than did the Citywide market because there is the ability to control access and the average number of trips is seasonally consistent.

In the fall of 2006, staff placed the issues of leaseability, transferability, and driver and vehicle caps on the TAT Workplan. The TAT created three sub-committees to frame the three issues and return back to the full TAT with input and recommendations. This report reflects the work of the sub-committees, and includes staff's recommendation to the full TAT regarding how to proceed on these issues.

## ANALYSIS

This section of the report describes the elements of the three items under review, the work and discussions that the TAT sub-committees conducted, and staff's recommendations. The current Taxicab Service Model was established with the goals of expanding access to the Airport and enhancing service to the downtown, neighborhoods, and customers in general. The service model was also designed to create equity and balance within the taxicab industry, between companies and drivers, and to improve driver's opportunity to earn more income. Finally, the service model needed to be efficient and manageable from a City regulatory perspective, given limited staff resources and lack of cost recovery of the fees charged to this industry. The evaluation of leaseability, transferability, and driver and vehicle caps must occur within the framework of the goals of the Taxicab Service Model in order to be effective.

### 1.  Leaseability of Airport Taxicab Driver Permits

Leasing taxicab permits and vehicles was exclusively within the realm of taxicab companies prior to implementation of the current Taxicab Service Model. With implementation of the current Taxicab Service Model, drivers were granted limited leasing provisions with their Airport taxicab driver permit. Drivers with Airport taxicab permits can lease their permits two times for up to a total of three months in a twelve-month period. The current permit holder remains accountable for all permit requirements, including the actions of the lessee. The lessee must also be a permitted taxicab driver in the City of San José. The remaining terms of the lease are between the parties executing the lease, including monetary compensation. Companies have the ability to lease Airport permits under their control, and are similarly accountable for all requirements.

The TAT sub-committee on leaseability met to discuss the issue on October 3rd, 30th and November 29th, 2006. The sub-committee determined at its first meeting that since no overall cap existed for Citywide taxicab driver permits, the only current market for leaseability was the Airport. Airport driver permits are limited to 300 (150 each alternate day) thus creating a potential market for drivers without Airport permits. The sub-committee also achieved consensus that the permit holder (driver or company) would remain accountable for meeting all permit requirements.

Taxicab drivers on the sub-committee proposed that Airport permitted drivers have authority to:

- Lease their permit at any time.
- Lease their permit to a second shift driver on the same day they worked their permit.
- Extend the total lease time from the current three months to six months.

Significant discussion occurred on the above proposals and other ideas include:

- Extending lease periods from the current three months to four months.
- Requiring the permit holder to service (actually drive) their permit 66% of their overall required 130 days (5 of every 14 days = 130). The 66% requirement would result in service being directly provided by the primary driver 86 days a year each at the Airport and in the City (172 total).
- Authorizing drivers to lease permits only on their assigned Airport days that they choose to not work themselves to avoid overcrowding of taxicabs serving the Airport.
- Lease Airport Access permits only to drivers currently on the Airport Permit Waiting List.

The sub-committee also discussed the potential impacts and challenges associated with the proposals and changes to the current system of leaseability. Those discussions included:

- Authorizing a 2nd shift lease would likely reduce the average number of trips per day that all Airport permitted drivers receive because it would likely add an additional driver at a time when the primary driver normally does not work. Prior to the implementation of the Taxicab Service Model, a total of 343 cabs had access to the Airport each day, with an average of 225 cabs working per day. These cabs averaged 1,025 trips per day for a per driver average of 4.55. Currently, 150 cabs have access to the Airport on any given day. The average trips have remained constant at roughly 1,025 per day, however, the average number of trips per driver have increased to an average of 6.83 per driver per day.

- Market forces would determine the fees that would be paid by lessee drivers. The City, unless it became more heavily involved in regulating this aspect of the industry, would not be able to monitor lease transactions, and the associated impact to driver income.

- Drivers on the waiting list will likely wait a much longer period of time to receive an Airport taxicab driver permit as existing permit holders would likely see alternative opportunities to generate income, without having to actually drive a taxicab vehicle, and thus would likely hold on to permits longer than they might otherwise. To date under the current taxicab service model, 23 drivers have declined Airport permits and 17 have returned them, allowing 40 drivers on the waiting list to gain the opportunity to service the Airport.

- Primary permitted drivers must remain accountable for all permit provisions. Extended and frequent leasing of the permit increases the likelihood that all permit provisions will not be met, and infractions would occur that must be resolved with the primary permit

holder. The likely impact of allowing leasing in excess of three to four months per year is an increased difficulty, if not impossibility, of contacting the primary permit holder to resolve potential issues or infractions by the lessee (e.g. the main reason drivers initially requested leaseability in its current form was to enable lengthy trips to other countries).

- Leasing for a 2nd shift at the Airport has the potential to attract drivers that normally serve the Downtown, neighborhoods, and dispatch calls, which may result in reduced service to non-airport passengers throughout San José.

Follow-up discussions on the topic with the Taxi Advisory Team (TAT) on April 20, 2007 included the following comments:

- Several companies indicated they are not utilizing their multiple driver leasing provision with any regularity, and as a result would agree to make their leasing provisions consistent with the drivers provisions.

- At the same time, several companies suggested that they would not engage in second shifting of any kind.

- All companies were unified in their opposition to having limits placed on the number of times per year that a company permit could be given to a new/different driver.

### Staff Recommendations to Taxicab Advisory Team on Leaseability

1. Extend the maximum lease timeframe for drivers from three months to four months, without limits on the number of times a permit can be leased per year.
2. Only authorize the extended lease period to drivers who are in full compliance with all permit obligations.
3. Establish the minimum annual service days at 86 days for on-and off-Airport days for a total of 172 City-wide.
4. Second shifting of driver or company permits should not be allowed under any circumstances to ensure that driver trip volumes do not drop to pre-model averages.

### 2. Transferability of Airport Taxicab Driver Permits

Transferability refers to the sale, exchange or relinquishment of Airport taxicab driver permits from a current Airport permitted driver to a driver that only has a City taxicab driver permit. As part of the approval of the current Taxicab Service Model, the City Council directed the development of a legal methodology and implementation plan for transferability of permits within the system. The direction also required that information be included on the anticipated impacts and important considerations of implementing a new system.

A TAT sub-committee on transferability met to discuss the issue on November 1, 2006. The sub-committee discussed a variety of potential transfer methods and criteria. Providing context for the entire transferability discussion was the fact that the Taxicab Service Model was designed to provide working drivers an opportunity to generate additional income through a more equitable regulatory system that provided flexibility to drivers to choose the company they affiliate with based upon the income opportunities and fees established by the company. It was not a service model designed to provide financial benefits for non-driving activities such as transferability. As a result, the City did not charge an acquisition fee to the primary permit holder. The Airport permits were assigned free of charge to drivers based upon their ranking on a list established by the number of trips a driver served Airport customers during the service model study period. A waiting list has since been established, via lottery, of drivers wishing to obtain their own Airport permit. As Airport permits become available, they are assigned to drivers in order on the waiting list free of charge. As mentioned previously, 40 drivers from the waiting list have received permits.

Participants in the sub-committee process identified several potential strategies upon which to base a transfer methodology. The first proposed method of transfer would occur when an Airport permit holder no longer wants to continue servicing the permit. The permitee would return the permit to the Airport, and drivers on the existing waiting list would be given the opportunity to acquire the permit in the order they appear on the list similar to the current method, after paying a transfer fee. The significant difference from the current method is that the transfer would result in the payment of a second City established transfer fee to the Airport, with 50% of the fee being paid to the permit holder initiating the transfer. The remaining 50% would be used by the Airport to offset the costs of managing taxicab programs.

The second potential method of transfer could be used when an Airport permit holder no longer wants to continue servicing the permit. Similar to the method described above, the permit holder would return their permit to the Airport and the permit would be transferred through a competitive bidding process by those on the waiting list, or all City permitted taxicab drivers. In this instance, the transfer would result in the payment of the proposed bid amount of the highest bidder to the Airport, with a 50% of the fee being paid to the permit holder initiating the transfer. The remaining 50% would be used by the Airport to offset the costs of managing the taxicab programs.

It is important to note that the original offering of Airport driver permits occurred without having assigned any value or potential monetary benefit at the time of the initial distribution. Staff recommends that, in the event that some form of transferability of Airport permits is adopted, the City and the Airport consider a re-distribution all 195 of the Airport Access Permits through a lottery system. This system will allow all drivers an opportunity to obtain a permit provided that they meet the overall criteria.

## Considerations of Transferability of Airport Driver Permits

At the time of approval of the new Taxicab Service Model in 2004, the City Council recommended consideration of transferability of Airport permits only after an evaluation of the

Evaluation of Leaseability, Transferability, and Caps
Page 6

effectiveness of the Taxicab Service Model. Any evaluation of the new system should consider how it is working both at the Airport and Citywide. A major objective of the alternate day rotation system and allocation of company Airport permits based on City trip volumes is to improve service for the City (non-airport) market. Thus, prior to considering transferability, the new system should be shown to be effective in both providing the desired level of service at the Airport, and in improving dispatch response times and service quality for non-Airport trips. There has been monitoring of the new system, yet a final determination on the overall effectiveness of the new system cannot be made quickly. The proposed system includes a 2-year transition period (thru September 2007), and that period of time and possibly an additional year are needed before the long-term success of the new system can be fully determined.

## Concerns with Transferability of Airport Driver Permits

Transferability of Airport driver permits is not part of the recommended service model largely due to the counterproductive impacts of transferability on driver incomes beyond an initial, potential windfall for the group of current drivers that received permits in the initial allocation; and due to the constraints that transferability would create for further modification of the taxi service model to changing City needs.

Fundamentally, transferability means that certain drivers receiving permits would benefit at the possible expense of existing drivers that do not receive a permit in the initial allocation and future generations of drivers. A major issue in the current study has been driver incomes; a major feature of the recommended service model is to control the number of cabs serving the Airport as a way to improve driver productivity and driver incomes. Drivers are hoping that these controls will translate into a value to their Airport permits. If this develops, drivers holding Airport permits could sell the permits to other drivers and thus profit from having held the permits.

While this may be desirable from the perspective of the drivers who have been issued the initial Airport permits, the effect would be to reduce the incomes of drivers that want to work the Airport in the future. Existing drivers not receiving permits in the initial allocation, and future drivers, would have to make an upfront payment to gain access to the Airport through a driver permit; putting them at a distinct disadvantage to current Airport permitted drivers. The payments would come from personal savings or loans. If loans are not available, the need for building up personal savings poses a barrier to entry for future drivers. If loans are available, payment on the loans then reduces the net income of those drivers making loan payments – potentially quite substantial, as seen in New York, Chicago, Boston and other major cities where a medallion system has been adopted.

In effect, permit transferability may result in the City facing the same problems with driver incomes that the proposed service model is designed to address. The new service model would thus be a short-term "fix" without lasting impact on the incomes of drivers who serve the Airport, exactly the opposite of the intended result.

Evaluation of Leaseability, Transferability, and Caps
Page 7

Transferability also is likely to create obstacles to modifying the regulatory system to meet unforeseeable changing circumstances. The value of permits from transferability creates very strong incentives for permit holders to resist changes to the system, however beneficial they might be. It is notable that in major medallion cities, taxi drivers and owners resisted increasing the number of taxicabs for decades on the fear that an increase would hurt medallion values. In fact, however, medallion values and the position of the industry were strengthened by the issuance of additional medallions because customers could be better served, industry market share increased, which in turn translated into increased medallion values. However, staff's position on transferability is that taxicab permits are City owned permits whose rights should not be privatized. The Taxicab Service Model is organized in a manner that emphasizes that the appropriate place for profit in the taxi industry is the result of providing excellent service to the customer.

### Staff Recommendations on Transferability of Airport Permits

1. As the initial two year phase of the taxicab service model nears completion, staff recommends that the current system where drivers gain access to Airport permits based upon service, and their position on a waiting list be maintained, as opposed to a system where drivers buy and sell permits through an open market or regulated transfer process. Current drivers gained access to Airport permits through service, without any charge, as a means of encouraging their long-term service commitment. Future drivers on the waiting list should be provided the same opportunity. Staff analysis of the issue, and recommendation, provides the requested information to meet City Council direction to develop a legal methodology for transferability, including the anticipated impacts and important considerations of a new system.

2. In his letter dated April 27, 2007, Ron Lind, President of United Food & Commercial Workers Local 5 states that the staff's analysis on Transferability is flawed, however, they make no statements as to how Transferability could be implemented or how the staff's recommendations should be modified.

### 3. Taxicab Driver and Vehicle Permit Caps

As part of the approval process of the Taxicab Service Model, the City Council directed that staff return to the City Council Transportation Committee with the framework for an administrative methodology for adjusting the number of Citywide taxicab permits. In the interim, there shall be no increase in the overall number of Citywide taxicab permits using March 1, 2004 as the baseline. Staff provided a status report to the City Council Transportation Committee on November 1, 2004 identifying the that number of taxicab driver permits had reached the level of 571 and the number of taxicab vehicle licenses had reached the level of 572. At the November 16, 2004 City Council meeting, staff was directed to draft an ordinance for City Council approval that would temporarily limit the number of citywide taxicab driver permits at 571 and the number of taxicab vehicles at 572. In response to this direction staff agendized an item for City Council consideration on May 17, 2005. The item was deferred twice to May 24th, 2005

Evaluation of Leaseability, Transferability, and Caps
Page 8

and August 23rd, 2005 before being dropped. Staff has continued to monitor driver and vehicle numbers and has provided status reports to the TAT from March 1st, 2004 to the present. Police Department data has consistently shown that driver permits and taxicab license numbers have remained constant at or near 500 for both drivers and vehicles.

## Background on Taxicab Driver and Vehicle Caps

The TAT sub-committee on Driver and Vehicle Caps met on November 13th, 2006 and January 17, 2007. Before the sub-committee discussions on a cap are presented, it is important that information and analysis on the subject place the issue in context. The goal of a cap on the number of permitted taxicabs in the City would be to address a perceived oversupply of taxicabs. The information below identifies what factors should be considered, and how the setting of a cap might occur, in the event that it is determined that setting a cap is the best course of action for the taxi industry and the City.

Setting and maintaining a cap must adequately address two issues. First, the factors to be used in the analysis that would lead to setting a cap must be clearly identified and be shown to have a direct impact on driver income. Second, a methodology must be developed for the on-going administration of a cap and the issuance of additional permits when demand for taxicab service increases beyond the taxicab industry's capacity to meet it.

## Challenges with the Use of Caps, Particularly on the Citywide Market

A cap on the number of taxicabs on a Citywide basis is not part of the recommended service model for the following reasons:

- Caps reduce incentives to expand markets and improve customer response times.
- The inherently difficult and imprecise nature of the analysis used to determine caps.
- Caps increase regulatory burden and costs created by administering and reviewing cap levels.

## Caps Reduce Incentives to Expand the Market

A primary goal of the recommended service model is to create incentives for cab companies to market their services and increase trip volumes for drivers. Caps undercut incentives for companies to improve and market their services, since they are prohibited from expanding in size as warranted by increased demand. Comparisons with other cities indicate that the demand for cab service in San José is partially depressed by high fares and slow response times, and capping the market will not improve this situation. San Jose's taxicab fare is among the highest fares in the nation, and in fact has the highest rate of the 13 largest taxicab markets in the US. In addition, in terms of customer satisfaction with wait times, it is one of the lowest rated aspects of service in this industry, with 35% of Downtown businesses rating response times as poor. When compared to San Diego, Seattle, Fairfax County VA, and Montgomery County MD, the average number of daily dispatched trips per 100,000 population is significantly lower in San Jose. It should also be kept in mind that San José has a number of factors that make future growth an

expected reality including: the Airport Masterplan, the City's Economic Development Strategy, future developments in Downtown, and new and updated regional malls.

## Setting Caps is Difficult and Imprecise Work

Caps require a difficult and imprecise evaluation of the number of cabs necessary to serve current demand. The optimal balance between the number of cabs and trip volumes is affected by numerous factors including the efficiency of dispatch procedures and geographic and time-of-day variations in demand. Setting the number of Airport permits at 300 has required extensive analysis; the task of setting a Citywide cap is several orders of magnitude more difficult, and must take into account that San Jose's cabs are also the primary fleets that serve many of the other cities in Santa Clara County.

The Airport has fairly precise taxicab data, by time of day and day of week. The Taxicab Advisory Team (TAT) extensively analyzed and debated what the appropriate number of cabs at the Airport should be. After two months of debate, the TAT could not agree on the appropriate number. The current Airport companies thought that 350 alternate day permits were needed to adequately serve Airport customers. Drivers were of the opinion that 240 could adequately meet customer needs. Staff determined that 300 permits (60 of which are proposed on a provisional basis until actual experience is obtained) would be the appropriate number to meet customer needs and ensure productive Airport days for drivers. Attempting to establish a similar number for the City given all the variables would be a difficult and costly exercise.

## Regulatory Burden and Cost of Setting Caps is High

Capping the number of taxicabs will likely result in the City regulating other economic aspects of the taxicab industry, principally the gate fees that cab companies charge drivers. San Francisco, Chicago and New York have all found it necessary to regulate gate fees as well as the number of cabs, when the goal attempting to be achieved is higher driver incomes. The results from each of these cities, in terms of impact on driver income, have been mixed.

Finally, the level of regulation incurred by caps and possibly gate fee regulation is costly and burdensome. In 2004, San Jose had a $750,000 shortfall in cost recovery for taxicab regulation. Staff has implemented a new service model, with improved regulatory oversight, all within existing staffing levels. Given the overall budget shortfall the City is attempting to balance by June 30th, proposing the addition of staff to regulate an industry that is well short of cost recovery remains counterproductive. Analysis of caps cannot be undertaken without additional staff or consultant resources, and fees on the industry. But if fees are to be raised, they should first be allocated toward reducing the City's current shortfall between regulatory costs and fee revenue, and not on adding new regulatory activities.

Evaluation of Leaseability, Transferability, and Caps
Page 10

## Relevant Factors for Setting a Cap on Taxicab Drivers and Vehicles

Setting caps on drivers or vehicles should be based on an analysis of the following factors:

- ❑ Trip volumes (both airport and non-airport trips) and market demand
- ❑ Customer response times and customer satisfaction
- ❑ Number of cabs and utilization rate
- ❑ Number of drivers (full-time, part-time and not working)
- ❑ Driver productivity and driver income
- ❑ Rate of (customer) fares
- ❑ Gate fees charged to drivers by companies
- ❑ Company marketing and promotion
- ❑ Driver movement between companies

Based on these factors, it could be assessed whether market conditions suggest that a cap is necessary. If it was determined that market conditions were favorable enough, no cap would need to be considered. If it is determined that market conditions were not improving, staff would then be authorized to begin the process of making a determination to set a cap. If the City Council were to direct staff to declare a cap, objective criteria would need to be used to ensure a fair and defensible process in the setting of a cap, requiring further consultation with the City Attorney's Office.

## Administration and Adjustment of a Cap

Were a cap to be instituted, there would necessarily be periodic (annual or every other year) reviews of whether the number of authorized taxicabs were sufficient to meet customer demand. The review should be conducted at the request of taxicab companies, drivers, taxicab users (including residents and the business community) or the relevant Departments of the Transportation and Aviation Services City Service Area.

Given the costs that would be created by a review process if a cap were set, it is recommended that a fee be charged to each taxicab company, based on the number of taxicabs in use at the company, including affiliated cabs, and on each permitted driver on a cost recovery basis. Companies and drivers would share the cost of the review. For example, if the total cost of a review was $60,000, and there were 480 taxicabs and 480 permitted drivers, the cost would be $61 per cab, including affiliated cabs (paid by companies) and $61 per driver (paid by drivers).

## Citywide or Company Specific Caps

A key consideration in setting and administering a cap concerns whether the cap applies to the industry as a whole or to individual companies. Generally, other jurisdictions have set their caps citywide. The advantages of the citywide approach are its simplicity and uniformity.

The disadvantage is that a citywide cap is unfair to cab companies that are not the source of the oversupply of cabs. While some companies may have an oversupply of cabs relative to dispatch calls, other companies may appropriately balance supply and demand. These latter companies most likely have effectively marketed and promoted their services and thus increased dispatch calls, trips per driver, driver productivity and driver income. It would be unfair and likely counterproductive to cap the ability of some companies to grow – and their incentive to improve their operations – due to problems at other companies. Thus, in order to maintain the current service model incentives for companies to market, promote and attract new customers, if the City Council determines a cap to be an appropriate regulatory tool for the City to use, it is suggested that it be considered on a company-specific basis rather than industry-wide.

An additional consideration in administering a cap concerns the start-up of new companies. A key element in the proposed service model is allowing new companies to enter the market and compete with existing cab companies. San José has seen one new company enter the market in recent years and compete effectively and build its business and reputation. In order to maintain this key feature of the recommended service model, it is recommended that new companies be allowed to enter the market, even in the event that a cap is instituted, if they show a market need, a credible business plan to meet the market need, and have a commitment from 5 or more drivers (15 after the 2-year transition period that ends in September 2007) to be affiliated with the company within a designated period of time.

## Experience in Other Jurisdictions with Caps

The experience of three jurisdictions illustrates alternative ways that periodic reviews on the number of authorized taxicabs are conducted.

<u>San Francisco</u> – The San Francisco Taxicab Commission conducts an annual review of the number of taxicabs in the city/county. The review this year will include a mail survey of taxi users, test calls to cab companies to measure dispatch response times, and observations of taxi availability for flag drops on Downtown streets and at hotel taxi stands. The Taxi Commission will publish the results and hold a hearing. If the Taxi Commission votes to issue additional medallions, the City Controller conducts an analysis of the financial impact on the industry and recommends to the Board of Supervisors whether fares and gate fee caps should be adjusted. The cost to the Taxi Commission including consultant and staff time is projected to be $50,000 to $60,000. The cost for the City Controller to complete their portion of this analysis was not available and the results of the analysis are typically limited in terms of the depth of analysis.

<u>Denver</u> – The Colorado Public Utilities Commission regulates Taxicabs in Colorado. Reviews of the number of taxicabs are conducted in response to applications for operating authority from existing or new taxi companies. Applicants must prove the need for additional cabs; companies typically attempt to do so through letters of support from the public and hotels and the testimony of witnesses (consumers and/or experts). Administrative law judges conduct the hearings and make a recommendation to the PUC based on the hearing record. PUC staff has not conducted independent studies. Costs include the time of judges and court reporters; no cost estimate is available.

Evaluation of Leaseability, Transferability, and Caps
Page 12

Las Vegas – The Nevada Taxicab Authority, which regulates taxicabs in Las Vegas, collects detailed statistics on trips, revenues, average fares and shifts worked from each of the 16 cab companies on a monthly basis. In 1996, the Taxicab Authority adopted a formula for issuance of additional taxicab medallion licenses based on the number of taxi trips. Additional medallions are issued based on increases in the number of trips. Taxicab Authority staff conduct analyses of the industry data and report to the Taxicab Authority Board, which makes the final decision after hearing testimony from companies, drivers and other interested parties. The Taxicab Authority has regularly issued new medallions, most recently a May 2003 allocation of three medallions per company. An estimate of costs of the analyses and reviews is not available.

## Sub-Committee Proposals on Driver and Vehicle Caps

During the first sub-committee meeting, the stakeholders representing drivers and the local union proposed the following:

- A cap on vehicle licenses at 475.
- A reduction of driver permits.

After lengthy discussion, the following impacts and challenges to implementing a cap on taxicab drivers or taxicab vehicles were brought forward:

- Setting a fixed cap may limit the ability to provide acceptable customer response times both on and off airport. (Acceptable response times identified in the Taxicab Regulatory and Service Model Study were 20 minutes from the request for service for off airport service calls or within 5 minutes of the requested pick-up time. On airport service wait times should be 5 minutes or less.)
- Setting a cap would limit taxicab companies' ability to grow their customer base.
- How would taxicab companies that are losing drivers, but not necessarily customers, meet customer demand if a cap on drivers has been hit?

Taxicab companies present at the sub-committee meeting were opposed to setting caps on both drivers and vehicles. It was pointed out that the City does not limit other industries from acquiring resources and equipment to respond to market demands. The taxicab companies indicated that their primary revenue transaction was to lease vehicles, and access to a customer base by contractual drivers. Should a cap be established it would:

- Limit a company's ability to generate business and market share.
- Adversely impact taxicab companies in their ability to meet trip demands.
- Adversely impact a company's ability to increase their fleet size, which further limits their ability to generate a return on their business investment.
- Drivers moving from one company to another may not be able to be replaced by the primary company and this could adversely impact customer service response times if the primary company does not have sufficient drivers to handle their call volume.
- If only vehicles were capped, then the remaining vehicles would have a much heavier demand and may create a necessity to operate a single vehicle 2-3 shifts a day.

Evaluation of Leaseability, Transferability, and Caps
Page 13

- Replacement vehicles for those cabs out of service for repair or because of an accident may be limited or non-existent.

## Staff Recommendation/Potential Impacts of Caps on Airport Access Permits

1) **Self-Regulation:** Given the industry's apparent self-regulation at 475 to 500 vehicles and drivers, there is no urgent reason for establishing a cap at this time. Reports of extended wait times for cab service in the downtown and at the airport have been reported during special events when the draw on cabs at both the airport and in the City is high. This in an indicator that there are insufficient cabs at certain times and that a cap would only increase poor response times if a cap were instituted and the numbers of available cabs were further reduced. Data shows that daily driver trip volumes have increased since the inception of the Taxicab Service Model. The pre-model average of approximately 4 trips per day has increased to a current average of approximately 7 trips a day.

2) **Company Plan/Offer:** Consistent with initiation of the service model in September 2005, staff will require taxicab companies to provide current and prospective drivers with a company plan and offer designed to inform drivers of the advantages, opportunities, marketing, and expected trip volume as well as the specific fees to be charged. The company plan and offer is designed to generate competition among companies for driver's services. This process along with the permitting of drivers, and providing access to all San Jose taxicab companies at the Airport provided for lower driver fees by companies, and the creation of a company that is majority owned by drivers.

3) **Cost Recovery Shortfall:** As was documented during approval of the service model in 2004, the current regulatory costs of the taxicab industry are not recouped through industry fees. The General, Airport, and Transportation Funds absorb the shortfall. Any expansion of regulatory requirements, like the implementation of a cap, would only exacerbate the existing shortfall, in an environment where further budget reductions are being recommended in the 2007-08 Proposed City Budget.

4) **Increase Regulatory Cost Per Driver:** If caps are instituted the shared cost of regulatory fees would need to be spread among a smaller driver base, and potentially significantly increasing individual driver costs.

5) **UFCW Local #5 Comments Regarding Caps:** In their April 27, 2007 letter UFCW Local #5 suggests "the emphasis of any analysis of appropriate supply and demand should focus on a solution around distribution of current cabs at appropriate times." This suggests that either the Airport or the City of San Jose have the regulatory capability to deploy cabs during high volume periods, which they do not. In addition, Taxicab Companies regard drivers as independent contractors and not employees, and therefore do not control their working hours in any way that would accommodate the union's recommendation. At present, the Taxicab Service Model regularly experiences cab shortages at the Airport during peak demand periods. It is clear that any reduction in the current number of cabs/drivers would significantly increase wait times as a result. It is important to note that, along with driver incomes, customer service is a central component of a successful taxicab service model.



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Office of the City Manager*

September 24, 2007

Mr. Rattan Dev S. Dhaliwal, Esq.
Dhaliwal & Rouhani
2005 De La Cruz Blvd.
Santa Clara, CA 95050

Re: Taxicab Service Model Report

Dear Mr. Dahliwal:

In light of our ongoing discussions, I thought it would be helpful to recap in writing the status of those discussions, and to use this as a response to your letter of June 4, 2007.

I would also like to confirm that the deferred discussion at the City Council's Transportation and Environment Committee is currently scheduled for discussion on October 1, 2007. While no specific action is being recommended, this meeting will provide the next scheduled opportunity for the City Council to discuss the status of the taxicab service model and associated issues. Please feel free to attend and make any communication you see fit to the Committee.

Please also let me reiterate that our recent discussions have been very constructive. You have demonstrated the communication skill and interest in this issue that is critical to building our mutual understanding of how we can work collectively for the betterment of the San José taxicab industry and customers.

Specifically, your June 4th letter makes points to support transferability and leasability of Airport and basic City permits, as well as a citywide cap on taxicab permits. Subsequently, we have met twice to better understand each other's perspective and attempt to identify workable solutions for all stakeholders. As we have discussed, City staff has concerns with each of the transferability/leasability/cap proposals, as well as the points made in their support. You have noted an interest in reviewing the background analysis and taxicab service model study that was completed for San Jose in 2004. You have since received this material, and I look forward to continuing our dialogue on the study and the basis for its conclusions.

As we continue with additional meetings for the purpose of mutual understanding, we respect your desire to work independently with drivers and companies to build consensus and lines of trust and communication. In the meanwhile, we will continue to report to the City Council on the status of service model implementation, our discussions, and highlight any notable areas for their information.

Mr. Rattan Dev S. Dhaliwal
September 24, 2007
Page 2

In particular, I am very optimistic about the prospect of engaging the City's Office of Economic Development and specifically our workforce investment program staff. As we have discussed, the City is willing to facilitate a small business review with your clients and the industry overall, to identify any potential business planning, market development, and training opportunities. We believe that this could be extremely beneficial to San José's taxicab companies as a way to enable the industry to develop and improve their business, and hope that you will be able to convince your clients to participate in this effort.

In conclusion, I hope that we are able to build on our meetings to date, as a means to build consensus within the industry and improve its success. The goals of the taxicab service model are to balance the needs of customers, companies, drivers and the City's regulatory requirements in the most effective an efficient manner, and effective communication is clearly a key element.

Please feel free to call me at (408) 535-8190 if you would like to further discuss these points.

Sincerely,

Ed Shikada
Deputy City Manager