1

2

3

E-FILED on ___12/31/2007_____

4

5

6

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

SAN JOSE DIVISION

8

9

10

11

12

13

U.S.A. EXPRESS CAB, LLC; ALPHA
TRANSPORTATION, INC. dba ALPHA CAB
COMPANY; DIAL DIALING, INC. dba
CALIFORNIA CAB; CITY CAB COMPANY;
MILPITAS CAB, LLC; NATIONAL CAB,
LLC; and NET CAB COMPANY

No. C-07-06171 RMW

ORDER DENYING CAB COMPANIES'
APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

14

15

Plaintiffs,

v.

16

17

CITY OF SAN JOSE; SAN JOSE CITY
COUNCIL; and DOES 1 through 10

Defendants.

18

19

20

21

22

23

24

25

On December 19, 2007, plaintiffs ("plaintiff Cab Companies") filed an *ex parte* application

for a temporary restraining order to enjoin the City of San Jose ("San Jose" or "the City") from

reallocating taxicab permits, as the City plans to do on January 1, 2008.  San Jose filed its opposition

on December 28, 2007.  The court has read the papers and finds that the application can be decided

without oral argument.  *See* Civil L.R. 7-1(b).  For the reasons set forth below, the court denies the

application for a temporary restraining order.[1]  A hearing on plaintiff Cab Companies' application

26

27

28

---

[1]   As a preliminary matter, an application for a temporary restraining order or preliminary
injunction cannot be supported by an unverified complaint.  Wright, Miller & Kane, Federal Practice
and Procedure § 2949, 214 & n. 12 (2d ed. 1995); *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89
(9th Cir. 1972).  In *K-2 Ski Co.*, the Ninth Circuit noted that interlocutory injunctive relief must be based
on a verified complaint or supporting affidavits. 467 F.2d at 1088.  In this case, the plaintiff Cab

ORDER DENYING CAB COMPANIES' APPLICATION FOR A TEMPORARY RESTRAINING ORDER—C-07-06171 RMW
TSF

United States District Court
For the Northern District of California

1   for a preliminary injunction can be noticed for any Friday morning pursuant to the time requirements

2   of the Civil Local Rules. *See* Civil L.R. 6.2, 6.3 and 7.2.

3                                      **I.   BACKGROUND**

4       **A.    Taxi Service in San Jose Prior to 2005**

5           Prior to 2005, taxi service at Mineta San Jose International Airport was exclusively supplied

6   by two cab companies.  Docket No. 16, Decl. of Robert Lockhart, ¶ 5 & Ex. A at 7 (hereinafter

7   "Lockhart Decl.").  Yellow Cab serviced Terminal A and Checker Cab serviced Terminal C.  *Id.*, Ex.

8   A at 7.  Service quality was generally poor.  *Id.*, Ex. A at 8.  The dispatch system worked poorly,

9   with a substantial number of calls picked up late or not at all.  *Id.*  A survey of downtown business

10  persons "expressed unhappiness."  *Id.*  Taxi fares were also among the highest in the United States.

11  *Id.*, Ex. A at 12.

12          In January 2001, the City created a Taxi Advisory Team to review the City's taxi industry

13  and recommend improvements. *Id.*, Ex. A at 1.  The City also authorized the hiring of consultants to

14  develop models for improving taxi service.  *Id.*  The San Jose Department of Transportation hired

15  Schaller Consulting, who produced its report in 2004.  *Id.*, Ex. A at 1-3.  The report developed the

16  Taxicab Service Model ("Model"), which the City later approved on May 18, 2004 and implemented

17  in September 2005.  *Id.* ¶¶ 2-3.  This Model is currently in use, with changes set to be implemented

18  on January 1, 2008.

19      **B.    Taxi Operations Under the Model**

20          As mentioned, the City adopted the consultants' Model and ended the airport cab duopoly in

21  September 2005.  The Model allocates airport access permits to qualified taxicab companies.  *Id.* ¶

22  3.  An airport access permit allows a taxicab to provide on-demand pickup service at Mineta San

23  Jose International Airport.  *Id.*  "On-demand" service refers to the practice of arriving passengers

24  hailing a cab from the airport.  *Id.* ¶ 4.  It is distinct from pre-arranged reservation service, where the

25

26  Companies filed an unverified complaint, but also filed numerous declarations.  The declarations,
    however, are substantially similar to each other and do not declare many of the facts alleged in the
    complaint and recited in the plaintiff Cab Companies' application.

27          San Jose's opposition was accompanied by three declarations which lay out much of the factual

28  background of this dispute.  Where the Cab Companies have not introduced evidence (as opposed to
    pleadings), the court relies on San Jose's declarations.

**United States District Court**
For the Northern District of California

1   passenger arranges to be picked up or dropped off in advance. *Id.* An airport access permit is not

2   required for reservation service; airport access permits are only required for making "on-demand"

3   pickups. *Id.*

4       The Model divides 300 airport access permits between taxicab companies (who received 105

5   permits) and individual drivers (who received 195 permits). *Id.* ¶ 6. Individual drivers with airport

6   access permits are free to associate with any taxicab company. *Id.* This case concerns only the

7   permits issued to companies.

8       The 105 company permits were initially split among fourteen taxicab companies, each

9   receiving a minimum of seven permits. *Id.* ¶ 7. This initial distribution of permits was to last for

10  two years. *Id.* ¶ 8. After two years, the City intended to evaluate whether the Model improved taxi

11  service and to update allocations. *Id.*

12      At the end of the two-year initial period, the airport access permits were to be reallocated to

13  taxicab companies meeting a variety of requirements. *Id.* ¶ 10. Taxicab companies had to conduct

14  at least 25% of their airport trips with alternative fuel vehicles and maintain a minimum fleet of 15

15  vehicles and 15 drivers to ensure "24/7" dispatch service. *Id.* This minimum fleet size for airport

16  access permits is greater than the five vehicles necessary for a company to be a licensed taxicab

17  company in the City. *See id.* ¶ 33. To be clear, a taxicab company had to meet these requirements

18  to be eligible to receive airport access permits in the planned reallocation. *Id.* ¶ 11.

19      The reallocation of permits was to based on the number of "off-Airport" trips completed by

20  the taxicab companies. *Id.* ¶¶ 9, 11. The City hoped that the incentive of receiving airport access

21  permits would motivate taxicab companies to improve taxi service in downtown San Jose and other

22  neighborhoods. *Id.* ¶ 13; *see also id.*, Ex. A at 38 (recommending tying reallocation of airport

23  access permits to off-Airport trips to provide an incentive to taxicab companies to increase dispatch

24  coverage in the City). As the reallocation of airport access permits has resulted in the present

25  dispute, it requires more detailed examination.

26      **C.    Counting "Off-Airport" Trips**

27      The taxicab company operating contract required taxicab companies with airport access

28  permits to provide monthly activity reports. *See id.*, Ex. E § 7b. The monthly activity report had to

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

contain information regarding "the number of passenger pickups made by Contractor's Airport permitted drivers at locations in Santa Clara County, other than the airport during the previous month." *Id.* The information was to be provided by permit number and the monthly activity report's form and details were subject to requirements developed by "the Director." *Id.*

Pamela McAnally is an analyst in San Jose's Department of Transportation. Docket No. 18, Declaration of Pamela McAnally ¶ 1 (hereinafter "McAnally Decl."). She attended a September 23, 2005 meeting of the Taxicab Advisory Team that described the off-Airport trip reporting requirements to the taxicab companies in attendance. *Id.* ¶ 7. She also led two mandatory meetings for taxicab companies on September 28 and 30 that described the reporting methodology. *Id.* On October 4, 2005, she sent a letter to all licensed taxicab companies following up on the meetings and detailing "specific instructions" for off-Airport trip reporting. *Id.* ¶ 2. The letter distributed a sample spreadsheet showing how the City wished the taxicab companies to submit their trip data. *Id.*, Ex. A. The spreadsheet included columns for date, permit number, whether the trip involved airport access, whether the trip was a dispatch or flagged trip, the time of the trip, where the trip originated (using numerical codes assigned to various San Jose neighborhoods), and where the trip ended. *Id.*, Ex. A. The methodology for reporting off-Airport trips and their requirements did not change between September 2005 and the reallocation. Lockhart Decl., ¶ 17.

The plaintiff Cab Companies' four owners have all submitted declarations. *See* Docket No. 8, entries 1-4 (declarations of Mekonnen Woldegebrial, Lakbor Singh Pooni, Jasrah Bhatia, and Kulwant Lasher). Each declaration contains identical averments that:

> After I signed the 2005 contract, there was great confusion on how or what to report how or what to report [sic] as "off-Airport" trip. [sic] Initially, City representatives informed me that only trips for cabs and drivers working at the Airport would be counted. Without any formal notice from the City, I then learned that the City would count all off-Airport trips be [sic] every cab of the company toward the reallocation in 2007. I was also told by city representatives that "flagged" [trips; footnote omitted] would not be counted by the City. In addition, it was unclear if a cab company was to report only trips, which originated in the City of San Jose, the County of Santa Clara, or elsewhere.

Woldegebrial Decl., ¶ 9; Pooni Decl., ¶ 13; Bhatia Decl., ¶ 13; Lasher Decl., ¶ 13. Each plaintiff Cab Company owner avers that he later understood that "other taxicab companies [were] reporting information for all trips, including company wide off-Airport trips, flag trips, or trips occurring

United States District Court
For the Northern District of California

1   outside San Jose City limits and the County of Santa Clara." Woldegebrial Decl., ¶ 10; Pooni Decl.,

2   ¶ 14; Bhatia Decl., ¶ 14; Lasher Decl., ¶ 16. Each owner additionally declares that had he been

3   allowed[2] to submit such information, he would have submitted more information and demonstrated a

4   higher volume of off-Airport trips for the purpose of the reallocation. Woldegebrial Decl., ¶ 11;

5   Pooni Decl., ¶ 15; Bhatia Decl., ¶ 15; Lasher Decl., ¶ 17.

6           Upon receiving the monthly activity reports, the San Jose Department of Transportation

7   audited the taxicab companies' data by random sampling. McAnally Decl. ¶ 4. Where the data

8   seemed questionable, for example, where a company reported trips by the same driver on opposite

9   sides of town in very close time windows, the City attempted to verify the data against driver and

10  outreach trip logs. *Id.*

11  **D.    Calculating the Reallocation of Permits**

12          Having used the methods described above, the City staff presented plans regarding the

13  reallocation of airport access permits based on each company's number of off-Airport trips to the

14  taxicab companies on September 28, 2007. Lockhart Decl., ¶ 14 & Ex. B, 6. "Many small taxicab

15  companies voiced their objections to the methodology stating it favored larger established taxicab

16  companies." *Id.*, Ex. B at 6. The City staff maintained that the established methodology for

17  counting off-Airport trips was proper, in part because the method was "previously established and

18  well communicated." *Id.*

19          Two events influenced the reallocation decision. Prior to the reallocation, two companies'

20  data – plaintiff Net Cab and non-plaintiff Golden Star – appeared suspect. McAnally Decl., ¶ 5.

21  Instead of disqualifying the two companies from participating in the reallocation, the City estimated

22  the companies could only verify 50% of their trips, and reduced both companies' off-Airport trip

23  numbers accordingly. *Id.* Furthermore, three companies – plaintiffs Alpha Cab, National Cab, and

24  _____

25          [2] Each declaration states that each plaintiff Cab Company owner would have submitted a higher
    number of trips "had he been allowed." *See* Woldegebrial Decl., ¶ 11; Pooni Decl., ¶ 15; Bhatia Decl.,
26  ¶ 15; Lasher Decl., ¶ 17. The declarations contain no sworn statement that the City prevented the Cab
    Companies from amending their data. The Cab Companies' application, however, states that "[w]hen
27  Plaintiff taxicab companies attempted to submit similar data, the City refused to consider this
    information." App. at 16. This statement is not supported by the Cab Companies' owners' declarations.
28  Accordingly, there is no evidence in the record that the City intentionally prevented Cab Companies
    from correctly reporting their trip data.

ORDER DENYING CAB COMPANIES' APPLICATION FOR A TEMPORARY RESTRAINING ORDER—C-07-06171 RMW
TSF                                              5

United States District Court
For the Northern District of California

1  Net Cab – did not meet the fifteen vehicle fleet minimum to qualify for reallocation.  Lockhart Decl.,

2  ¶ 27.  National Cab also failed to meet the alternative energy requirement.  *Id.*  The City therefore

3  excluded Alpha Cab, National Cab, and Net Cab from receiving any airport access permits in the

4  reallocation.  *Id.*

5        The San Jose City Council approved reallocation of airport access permits on November 20,

6  2007.  Lockhart Decl., ¶ 19.  The city council modified the reallocation by requiring that only trips

7  originating in San Jose be counted as "off-Airport" trips.  *Id.*, ¶ 21.  This reduced every taxicab

8  companies' number of trips.  *Id.*  The city council also provided for a minimum number of four

9  airport access permits for each qualifying company, regardless of its share of off-Airport trips.  *Id.* ¶

10 24 & Ex. G, at 19 (city council minutes).  Taking into account the exclusion of plaintiffs Alpha Cab,

11 National Cab and Net Cab,[3] the reduction of Golden Star's reported trips by 50%, and the exclusion

12 of all trips originating outside of San Jose, the City produced the following reallocation of airport

13 access permits:

| Company | San Jose trips | % of total | Minimum permits | % of 462,398 trips for companies earning over 4 permits | Additional permits | Total permits |
|---|---|---|---|---|---|---|
| California | 19,167 | 3.7% | 4 | | 0 | 4 |
| City | 7,998 | 1.5% | 4 | | 0 | 4 |
| Executive | 11,209 | 2.1% | 4 | | 0 | 4 |
| Golden Star | 36,938 | 7.1% | 4 | 7.9% | 5 | 9 |
| Milpitas | 7,894 | 1.5% | 4 | | 0 | 4 |
| Rainbow | 58,269 | 11.1% | 4 | 12.6% | 8 | 12 |
| SV Checker | 74,014 | 14.1% | 4 | 16.0% | 10 | 14 |
| United | 32,154 | 6.1% | 4 | 6.9% | 5 | 9 |
| USA Express | 14,922 | 2.8% | 4 | | 0 | 4 |
| Yellow | 261,023 | 49.9% | 4 | 56.4% | 37 | 41 |

---

[3]  The City also excluded All Star Cab and American Cab for not meeting the minimum eligibility requirements.  All Star and American are not parties to this action.

| *Totals* | 523,588 | | 40 | | 65 | 105 |
|---|---|---|---|---|---|---|

*Id.* ¶ 24 & Ex. H.[4]  By virtue of the four-permit minimum, plaintiff Cab Companies received more airport access permits than they would have based on percentage of off-Airport trips alone.  *Id.* ¶ 31.

It is relevant to note that plaintiff Cab Companies are not the only taxicab companies owned by members of protected classes.  Golden Star is a cooperative owned by drivers of Indian and African descent.  Lockhart Decl., ¶ 26.  United is owned by a woman.  *Id.*  Executive and Rainbow are both owned by a Russian immigrant.  *Id.*

**E.    Evidence Suggesting the Gravity of Harm**

Some of the plaintiff Cab Companies will receive four airport access permits under the January 1 reallocation (Alpha, National and Net will receive none).  The Cab Companies' owners declare that they cannot maintain a fleet of fifteen cabs with only four airport access permits.  Woldegebrial Decl., ¶ 13; Pooni Decl., ¶ 19; Bhatia Decl., ¶ 19; Lasher Decl., ¶ 21.  Thirty-seven declarations of cab drivers indicate that many cab drivers associated with the Cab Companies will quit if the Cab Companies receive four (or zero) airport access permits.  *See generally* Docket Nos. 8-9 (driver declarations).  If these drivers quit, the Cab Companies currently qualifying for four permits will no longer meet the fleet minimum of fifteen drivers and have their allocation reduced to zero permits.  Woldegebrial Decl., ¶ 13; Pooni Decl., ¶ 19; Bhatia Decl., ¶ 19; Lasher Decl., ¶ 21.  The Cab Company owners state that this will force them to close operations.  *Id.*

On the other hand, Golden Star currently has no airport access permits.  Lockhart Decl., ¶ 39.  Since 2005, Golden Star has successfully operated in San Jose without airport access permits, receiving enough business that it has qualified for nine airport access permits in the reallocation.  *Id.*  Additionally, each of plaintiff Cab Companies operated prior to September 2005.  Lockhart Decl., ¶ 38.  Prior to September 2005, no taxicab company other than Yellow and Checker could pick up at the airport.  *Id.*  Despite this inability to service the airport, plaintiff Cab Companies apparently were able to operate.  *Id.*  Finally, evidence suggests that airport on-demand trips account for 42.5% of all

----

[4]  The above table is a reproduction of the table emailed to the taxicab companies on December 12, 2007 by the City, except the format of the percentages has been changed.

1   San Jose taxicab trips.  *Id.*  Accordingly, a taxicab company lacking airport access permits would

2   still be able to compete for 57.5% of taxicab trips.

3                                         **II.  ANALYSIS**

4        **A.     Legal Standard Governing Temporary Restraining Orders**

5        "Where the opposing party actually receives notice of the application for a restraining order,

6   the procedure that is followed does not differ functionally from that on an application for a

7   preliminary injunction and the proceeding is not subject to any special requirements."  Wright,

8   Miller & Kane, Federal Practice and Procedure § 2951, at 254 & n. 7 (2d ed. 1995).  In this case,

9   San Jose has received notice and opposed the motion for a temporary restraining order.

10  Accordingly, a temporary restraining order may issue if the conditions for a preliminary injunction

11  are met.  Namely, the Cab Companies must demonstrate "either (1) a combination of probable

12  success on the merits and the possibility of irreparable injury or (2) that serious questions are raised

13  and the balance of hardships tips sharply in [their] favor."  *Los Angeles Memorial Coliseum Comm'n*

14  *v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).  These are not separate tests, but

15  extreme points along a spectrum of two variables: likelihood of success and injury.  *Id.*  At one

16  extreme, a plaintiff must make a strong showing of likely success and a lesser showing of harm.  At

17  the other, a plaintiff must make a showing of possible success and a strong showing of imminent

18  harm.  The outer limit of a showing of "possible success" has been described as a "fair chance of

19  success on the merits."  *See Glider v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991).

20       As discussed below, the court does not find on the evidence presented that plaintiff Cab

21  Companies have a "fair chance of success on the merits."  Furthermore, the court does not find that

22  the balance of hardships "tips sharply in [the Cab Companies'] favor."

23       **B.     Likelihood of Success on the Merits**

24       The Cab Companies argue that they are likely to succeed on the merits of their equal

25  protection claim and their substantive due process claim.[5]  Each is addressed in turn below.

26

27          [5]  The court notes that the Cab Companies' complaint sets forth seven claims for relief.  The
28  application for a temporary restraining order addresses only two.  *See* App. at 13 ("Plaintiffs have
    asserted two causes of action upon which they are likely to succeed.").

ORDER DENYING CAB COMPANIES' APPLICATION FOR A TEMPORARY RESTRAINING ORDER—C-07-06171 RMW
TSF                                                    8

**United States District Court**
For the Northern District of California

1

## 1.    The Equal Protection Claim

2     The Cab Companies concede that "the regulation at issue does not blatantly discriminate on

3  the basis of race on its face."  App. at 14.  A racially-neutral[6] statute may, however, be applied in

4  violation of the equal protection clause if the law's application purposefully discriminates on the

5  basis of race.  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  An equal protection violation must

6  "reflect[] a racially discriminatory purpose."  *Id.*; *see also Vieth v. Jubelirer*, 541 U.S. 267, 333

7  (2004) (Stevens, J., dissenting) ("In evaluating a claim that a governmental decision violates the

8  Equal Protection Clause, we have long required a showing of discriminatory purpose.").  A racially

9  disproportionate impact does not alone reflect such a purpose and does not violate the equal

10  protection clause.  *Id.*

11     A racially disproportionate impact is relevant to the inquiry, however.  *Arlington Heights v.*

12  *Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-67 (1977).  A court must make a

13  "sensitive inquiry" into whatever "circumstantial and direct evidence of intent as may be available."

14  *Id.* at 266.  The non-exclusive factors a court may consider in addition to disparate impact in finding

15  a discriminatory purpose behind a regulation include: the historical background, particularly if it

16  reveals past invidious discrimination; the specific sequence of events leading up to the challenged

17  decision; departures from normal procedures; and substantively unusual outcomes.  *See id.* at 267.

18     The evidence submitted by the plaintiff Cab Companies with their application does not

19  demonstrate that there is a "fair chance" the Cab Companies will succeed on their claim.  The only

20  relevant evidence submitted is the numerical impact the permit reallocation will have on minority

21  owned taxicab companies, namely, that the plaintiff Cab Companies will have their permits reduced

22  to four, and possibly zero.  Militating against this disparate impact, however, is the increase in

23  permits being allocated to Golden Star, a minority-owned cooperative.  Nevertheless, as *Washington*

24  and *Arlington Heights* make clear, a disparate impact alone cannot support a finding of an equal

25

26     [6]  Because the city regulations at issue do not facially discriminate on the basis of race, the Cab

27  Companies' reliance on strict scrutiny case law is misplaced.  Strict scrutiny is reserved for laws that
facially discriminate on the basis of race.  *See, e.g., Parents Involved in Community Schools v. Seattle*

28  *School Dist. No. 1*, __ U.S. __, 127 S.Ct. 2738, 2751-52 (2007) (opinion of Roberts, C.J.).

ORDER DENYING CAB COMPANIES' APPLICATION FOR A TEMPORARY RESTRAINING ORDER—C-07-06171 RMW
TSF                                                                       9

1    protection violation.

2        The plaintiff Cab Companies set forth a variety of arguments to augment the "disparate

3    impact" that they argue demonstrate a discriminatory purpose on the part of the City.  First, the Cab

4    Companies point to the City's refusal to consider additional off-Airport trip information.  As

5    discussed previously in footnote two, the Cab Companies have provided no evidence that the City

6    ever rejected an attempt to supplement data.  Arguments in briefing and allegations in unverified

7    complaints cannot serve as the basis for injunctive relief.  Accordingly, the court does not consider

8    these allegations.[7]

9        The Cab Companies next argue that the City arbitrarily reduced Net Cab's reported trip data

10   and refused to acknowledge National Cab's data.  The Cab Companies argue that these refusals were

11   not explained, and therefore indicate a discriminatory purpose.  On the contrary, the City has

12   introduced strong evidence that it reduced Net Cab's data because it was unreliable, and that instead

13   of disqualifying Net Cab entirely, it merely penalized Net Cab's reported figures by fifty percent.

14   This reduction, however, was irrelevant because neither Net Cab nor National Cab met the fifteen

15   vehicle requirement for eligibility for permits.  Far from being "unexplained," the City's actions in

16   this respect cannot reasonably be understood to be discriminatory.  The Cab Companies contrast this

17   with the reduction in Yellow Cab and SV Checker's "unverified" trip reports.  There is no evidence

18   to support the assertion that Yellow and SV Checker had unverified trips other than the Cab

19   Companies' allegation in their complaint.  On the contrary, the documents submitted by the City

20   suggest that only Golden Star and Net Cab provided suspect data.

21       The plaintiff Cab Companies also argue that the fifteen vehicle requirement is

22   "discriminatory as applied" because it is intended to drive minority companies out of business.

23   There is no evidence to suggest such intent.  On the contrary, the City has submitted evidence that

24   the fifteen vehicle requirement is necessary to provide effective dispatch service.  The City has

25   rationally decided to reward airport access permits to taxicab companies that develop effective

26

27   _____

        [7] To be clear, such evidence could be highly relevant to proving a discriminatory purpose.  By
28   this opinion, the court only points out that the Cab Companies have not sufficiently supported these
     allegations with evidence.

United States District Court
For the Northern District of California

1  dispatch service.  Moreover, the fifteen vehicle requirement does not appear to have adversely

2  affected Golden Star, Executive, Rainbow, or United, the non-plaintiff taxicab companies that would

3  arguably be drawn in by a purpose of driving "minority companies out of business."

4       Finally, the plaintiff Cab Companies argue that the exclusion of the plaintiff Cab Companies

5  from the award of additional airport access permits beyond four evinces discriminatory intent.  Far

6  from being "incomprehensible," the City demonstrated that had the rules been implemented as

7  planned, plaintiff Cab Companies would have received *less than* four permits.  After awarding the

8  minimum of four permits to every qualified taxicab company, the City excluded the plaintiff Cab

9  Companies (who would not have been entitled to four) in distributing the remainder.  The City did

10  not have to dole out the additional permits this way.  It could have included the plaintiff Cab

11  Companies.  Its failure may be probative of a discriminatory purpose, but only weakly so.

12      On the other hand, consideration of the *Arlington Heights* factors undermines a finding of

13  discriminatory purpose.  The record reflects no history of invidious discrimination.  Indeed, the

14  history of taxi service in San Jose before the court suggests a new opportunity for minority-owned

15  businesses once the City scrapped its airport service duopoly.  The procedures and events leading up

16  to the reallocation also do not suggest a discriminatory purpose on the part of the City.  Indeed, the

17  city council altered the implementation of the reallocation to award *more* permits to plaintiff Cab

18  Companies.

19      Weighing these considerations, the court cannot find that the Cab Companies have a "fair

20  chance of success on the merits" of their equal protection claim.

21                    **2.        The Substantive Due Process Claim**

22      The Constitution's substantive due process guarantee protects the individual from arbitrary

23  government action.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).  Substantive

24  due process is violated by "executive abuse of power . . . which shocks the conscience."  *Id.* at 846.

25  Legislative action violates substantive due process where it lacks a rational basis.  *See Lawrence v.*

26  *Texas*, 539 U.S. 558, 580 (2003).  The Cab Companies argue that the City has violated the plaintiff

27  Cab Companies' substantive due process rights in nine ways:

28      The City has acted in a number of arbitrary ways: (1) Requiring a taxicab company to own

United States District Court
For the Northern District of California

and operate fifteen (15) taxicabs in order to qualify for taxicab Airport permits while the City Ordinances only require a taxicab company to own and operate five (5) taxicabs to be considered a taxicab company for licensing purposes; (2) Only allocating a minimum of four (4) Airport permits to each taxicab company despite the fifteen (15)-cab requirement; (3) Failing to provide clear or consistent information to the taxicab companies regarding what "off-Airport" trip information was required; (4) Failing to provide oversight of what information should be reported to the City regarding "off-Airport" trips; (5) Reducing, by fifty percent (50%), the number of reported trips of Net; (6) Arbitrarily reducing Yellow's reported trip numbers by Eighty Thousand (80,000) trips; (7) By failing to actually reallocate permits based on the number of "off Airport" trips; (8) By arbitrarily excluding Plaintiff Cab Companies from consideration of additional permits without notice or justification; and (9) By creating a system where at least fifty-two percent (52%) of the Airport permits are allocated to a single non-minority concessionaire.

App. at 21-22.

As a preliminary matter, regulation of taxicabs is a traditional exercise of a city's police power. *See Cotta v. City and County of San Francisco*, 2007 WL 4395647, at *6 (Cal. Ct. App. Dec. 18, 2007). The fifteen taxicab requirement to receive airport access permits is rationally related to the City's desire to stimulate effective dispatch service across the City. The Cab Companies suggest that the fifteen cab requirement is irrational in light of the five-cab requirement for being a licensed taxicab company. The Cab Companies overlook the city's legitimate use of airport access permits to encourage effective citywide taxi dispatch service. This is not irrational.

The Cab Companies next suggest that the City acted irrationally by requiring fifteen vehicles but setting the minimum number of permits at four, presumably because the owners have declared that they cannot maintain a fifteen vehicle fleet with only four permits. Ample evidence contradicts the owners self-serving declarations that a taxicab company needs at least one permit for every two vehicles to survive. The plaintiff Cab Companies survived when they had no airport access permits, and Golden Star has flourished despite lacking airport access permits.

The Cab Companies also argue that they have a fair chance of prevailing because the City failed to provide clear information regarding "off-Airport" trip requirements. Other than the owners' professed "confusion" in their declarations, the evidence in the record suggests the requirements were not so unclear as to "shock the conscience" and violate substantive due process. The Cab Comapnies' assertion that the City failed to provide oversight also does not have a fair chance of succeeding as a substantive due process claim.

The City's reduction of Net Cab's reported trips likely does not violate substantive due

process based on the record.  The only evidence submitted by the Cab Companies is that this was "unexplained."  On the contrary, the City has introduced evidence that this reduction was imposed because Net Cab's data appeared fraudulent.  This is not conscience-shocking behavior; on the contrary, it appears reasonable.

The Cab Companies' next complain that the City's reduction of Yellow's reported claims was done by not counting its unverified trips as opposed to arbitrarily reducing its figure by 50%, as was done with Net Cab and Golden Star.  What little evidence there is regarding Yellow's reduction suggests it was done to filter out Yellow's non-San Jose trips, not because Yellow's trip data appeared suspicious.  Moreover, the Cab Companies make no explanation for how they would have standing to enforce a violation of Yellow's substantive due process rights.[8]

The Cab Companies then argue that the City acted arbitrarily by failing to "actually reallocate" on the basis of off-Airport trips and by not including plaintiff Cab Companies in the distribution of permits beyond the four-permit minimum.  The Cab Companies introduce no evidence to support the first contention, and the court can glean none from the City's submissions.  As to the second, the City's decision to allocate the minimum of four permits to all qualified companies and then allocate the excess permits to qualified companies that would have been entitled to more than four permits prior to the imposition of the minimum is not irrational given the desire to reward effective provision of dispatch service.

Finally, the Cab Companies argue that the City of San Jose violates substantive due process by creating a system that allocates 52% of the available airport access permits to a single non-minority owned company.  This argument is without merit, as indicated by the Cab Companies' failure to supply any authority for the proposition.

In short, none of the Cab Companies' nine substantive due process arguments stands a "fair chance of success on the merits" given the record before the court.

**C.     Balance of Hardships**

---

[8] San Jose has demonstrated serious questions relating to some of the plaintiff Cab Companies' standing.  San Jose does not argue, however, that all of the Cab Companies lack standing.  Because at least one of the Cab Companies has standing to bring their application, the court does not reach the issue of standing here.  Such issues may be raised later in a motion to dismiss.

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1    The plaintiff Cab Companies argue that the balance of hardships tips sharply in their favor

2    for two reasons.  First, the Cab Companies contend that they have suffered irreparable injuries from

3    the City's violation of their constitutional rights.  As discussed above, the Cab Companies have not

4    demonstrated a fair chance of demonstrating a constitutional violation.  Second, the Cab Companies

5    argue that the substantial loss of business they face from losing their airport access permits when

6    their drivers defect also justifies injunctive relief.

7    A substantial loss of business might suffice to justify a preliminary injunction.  *See Doran v.*

8    *Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  The Cab Companies' owners' averments of the doom

9    facing them belies the fact that they all apparently operated successfully before ever receiving an

10   airport access permit and that Golden Star continues to operate successfully without airport access

11   permits.  While the reallocation may work a hardship on the Cab Companies, the possibility of an

12   unwarranted injunction of the City's operations works a hardship against the City.  On the record

13   before the court, the court does not find that the hardships "tip sharply" in the Cab Companies' favor.

14   **III.  ORDER**

15   For the foregoing reasons, the Cab Companies have not demonstrated even a fair chance of

16   success on the merits, nor have they demonstrated that the equities tip sharply in their favor.

17   Accordingly, the Cab Companies' application for a temporary restraining order is DENIED.

18   If the Cab Companies wish to move for a preliminary injunction, they may notice a motion

19   for one pursuant to the Civil Local Rules.  *See* Civil L.R. 6.2, 6.3 and 7.2.  If such a motion is filed,

20   the plaintiff Cab Companies should offer any evidence they have showing any arbitrary refusal to

21   accept data, any historical discriminatory animus, any facts showing that a fleet of fifteen cabs

22   cannot be sustained with only four airport access permits, and any other actions by the City evincing

23   a discriminatory purpose.

24

25   DATED:        12/31/2007

26                                              RONALD M. WHYTE
                                                United States District Judge

27

28

1    **Notice of this document has been electronically sent to:**

2    **Counsel for Plaintiffs:**

3    Patrick Toole                ptoole@sjhattorneys.com

4    **Counsel for Defendants:**

5    Daisy M. Nishigaya           Daisy.Nishigaya@sanjoseca.gov
     Richard D. North             cao.main@sanjoseca.gov
6

7    Counsel are responsible for distributing copies of this document to co-counsel that have not
     registered for e-filing under the court's CM/ECF program.
8

9

     **Dated:**     _____**12/31/07**_____        _____
10                                                          **TSF**
                                                            **Chambers of Judge Whyte**
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

ORDER DENYING CAB COMPANIES' APPLICATION FOR A TEMPORARY RESTRAINING ORDER—C-07-06171 RMW
TSF                                                                    15